Filing # 12585871 Electronically Filed 04/16/2014 03:07:26 PM

IN THE CIRCUIT COURT OF THE THIRTEETH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

PATRICIA DELORENZO, as            CASE NO.:
Personal Representative for the Estate
of MARY FRANCES DELORENZO KNIGHT,

           Plaintiff,

v.


HP ENTERPRISE
SERVICES, LLC (HPES) a Texas Limited Liability Corporation, and
THE EXPERTS, INC., a Florida Corporation, and UNITED STATES
OF AMERICA and JOHN DOES/JANE DOES 1-4

           Defendants.

_____/

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

PLAINTIFF, Patricia Delorenzo, as Personal Representative for the Estate of

Mary Frances Delorenzo Knight, by undersigned counsel sues the Defendants HP

ENTERPRISE SERVICES, LLC (HPES), a Texas Limited Liability Corporation

and THE EXPERTS, INC., a Florida Corporation, UNITED STATES OF

AMERICA, and JOHN DOES/JANE DOES 1-4 and states:

## NATURE OF THE ACTION

1.     This is an action for damages arising from the wrongful death of

deceased Mary Frances Delorenzo Knight whose wrongful death on September 16,

Page 1 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

2013, at the Washington Naval Yard was proximately caused by the negligence of Defendants and each of them.

2.    The claims for relief arise under (A) The United States Constitution (Article III §2 And Article V guaranteeing the right to life and liberty); (B) The Laws of the United States including Federal statutes Other Than the Federal Tort Claims Act (FTCA), Presidential Executive Orders, acts and regulations of Federal administrative agencies not specifically exempted by Congress from judicial review, and common-law of the United States; (C) Federal Tort Claims Act (FTCA) (title 28 United States code §2671 and §1346 (b) (1); (D) The District Of Columbia Wrongful Death Act (DC code §16-2701 (2013).

3.    The Laws of the United States (other than the FTCA) under which the claims for relief arise include the following which were intended to protect a special class of persons including the deceased Mary Frances Delorenzo Knight who was present on Federal facilities when shot by a person who was negligently permitted to possess a unlawful firearm.

(A) National Industrial Safety Program (NISP) established by presidential Executive Order 12829 January 8, 1993 creating Federal policy to safeguard classified information that may be released to contractors of United States agencies. (Plaintiff's Exhibit 55)

Page 2 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(B) National Industrial Safety Program Operating Manual (NISPOM) established by Department of Defense directive DoD 5220.22-M as amended on March 28, 2013 establishing specific requirements, restrictions and other safeguards as considered necessary to protect classified information that may be disclosed to contractors of United States agencies. (Plaintiff's Exhibits 52, 54) NISPOM requires contractors to report adverse information coming to their attention concerning any of their cleared employees. (Plaintiff's Exhibit 52 at paragraph 1-302 (a))

(C) Title 18 United States Code §930 which prohibits and criminalizes possession of firearms on any and all Federal facilities including military installations. This statute is intended to protect a special class of persons on Federal facilities by requiring a reasonable search for firearms before granting access to Federal facilities.

(D) Title 40 United States Code §1315 which imposes a duty on the Department Secretary of Homeland Security (DHS) to protect Federal facilities and the persons on the property from terrorists and criminal threats. The statute is intended to protect a special class of persons (including the deceased Mary Frances Delorenzo Knight) who was present on Federal facilities. The DHS discharges its duty in part by mandating all Federal agencies and Federal facilities operators to

Page 3 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

implement countermeasures including reasonable searches to mitigate risks of workplace violence on Federal facilities in full compliance with title 18 United States code §930.

(E) Navy Policy Instruction OPNAVINST 5530.14E (chapter 3.0306, page 3-5) (January 28, 2009) (Plaintiff's Exhibit 28) specifically prohibiting the non-preapproved possession of firearms on a Navy installation and specifically requiring sentries at entry control points (ECP) to perform inspections of packages, vehicles and individuals" and to "deny access to persons who are not authorized (access) or represent a criminal threat." (Id. Chapter 2.0210 (a) (2) at page 2-6) Further, Installation Commanding Officers (ICO's) "shall" ensure that policy dealing with entry control point (ECP) access include "special precautions" which "shall be watchful for the unauthorized introduction" of "weapons" to the installation (id. at page 2-6)

(F) Title 18 United States Code §1382 providing that it is a criminal violation for any person to enter a Navy Yard or installation for any purpose prohibited by law or lawful regulation. Any person possessing an unauthorized firearm and seeking entrance to a Navy installation is committing a criminal offense.

Page 4 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(G) Title 10 United States code §809 (e) providing that any person who commits a criminal offense on a military installation may be apprehended and taken into custody until the proper authority may be notified.

(H) Title 41 CFR 102-81.10 mandates Federal agencies on Federal property under the charge and control of (General Services Administration) GSA that have been delegated security authority from DHS must provide for the security and protection of the real estate they occupy including the protection of persons within the property.

(I) Title 41 CFR 102-74.440 establishes Federal policy that the possession of firearms or other dangerous weapons in Federal facilities and Federal court facilities by unauthorized persons is a criminal offense.

(J) Title 41 CFR 102-74.370 authorizes Federal agencies to conduct a full search of a person entering a Federal facility and the vehicle the person is driving to inspect for prohibited items including firearms.

(K) DOD Security Engineering Facilities Planning Manual (UFC 4-020-01) (September 11, 2008) (Plaintiff's Exhibit 100) requires protective measures mitigation against "insider" threats to Federal facility and personnel security.

Page 5 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(L) Department of Homeland Security standards (DMS) constitute baseline standards for mitigation of "insider" threats to Federal facility and personnel security. DMS standards for "personnel screening" include "NIJ 0601.02 walk-through metal detectors for use in concealed weapon and contraband detection" (Plaintiff's Exhibit 106) and "NIJ 0602.02 "hand-held metal detectors for use in concealed weapon and contraband detection". (Plaintiff's Exhibit 107)

(M) District of Columbia DC code 22-4514 states "no person shall within the District of Columbia possess any machine gun, sawn off shotgun, or any instrument or weapons of the kind commonly known as blackjack, slingshot, Sam club, sandbag, switchblade knife, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muscle the noise of the firing of any firearms."

(N) Guidelines, Policies, Rules and Instructions of the Director, Department of the Navy (DON) Central Adjudication Facility (DON CAF) requiring military and civilian personnel and cleared contractor employees to continuously report known security incidents/adverse information involving persons holding security clearances to the DON Central Adjudicative Facility (CAF) and/or the Defense Industrial Security Clearance Office (DISCO) via the Joint Personnel Adjudication System (JPAS) pursuant to the Department of the Navy Personnel Security

Page 6 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

Program, SECNAV M-5510.30 (June 2006) (Plaintiff's Exhibit 43 at Chapter 7-2 (CAF) and appendix E 3-1 (JPAS) and Chapter 10 "Continuous Evaluation" at pp. 10 1-5 and Chapter 10A "Continuous Evaluation Check Sheet" at pp. 10A 1-3).

(O) Guidelines, Policies, Rules and Instructions to date of the Secretary of the Navy (SECNAV) issued to implement the Personnel Security Policy in compliance with Presidential Directives including Executive Order (EO) 12968 "Access to Classified Information"(Plaintiff's Exhibit 89) incorporating PCP policies and procedures established by other executive branch agencies. (Plaintiff's Exhibit 43 at page 2)

(P) Guidelines, Policies, Rules and Instructions to Date Of the Secretary of the Navy (SECNAV) issued to implement specific policy set forth in SECNAVINST 5510.30B, "Department of Navy (DON) Personnel Security Program (PSP) Instruction" applicable to all DON commands and to all DON military and civilian personnel. (Plaintiff's Exhibit 43 at page 2)

(Q) Guidelines, Policies (DON PSP Policy), Rules and Instructions to date issued by the Department of the Navy Chief of Naval Operations, Assistant for Naval Investigative Matters and Security (N09N) required by SECNAV M-5510.30 (June 2006). (Plaintiff's Exhibit 43)

Page 7 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 7

(R) Guidelines, Policies, Rules and Instructions to date issued by The Director, Department of the DON CAF to assist DON commands regarding the continuous evaluation process in SECNAV M-5510.30 (June 2006) (Plaintiff's Exhibit 43, Chapter 10).

(S) Guidelines, Policies, Rules and Instructions to date issued by the Director, DON CAF concerning the adjudication and suspension of access to classified information of DON contractor personnel under the National Industrial Security Program (NISP) (Plaintiff's Exhibit 52, section 1-302) as required by SECNAV M-5510.30) (June 2006). (Plaintiff's Exhibit 43 at Chapter 9-18).

(T) Guidelines, Policies, Rules, Programs, and Instructions to date issued by DON Commanding Officers at the Washington Navy Yard and Newport Rhode Island Navy Yard establishing and maintaining a security education program to instruct personnel on security responsibilities and expectations mandated by SECNAV M-5510.30 (June 2006) (Plaintiff's Exhibit 165)  and SECNAVINST 5510.30B (October 6, 2006). (Plaintiff's Exhibit 166)

(U) Guidelines, Policies, Rules, Programs and Instructions to date issued by DON Commanding Officers at the Washington Navy Yard and Newport Rhode Island Navy Yard regarding their duty under SECNAV M-5510.30 (Plaintiff's Exhibit 165 at Chapter 7-2) and SECNAVINST 5510.30B. (Plaintiff's Exhibit

Page 8 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

166) including but not limited to continuously evaluate command personnel (military and civilian personnel and cleared contractor employees) with regard to their eligibility for access to classified information applying the Exhibit 10A criteria and to notify the DON CAF when potentially disqualifying information is developed.

(V) The Personnel Security Policy (PSP) established by the DON Commanding Officer at the Newport Rhode Island Navy Yard in compliance with SECNAV M-5510.30 (June 2006) (Plaintiff's Exhibit 43) and SECNAVINST 5510.30B. (Plaintiff's Exhibit 166)

(W) Guidelines, Policies, Rules, Programs and Instructions to date issued by DON Commanding Officers at the Washington Navy Yard and Newport Rhode Island Navy Yard regarding the Commanding Officers suspension of an individual's access to classified information for cause including when questionable or unfavorable information becomes available as required by SECNAV M-5510.30, Chapter 9-7. (Plaintiff's Exhibit 43)

(X) Guidelines, Policies, Rules, Programs and Instructions to Date issued by the DON Commanding Officers at the Washington Navy Yard and Newport Rhode Island Navy Yard regarding the duty of the commanding officer to report to the DON CAF via JPAS any questionable or unfavorable information made available

Page 9 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

concerning an individual who has been granted access to classified information as required by SECNAV M-5510.30 Chapters 9-1 and 9-7. (Plaintiff's Exhibit 43)

(Y) Guidelines, Policies, Rules, Programs and Instructions to date issued by the DON Commanding Officers at the Washington Navy Yard and Newport Rhode Island Navy Yard regarding the duty of the commanding officer to report to the DON CAF via JPAS any action taken by the commanding officer to suspend, reassign or limit an individual's access to classified information when questionable or unfavorable information becomes available pursuant to SECNAV M-5510.30, Chapters 9-1 and 9-7. (Plaintiff's Exhibit 43)

(Z) Guidelines, Policies, Rules, Programs and Instructions to date issued by the DON Commanding Officers at the Washington Navy Yard and the Newport Rhode Island Navy Yard regarding the duty of security personnel and/or military and civilian employees to inform the Commanding Officer any questionable or unfavorable information made available concerning an individual who is been granted access to classified information as required by SECNAV M-5510.30, Chapter 10-1. (Plaintiff's Exhibit 44)

(AA) Presidential Executive Order 13587 (October 7, 2011) (Plaintiff's Exhibit 231) establishing policy and minimum standards regarding information

Page 10 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

security, personnel security and systems security addressing both internal and external security threats and vulnerabilities on Federal facilities.

(BB) Title 10 United States code Section 367 Directing the Secretary of Defense to establish policy and promulgate guidelines to ensure civilian and military law enforcement personnel charged with security functions on military installations shall receive active shooter training as described in finding 4.3 of the document entitled "Protecting the Force: Lessons from Fort Hood." (Plaintiff's Exhibit 237) (Public Law 112-277, 112th Congress "Intelligence Authorization Act for Fiscal Year 2013).

(CC) Presidential Executive Order 12977 (October 19, 1995) directing the Interagency Security Committee (ISC) to establish policies for security and protection of Federal facilities occupied by Federal employees for non-military activities. (Plaintiff's Exhibit 87)

(DD) Presidential Executive Order 13284 (January 2003) amending Executive Order 10865 (February 20, 1960) ("Safeguarding Classified Information Within Industry") empowering the Secretary of Homeland Security to establish policy for security and protection of Federal facilities occupied by Federal employees in safeguarding classified information within industry. (Plaintiff's Exhibit 88)

Page 11 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(EE) Presidential Executive Order 12968 (August 2, 1995) establishing restrictions on access to classified information for the security and protection of Federal facilities occupied by Federal employees. (Plaintiff's Exhibit 89)

(FF) Presidential Executive Order 13467 (June 30, 2008) establishing restrictions on contractor employees and eligibility for access to classified national security information for the security and protection of Federal facilities occupied by Federal employees. (Plaintiff's Exhibit 90)

(GG) DoDi 2000.16 which requires inspections of person and vehicles for the possession of firearms prior to admitting access to Federal facilities/military installations. (Plaintiff's Exhibit 252)

## JURISDICTION AND VENUE

3.      The jurisdiction of this court to hear and render judgment in this case is vested pursuant to Article V Section 5 (b) of the Florida Constitution. Venue is properly lodged in this court against these Defendants as follows: (a) Venue is proper against the Defendant United States of America pursuant to title 28 United States code §1402 (a) (1) and (b) and §1346 (b) (1) providing that suit may be brought in the district where the appointed personal representative/executor of the Plaintiff's estate resides. The appointed personal representative/executor of the

Page 12 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

Plaintiff's estate, Patricia Delorenzo resides in Tampa, Hillsborough County, Florida; (b) Venue is proper against the Foreign Corporation Defendant HP Enterprise Services, LLC (HPES) pursuant to Section 47.051 Fla. Stats. (2013) which provides that actions against foreign corporations shall be brought in a County where such Corporation has an agent or other representative. Foreign Corporation Defendant HPES resides in Tampa, Hillsborough County Florida where it has an agent or other representative; (c) Service of Process upon HPES is proper under Sections 47.05, 48.181, 48.081, 48.193, Florida Statutes. Venue is proper against the domestic corporation THE EXPERTS, Inc. pursuant to Section 47.051 Fla. Stats. which provides that actions against domestic corporations may be brought in a County where such corporation has, or usually keeps, an office for transaction of its customary business. Under Section 47.051 Fla. Stats. (2013) domestic corporation Defendant THE EXPERTS, Inc. resides in Tampa, Hillsborough County, Florida where it has, and usually keeps an office for the transaction of its customary business. Service of Process upon THE EXPERTS is proper under Sections 48.091, 48.193, 48.081, Florida Statutes.

4.     The amount in controversy exceeds the sum of $75,000 exclusive of interest and costs. The amount alleged in the FTCA claim served on the USA is $37,500,000.00.

Page 13 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

5.    Plaintiff, Patricia Delorenzo is a resident and citizen of Tampa Hillsborough County Florida. Patricia Delorenzo is the duly qualified and lawfully appointed Executor for the estate of Mary Delorenzo Knight, deceased in the Circuit Court of Fairfax County Virginia and is authorized to bring this wrongful death action pursuant to DC code §16-2702 (2013).

## PARTIES

6.    All conditions precedent necessary to bringing this action have occurred including the exhaustion of administrative remedies. On October 8, 2013, Plaintiff Delorenzo filed an administrative claim under the FTCA, Title 28 United States Code §1346. (Plaintiff's Exhibit 247) On March 26, 2014 the United States of America denied the administrative claim. (Plaintiff's Exhibit 187)

7.    Plaintiff, Patricia Delorenzo, is the sister of Mary Frances Delorenzo Knight and the duly qualified and legally appointed executor of her estate. As executor of the estate of deceased Mary Frances Delorenzo Knight Plaintiff Patricia Delorenzo is authorized to bring this action pursuant to DC code §16-2702 (2013).

8.    The United States has long-standing, substantial continuous and systematic government contacts in Tampa, Florida. MacDill Air Force Base serves

Page 14 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

as headquarters to both Department of Defense US Central Command (USCENTCOM) (responsible for protecting US security and 25 nations) and US Special Operations Command (USSOCOM) (responsible for the global war on terrorism). MacDill Air Force Base has an annual economic impact of $5 billion and employs approximately 18,000 personnel in the Tampa Bay region. USCENTCOM was established by President Reagan in January 1983 and is comprised of components from the Army, Marine Corps, Navy, Air Force and Special Operations Command. The headquarters staff at MacDill AFB includes over 900 personnel from each of the four military services. These include U.S. Navy Central command and US Marine Central command missions. The United States Department of Veterans Affairs regional office in St. Petersburg is responsible for delivering nonmedical VA benefits and services to 1.8 million veterans and their families. The James A. Haley Veterans Hospital in Tampa established in 1972 is a teaching hospital affiliated with the University of South Florida College of Medicine with over 500 authorized beds.

9.     Deceased Mary Frances Delorenzo Knight was 51 years old at the time of her wrongful death. Her estate beneficiaries are Danielle Knight (20 years old) and Nicole Shuck (25 years old). Mary Knight was born in Germany to Green Beret Lt. Col. Thomas Knight and Lilly Delorenzo of Trieste Italy. The Delorenzo

Page 15 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

family moved to Fayetteville, North Carolina where Col. Knight taught military science at Fort Bragg. Mary Frances attended Seventy-first High School and obtained a Bachelors Degree and Masters Degree in computer science. She worked as a computer technician for the Fayetteville Police Department. Mary Frances later became an expert in cyber security after she moved to Reston, Virginia and began working for the Naval Sea Systems Command at the Washington Naval Yard. She achieved the highest possible pay grade of GS 15 in the General pay scale and taught computer science at North Virginia Community College.

10.   The United States has waived its Federal Sovereign immunity under Title 28 United States Code §1346(b) (1) in an action permitted under the Federal Tort Claims Act and actions arising under the Fifth Amendment.

11.   Defendant THE EXPERTS Inc. The Experts, is a Florida Corporation organized under Chapter 607 Florida Statute on June 29, 1998. The company headquarters is 2400 E. Commercial Blvd. Suite 420 Fort Lauderdale, Broward County, Florida. On August 4, 2009, Defendant THE EXPERTS opened a branch office in Tampa, Florida for the transaction of its customary business including its new and existing clientele in the Tampa area. James Malkovich is employed as director of operations for THE EXPERTS Tampa office. (Plaintiff's Exhibit 180) The new office is located at W. Shore International Ctr., 2202 N. West Shore Blvd.

Page 16 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 16

Suite 200 in Tampa, Florida. THE EXPERTS provided IT services in a multi-year subcontract For the United States Central Command (USCENTCOM) at MacDill Air Force Base in Tampa, Florida. On April 1, 2013 THE EXPERTS announced that it would continue to provide subcontractor IT services on a multi-year contract for United States Special Operations Command (USSOCOM) at MacDill Air Force Base in Tampa, Florida. The chief executive officer of THE EXPERTS is Thomas E. Hoshko. The company was formerly known as Expert Resources, Inc.

12.     For the past six years Defendant THE EXPERTS, INC. has been a party to subcontracts with Defendant HP Enterprise Services, LLC (HPES) providing services through 250 employees on HP contracted projects with the Department of Defense (DoD) at MacDill Air Force Base in Tampa, Florida and the United States Navy at the Washington Navy Yard and throughout the world. October 31, 2008, THE EXPERTS, INC. entered into a multi-year, multimillion dollar contract with teaming partner SAIC to perform IT services for the US Central command (USCENTCOM) located at MacDill Air Force Base Tampa, Florida. The contract services extended over five years. THE EXPERTS, INC routinely advertised and recruited job positions for this contract and employed hundreds of employees who worked at MacDill Air Force Base on this contract. On April 1, 2013, THE EXPERTS INC., entered into a multimillion dollar, multi-

Page 17 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

year subcontract to continue providing IT support services on MacDill Air Force Base in Tampa, Florida for The United States Special Operations Command (USSOCOM) headquartered at MacDill AFB. THE EXPERTS INC., have routinely advertised and recruited job positions for this contract and employed hundreds of employees who work at MacDill Air Force Base on this contract. The business activities and contacts of THE EXPERTS INC., at MacDill Air Force Base and in Tampa, Florida from and after October 31, 2008, to the present have been substantial, continuous and systematic. THE EXPERTS INC., have and maintain corporate offices in Tampa, Florida since 2008 for the purpose of administering its employees and the contract services at MacDill Air Force Base. THE EXPERTS INC., have also maintained bank accounts in Tampa, Florida and have continuous management level company employees living and working in Tampa, Florida. Furthermore, THE EXPERTS, INC., and its corporate employees have engaged in routine and systematic purchases of goods, equipment, services in Tampa, Florida totaling millions of dollars each year from 2008 to the present. From and after 2008 to the present, THE EXPERTS INC. have maintained a regular and established place of business in Tampa, Florida. (Plaintiff's Exhibit 59, 60, 63, 64, 65, 59 and 180).

Page 18 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

13.     Defendant THE EXPERTS, INC., employed Aaron Alexis for six months during 2013 next preceding his shooting of Mary Frances Delorenzo Knight, and during which time employee Alexis was subjected to two background investigations checks by THE EXPERTS, INC., (Plaintiff's Exhibit 61)

14.     Defendant HP Enterprise Services, LLC. (HPES), formerly Electronic Data Systems (EDS), pioneered the computer outsourcing business. The Company headquarters in Plano, Texas delivers such services as cloud computing, systems integration, network and systems operations, data center management, applications development, and outsourcing. It is one of the largest Federal government contractors, but is also serves commercial customers in a wide range of industries, including energy, entertainment, health care, manufacturing, and transportation. Top clients have included the US Navy and former parent General Motors. HP Enterprise Systems (HPES) is a subsidiary of HP and operates as part of the HP Enterprises Business (HPES) segment. HP  Enterprise Services (HPES) is a corporation organized and existing pursuant to the laws of Texas with Corporate Headquarters at 5400 Legacy Drive (H1 4A 66) Plano, Texas 75024. At all times material hereto, Defendant HPES had a contract with the Department of Defense (DoD) to provide services including the Washington Navy Yard. Further, for six years preceding the shooting of Mary Frances Delorenzo Knight, Defendant HPES had a subcontract with Defendant THE EXPERTS, INC., to provide services to the

Page 19 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

Department of Defense (DoD) including the Washington Navy Yard where deceased Mary Frances Delorenzo Knight also worked. On February 4, 2011, Defendant HPES entered into a $68 million contract to provide IT services to USSOCOM primarily at MacDill Air Force Base in Tampa, Florida. The contract period for performance is 4 years, (Plaintiff's Exhibit 59 and 60). From and after February 2011, Defendant HPES has routinely advertised and recruited job positions for this contract and employed hundreds of employees who work on this contract at MacDill Air Force Base in Tampa, Florida. HPES has engaged in substantial continuous and systematic business activities and contacts at MacDill Air Force Base and in Tampa, Florida since February 2011 to the present time. HPES has maintained corporate offices in Tampa, Florida for the purpose of administering its employees and the contract services at MacDill Air Force Base. HPES has maintained bank accounts in Tampa Florida and have continuous management level company employees living and working in Tampa Florida. Furthermore, HPES and its corporate employees have engaged in routine and systematic purchases of goods, equipment, services in Tampa, Florida totaling millions of dollars each year from 2011 to the present. From and after 2011 to the present, HPES has maintained a regular and established place of business in Tampa, Florida for the purpose of administering the contract at MacDill Air Force Base. HPES has engaged in substantial continuous and systematic business

Page 20 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 20

activities and contacts at MacDill Air Force Base and in Tampa Florida. Since February 2011 to and including the present time, HPES has maintained corporate offices at 2909 W. Bay To Bay Blvd., #209, Tampa, FL 33629 with agents and representatives for the purpose of administering its employees and contract services at MacDill Air Force Base. HPES is registered to do business at that location with the Hillsborough County Tax Collector's Office. (Plaintiff's Exhibit 182)

## FEDERAL SECURITY LAWS AT FEDERAL FACILITIES

15.    There are two specific categories of Federal laws intended and designed to protect Federal facilities and members of a specially legally protected class of persons located within those facilities (including Federal employees and service personnel) from both internal (insider) and external security threats and vulnerabilities including: (A) The Federal Personnel Security Clearance Process; and (B) The Risk Management Process for Federal Facilities. (Plaintiff's Exhibits 2,3,4,5,6,7,8,9, 12, 16, 22, 24, 29, 40, 42, 45, 49, 95, 96, 112, 113, 114, 183)

16.    The Federal personnel security clearance process is governed primarily by Presidential Executive Order 12968 (August 2, 1995) (Plaintiff's Exhibit 89), Presidential Executive Order 13467 (June 30, 2008) (Plaintiff's Exhibit 90) and implementing Federal Department of Defense regulations

Page 21 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

including DoD regulation 5200.2R "DoD Personnel Security Program" (January 1987) as amended (Plaintiff's Exhibit 46) and DoD Directive 5200.2 "DoD Personnel Security Program (April 1999) as amended. (Plaintiff's Exhibit 168).

17.     Security Clearances (Confidential, Secret and Top-Secret) provide access to classified government information. The Department of Defense has about 2.5 million non-intelligence agency, military, civilian, and contractor personnel who are eligible for access to classified information. (Plaintiff's Exhibit 183)

18.   Security Clearances are issued following a "personnel security investigation" (PSI) required to determine eligibility. The results of the PSI investigation are then forwarded to the DoD Consolidated Adjudications Facility (CAF) for adjudication. An adjudicator will review the PSI and make a clearance determination based on adjudicative guidelines. A "periodic reinvestigation" (PR) is required to be conducted for a "top secret" clearance every five years. (Plaintiff's Exhibit 183)

19.     The Department of the Navy (DoN) continued its own agency operated DoN CAF until October 1, 2013. Effective October 1, 2013, the Department of the Navy implemented the consolidated DoD CAF Navy Division Case Adjudication Tracking System (CATS).

Page 22 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

20.    Other statutes, policies and regulations are intended to provide physical protection for a special class of persons present in the "gun free zones" in Federal facilities including those set forth in paragraph 3 (A-Z) and 3 (AA-FF) and paragraph 77-82 set forth herein.

## GENERAL ALLEGATIONS

21.    Deceased Mary Frances Delorenzo Knight was, at all times material hereto, a civilian employee of the United States Navy Sea Systems Command (NAVSEA) Headquartered at the Washington Naval Yard.

### WASHINGTON NAVY YARD

25.    The Washington Navy Yard is a prominent visible symbol of U.S. power and might.

26.    The Washington Naval Yard sits on 65 square acres and is the country's oldest and biggest onshore military installation dating back to its establishment in 1799. The Washington Naval Yard is the U.S. Navy's longest continuous operated Federal facility. For decades it was the nation's largest naval shipbuilding facility. Later the Navy Yard changed from shipbuilding to production of finished ship products and weapons ammunition. During World War II the Naval Yard was the largest naval ordnance manufacturing plant in the world.

Page 23 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 23

27.   The land was purchased under an act of July 23, 1798. On October 2, 1799 the property was formally transferred to the Navy. At its peak, the Navy area consisted of 188 buildings on 126 acres of land while employing nearly 25,000 people. In December 1945 the Navy Yard was renamed the U.S. Naval Gun Factory. The manufacture of ordnance was phased out in 1961. On July 1, 1964, the property was re-designated the Washington Navy Yard and the factory buildings were converted to office use.

28.   Today, the Washington Navy Yard has about 16,000 predominately civilian employees who work together with Navy and Marine Corps uniformed personnel. The Navy Historical Center is located in a complex of buildings on the property known as the Dudley Knox Center for Naval History. Public visitors are welcome to visit the Navy Museum also located on a separate part of the property.

## NON-DELEGABLE DUTY TO MAINTAIN A SAFE WORKPLACE AT THE WASHINGTON NAVAL YARD

22.   United States of America d/b/a Department of Navy and each of them had a non-delegable duty to maintain a safe workplace at the Washington Naval Yard. This duty was owed by the United States of America to all persons present at the Washington Naval Yard who have a reasonable expectation that the premises

Page 24 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 24

are secure from reasonably foreseeable risks of harm and/or death as a "gun free zone".

23.     The non-delegable duty of the United States of America included the obligation to conduct a reasonable search of any and all persons permitted to access the Washington Naval Yard to determine whether they possess a firearm or pose a reasonably foreseeable risk of harm and/or death to the safety of fellow employees on the premises before the persons are permitted access to the premises.

24.     Deceased Mary Frances Delorenzo Knight had a reasonable expectation that all other persons who accessed the Washington Naval Yard where she worked also had been screened for firearms, were vetted, were safe, and no persons would be granted access to the secured Naval Yard who posed a risk of reasonably foreseeable harm and/or death to the safety of those present on the premises.

## FORESEEABLE RISK OF VIOLENCE SPECIFICALLY AT THE WASHINGTON NAVY YARD

29.     Prior to the violence alleged to have occurred in the case at bar, the Washington Navy Yard has been the site of prior attacks on this prominent visible symbol of U.S. power and might.

Page 25 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

30.    In 1983, a Puerto Rican separatist group known as the "Armed Resistance Unit" set off a bomb in a computer center which exploded at the Washington Navy Yard. The same group planted a bomb which exploded on the second floor of the U.S. Capitol Building's north wing Near the Senate Chamber on November 7, 1983. The bomb blast caused over $250,000 in damages.

31.    A subsequent attack on the Washington Navy Yard occurred in 1992.

32.    These events put the Defendants and the Washington Navy Yard on notice of the heightened foreseeable risk of violence at the Navy Yard because it is a prominent visible symbol of U.S. power and might. (Plaintiff's Exhibit 19 and 39)

## HEIGHTENED FORSEEABLE RISK OF ACTIVE SHOOTING EPISODES AT FEDERAL FACILITIES GENERALLY

33.    Gun violence in workplaces in America has become foreseeable and not unexpected. (Plaintiff's Exhibit 3, 4, 5, 6 and 7)

34.    Employers including Defendants have a duty to access risks of harm, adopt mitigation plans and follow up to insure compliance. (Plaintiff's Exhibit 2, 3, 4, 5, 6, 7, and 8)

35.    The United States Department of Homeland Security (DHS) defines an "active shooter" as "an individual actively engaged in killing or attempting to

Page 26 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

kill people in a confined and populated area." The DHS has observed that "in most cases, active shooters use firearms and there is no pattern or method to their selection of victims." There is a recognized profile of an active inside shooter. (Plaintiff's Exhibits 152, 81, 156, 119)

## HEIGHTENED FORESEEABLE RISK OF ACTIVE SHOOTERS AT NATIONAL FOOTBALL LEAGUE STADIUMS

36.    In September 2005, The Tampa (Florida) Sports Authority instituted a policy requiring brief pat-down searches of all person attending National Football League (NFL) Tampa Bay Buccaneers football games. See <u>Johnston v. Tampa Sports Authority</u>, 530 F.3d 1320 (11th Cir 2008).

37.    The NFL first implemented the pat-down search policy in February 2002 for Super Bowl XXVII and other events.

38.    The NFL pat-down search policy was expanded in August 2005 to require pat-down searches from the waist up of all patrons entering all NFL stadiums.

39.    The basis for the pat-down search of all patrons was the NFL's heightened foreseeability that NFL stadiums are attractive terrorist targets based on the publicity that would be generated by an attack at an NFL game.

Page 27 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 27

40.   The pat-down search policy of all patrons focuses on the detection of improvised explosive devices ("IEDs") and firearms which might be carried on a person entering a stadium.

41.   The pat-down search policy reasonably supports a "vital interest" of the NFL to guard against foreseeable mass casualties at NFL games from a potential terrorist attack.  See Johnston v. Tampa Sports Authority, 530 F.3d 1320, (11th Cir. 2008)

42.   In September 2011, the NFL expanded its search policy to require search of all spectators at their games from the ankles up based on the reasonably foreseeable risk of a terrorist attack by a patron in possession of a firearm or IED upon entering the stadium.

NON-MILITARY FEDERAL FACILITIES SECURITY STANDARDS

44.   The Federal government had no formally established security standards for Federally owned or leased non-military facilities prior to the April 19, 1995, bombing of the Alfred P. Murrah building in Oklahoma City.

45.   However, after that attack, President William J. Clinton directed the Department of Justice (DoJ) to assess the vulnerability of Federal facilities to violence or terrorist attacks and to develop recommendations for minimum security standards.

Page 28 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

46.    Together, the DoJ, U.S. Marshals Service (USMS) and General Services Administration (GSA) conducted assessments that more than 1200 Federal facilities and based on those evaluations established proposed minimum security standards for Federal facilities.

47.    On June 28, 1995, the Department of Justice published the results of the U.S. Marshals Service review in a Department of Justice (DoJ) report entitled "Vulnerability Assessment of Federal Facilities". The report recommended that GSA carryout recommended security improvements for existing Federal facilities and for new construction. The DoJ report also recommended that each Federal facility be enhanced with a minimum set of security standards based on specific needs. The standards focused on four primary areas: perimeter security, entry security for access of people, packages, and mail into a building, interior security for prevention of criminal and terrorist activities inside the facility and security planning.

48.    From 1995 to 1998 the GSA completed over 8,000 security upgrades on Federal facilities including: hiring more contract security guards, limiting access to entry points and facilities, restricting parking, installing closed-circuit television cameras and monitors, installing x-ray machines and magnetometers, and instituting closer scrutiny of employee and visitor identification.

Page 29 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

49.    In 1995, the Interagency Security Committee (ISC) was created under the Department of Homeland Security (DHS), whose mandate is to "develop and evaluate security standards for Federal facilities." Presidential Executive Order 12977 directs each executive agency and department to cooperate and comply with ISC policies and recommendations monitored by the secretary of homeland security. (Plaintiff's Exhibit 4)

50.    The Mission of the ISC is to safeguard U.S. civilian facilities from all hazards by developing state-of-the-art security standards in collaboration with public and private homeland security partners. ISC standards apply to all civilian Federal facilities in the United States. These include facilities that are government owned, leased or managed, to be constructed or modernized, or to be purchased, accounting for more than 399,000 Federally owned and leased assets and over 3.35 billion square feet nationwide. The ISC is responsible for the creation and implementation of standards, guidelines and best practices for the protection of approximately 1.2 million Federally owned buildings, structures, and land parcels, more than 2.5 million tenet employees, and millions of visitors each day from harm. (Plaintiff's Exhibit 6)

51.    Prior to the creation of ISC, there was no Federal body responsible for developing government wide physical security standards. These ISC minimum security standards include:

Page 30 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

1.    Physical security criteria for Federal U.S. facilities

2.    Develop a profile of the type, composition capabilities of adversaries

3.    Determine the level of security needed for a Federal facility

4.    Measure the effectiveness of physical security programs by testing and evaluation

52.    In 2004, the ISC established physical security standards for Federally leased space. The GSA acts as the lead Federal agency responsible for the two hundred and fifty million square feet of space leased domestically by the Federal government. (Plaintiff's Exhibit 5)

53.    From November 2011 to January 2013 the Federal Government Accounting Office (GAO) conducted an audit of 9000 Federal facilities occupied by Federal employees for non-military activities comprising 32 Federal agencies. Twenty nine of the 32 Federal agencies reported that they followed the ISC physical security program standards. Those agencies that "turned a blind eye" to the use of ISC minimum security standards "reflected a lack of understanding how the standards are intended to be used." (Plaintiff's Exhibit 8)

SECURITY CLEARANCE INVESTIGATION PROCEDURES

54.    Personnel security clearances allow government and industry personnel (contractors) to gain access to classified information that, through

Page 31 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

unauthorized disclosure can in some cases cause exceptionally grave damage to US national security. Federal agencies also use other processes and procedures to determine if an individual should be granted access to certain government buildings or facilities or to be employed as either a military, Federal civilian employee, or contractor for the Federal government. (Plaintiff's Exhibit 16 at page 1)

55.    Several agencies in the Executive Branch have key roles and responsibilities in the personnel security clearance process. Executive Order 13467 Designates the Director of National Intelligence (DNI) As the Security Executive Agent who is responsible for developing policies and procedures for background investigations and adjudications.

56.    Presidential Executive Order 12968 issued in 1995 makes the heads of agencies-including executive branch agencies and the military departments – responsible for establishing and maintaining an effective program to ensure that access to classified information by each employee is clearly consistent with the interests of national security.

57.    The Office of Personnel Management (OPM) through its Federal Investigative Services, conducts investigations for most of the Federal government. OPM provides the resulting investigative reports to the requesting agencies for their internal adjudicators, who use the information along with the Federal

Page 32 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

adjudicative guidelines to determine whether an applicant is eligible for a personnel security clearance. (Plaintiff's Exhibit 16 at page 3; Plaintiff's Exhibit 2 and 9)

58.    Title 5 CFR part 732 provides for a designation of sensitivity level which determines the type of background investigation required. Part 732 establishes three sensitivity levels: special sensitive, critical sensitive and noncritical sensitive.

59.    According to OPM, positions that an agency designates as special sensitive and critical sensitive require a background investigation that typically results in a top-secret clearance. Noncritical sensitive positions typically require an investigation that supports a secret or confidential clearance.

60.    Adjudicators from agencies such as the Department of Defense (DoD) and Homeland Security that request background investigations use the investigative report and consider Federal adjudicative guidelines when making clearance determinations. (Plaintiff's Exhibit 19, 23, and 24)

61.    The scope of the investigation will vary depending on the level of access required. The intensity of the investigation increases as the risk to national security increases.

62.    To help ensure the trustworthiness and reliability of personnel in positions with access to classified information, executive branch agencies rely on a

Page 33 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

personnel security clearance process that includes multiple phases: requirements determination, application, investigation, adjudication, appeals (if applicable, where the clearance has been denied) and reinvestigation (where applicable, for renewal or upgrade of an existing clearance). (Plaintiff's Exhibit 12)

63.    Since 1997, Federal agencies have followed a common set of personnel security investigative standards and adjudicative guidelines for determining whether Federal civilian workers, military personnel, and others, such as private industry personnel contracted by the government, are eligible to hold a security clearance.

64.    Individuals, including government contractors, are subject to re-investigations of suitability for security clearances at intervals that are dependent upon the level of security clearance. For example, top secret and secret clearance holders are to be re-investigated every five years and 10 years respectively. (Plaintiff's Exhibit 16 at page 2)

65.    Federal agencies also use processes and procedures other than security clearances to determine if an individual should be granted access to certain government buildings or facilities or to be employed as a Federal government contractor. The executive branch uses determinations of suitability to ensure individuals are suitable, based on character and conduct, for access to government buildings and facilities. (Plaintiff's Exhibit 16 at page 1)

Page 34 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

66.    On February 24, 2012 the Department of Defense issued its "DoD Manual on Information Security Program" (ISP) designated as DoD M 5200.01 Volume1. (Plaintiff's exhibit 44) These standards apply to all military departments, office of the chairman of the Joint Chiefs of Staff, the combatant commands, the defense agencies, and all other organizational entities within the Department of Defense. (Plaintiff's Exhibit 44 at page 2)

67. The DoD Manual on Information Security Program (ISP) includes the standards for The Special Access Program (SAP). The Special Access Program (SAP) establishes the standards for designation of classification, protection and access to classified information.

68.    Reporting of "Security incidents" involving classified information is required by the DoD Manual on Information Security Programs (ISP) (DoD M 5200.01 volume 3 enclosure 6). "Security incidents" involving US government contractor personnel are required to be reported to The Defense Security Service (DSS) which manages and administers the DOD portion Of the National Industrial Security Program to ensure the protection of classified information released or disclose to industry in connection with classified contracts. (Plaintiff's Exhibit 45 at page 23)

69.    While contractors may conduct preliminary inquiries to determine if a security incident is a violation or an infraction, there are certain inherently

Page 35 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

governmental functions and activities that cannot be outsourced to a contractor. Inherently governmental security functions include conducting investigations of, or determining fault in, security incidents involving U.S. government or other contractor personnel. (Plaintiff's Exhibit 45 at page 27)

70.    The Department of the Navy (DoN) Personnel Security Program (PSP) was adopted June 2006 in SECNAV M-5510.30. (Plaintiff's Exhibit 43)

71.    The Navy Personnel Security Program (PSP) provides that the commanding officers may grant access to classified information to any individual who has an official need to know, establish security clearance eligibility, and about whom there is no known adjudicated disqualifying information. (Plaintiff's Exhibit 43 at page 9-1)

72.    The Navy Personnel Security Program (PSP) further provides the following security incident regulations:

a.    Access to classified information will be formally terminated when it is no longer required in the performance of assigned deal when duties and/or when the individuals security clearance eligibility is denied or revoked. (Plaintiff's Exhibit 43 at page 9-2)

b.    When questionable or unfavorable information becomes available concerning an individual who has been granted access to classified information or assigned to sensitive duties, commands will report that information

Page 36 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

to the DoD Central Adjudication Facility (CAF). (Plaintiff's Exhibit 43 at page 9 –
9)

   c. Individuals are required to report to their supervisor or
appropriate security official and seek assistance for any incident or situation that
could affect their continued eligibility for access to classified information.

   d. Coworkers have an obligation to advise their supervisor or
appropriate security official when they become aware of information with potential
security clearance significance.

   e. Supervisors and managers play a critical role in assuring the
success of the continuous evaluation program. The goal is early detection of an
individual's problems.

   f. The continuous evaluation program will rely on all personnel
within the command to report questionable or unfavorable information that may be
relevant to a security clearance determination. (Plaintiff's Exhibit 43 at page 10-1)

   g. When questionable or unfavorable information becomes
available concerning an individual who has been granted access to classified
information were assigned to sensitive duties, commands shall report that
information to the DoD CAF via The Joint Personnel Adjudication System (JPAS)
JPAS is the automated system of record for documenting reports of security related
incidents.

Page 37 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

h.    Commands will report all security incident information without attempting to apply or consider any mitigating factors which may exist.

i.    A command report of suspensions of access for cause will automatically result in the suspension of the individual's clearance eligibility by the DoD CAF.

j.    In cases where unfavorable information was developed at the local command and subsequently resolved by local investigation or inquiry, commands must notify the DoD CAF. (Plaintiff's Exhibit 43 at page 10-4)

k.    The following security issues must be reported to the DoD CAF:

1.    Conduct involving questionable judgment, untrustworthiness, unreliability, or unwillingness to comply with rules and regulations.

2.    Alcohol abuse: alcohol related incidents away from work, fighting or other criminal incidents related to alcohol use (Id at G-12)

3.    Apparent mental, emotional or personality disorders: a pattern of high risk, irresponsible, aggressive, antisocial or emotionally unstable behavior; information that suggests that the individual's current behavior indicates a defect in his or her judgment or reliability (Id at G-16)

Page 38 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

4.    Criminal conduct: allegations or admissions of criminal conduct regardless of whether the person was formally charged (Id at G-17). (Plaintiff's Exhibit 43 at page 10A-1; appendix E-1)

### THE GOVERNMENT CONTRACT WITH HPES

73.    Defendant HPES is a "cleared contractor" under the National Industrial Security Program (NISP).

74.    Defendant HPES is a prime contractor performing work under the Navy's Navy-Marine Corps intranet (NMCI) Continuity of Service Contract (CoSC) awarded July 8, 2010. (Plaintiff's Exhibit 239 at page 30-31, 50)

75.    The HPES contract CoSC is overseen by the Space and Naval Warfare Systems Command (SPAWAR), Program Executive Officer for Enterprise Information Systems (PEO EIS) and Naval Enterprise Networks Program Office (PMW 205).

### CONTRACTOR DUTIES UNDER NISPOM

76.    The CoSC contract invokes the National Industrial Security Program Operating Manual (NISPOM) (DoD 5220.22M) Which defines the security requirements for cleared defense contractors. (Plaintiff's Exhibit 239)

77.    SPAWAR is responsible for the CoSC contract administration and Supports Program Executive Office for Enterprise Information Systems (PEO EIS) and Naval Enterprise Networks Program Manager Warfare (PMW 205). PEO EIS

Page 39 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

and PMW 205 are responsible for the program management of the NMCI/CoSC program. (Plaintiffs Exhibit 239 at page 66)

78.    SPAWAR had a duty to exercise effective oversight of personnel security related aspects of contractor performance for the NMCI/CoSC contract. SPAWAR was also obligated to perform quality assurance of personal security practices of HPES and its subcontractors as required by the Federal Acquisition Regulation (FAR) Part 46 (Quality Assurance). This duty included requiring adoption of a quality assurance plan for the CoSC and an internal audit program for security-related matters. The duty also required government verification that contractors had self-reported critical security information to the central adjudicative facility ( CAF).

79.    Defendant THE EXPERTS is a "cleared contractor" under NISP. HPES entered into a subcontract with THE EXPERTS on to provide services under the NMCI/CoSC contract.

80.    Under the NISPOM, the prime contractor HPES, the subcontractor THE EXPERTS, and each employee with a security clearance had individual duties to continuously evaluate employees with security clearances and for each to continuously report adverse information via The Joint Personnel Adjudicative Facility (JPAS) to the Department of Defense Central Adjudication Facility (DoD

Page 40 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

CAF) and U.S. Navy Installation Commanders as required by SECNAV M-5510-30.(Plaintiffs Exhibit 239 at page 55)

81.    SECNAV M-5510-30 (Department of the Navy (DON) Personnel Security Program (PSP) established the requirements and procedures to implement the Presidential Executive Order (EO) 12968 (Access to Classified Information); EO 10450 (Security Requirements for Government Employees); and Department of Defense (DoD 5200.2-R (DoD PSP Regulations for all DoN military members, civilian personnel and contractors. (Plaintiffs Exhibit 239 at page 55)

82.    The duties of HPES, THE EXPERTS, and each employee with a security clearance required continuous evaluation of "adverse information" that could affect the clearance holding employees continued eligibility for access to classified information and also required coworkers, supervisors, and managers to similarly report adverse information having potential security clearance significance about other clearance holders whether employee or not.

83.    "Adverse Information" under NISPOM is information that reflects on the integrity or character of an individual across 13 criteria including emotional, mental and personality disorders, criminal conduct, financial considerations, personal conduct, and alcohol consumption.

Page 41 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

84.   Under Its NISPOM duties, HPES and THE EXPERTS were required to report "adverse information" even if the employee conduct was believed to be a "one-time" event. (Plaintiffs Exhibit 239 at page 64)

85.   Also under its NISPOM duties, HPES and THE EXPERTS were required to deny any employee access to classified information and facilities upon learning of any adverse incident that called into question the trustworthiness of an employee or raised serious questions concerning the employee's state of mind including bizarre behavior until HPES could fully understand the employee's condition. (Plaintiffs Exhibit 239 at page 65)

86.   THE EXPERTS and HPES had a duty under NISPOM to continuously evaluate its employees with clearances and report adverse information to the government concerning an employee's emotional, mental or personality condition especially if the company had concerns that the employee may cause harm to others. (Plaintiffs Exhibit 239 at page 62)

87.   THE EXPERTS and HPES duty under NISPOM to report adverse information to the government via JPAS is breached if the company enters a "debrief" entry in JPAS in place of an entry containing specific details of the adverse information. A "debrief" entry simply records an administrative decision by the company that the individual no longer requires access to classified

Page 42 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

information and does not convey any details of the known adverse information. (Plaintiffs Exhibit 239 at page 37-38)

### THE SHOOTINGS WERE PREVENTABLE WITH DUE CARE BY THE DEFENDANTS

88.     Aaron Alexis would not likely have been granted access to the Washington Navy Yard on September 16, 2013, without possession of a secret security clearance (CAC).  Aaron Alexis would not likely have been granted access to the Washington Navy Yard on September 16, 2013, if the Defendant United States of America had used due care in discharging its duty to screen for the possession of illegal firearms and ammunition on a Federal facility.

89.     The DoD CAF would more likely then not have revoked/terminated shooter Aaron Alexis' (CAC) immediately upon reporting of the known "adverse circumstances" by the Defendants to the DoD CAF via JPAS prior to September 16, 2013, alleged in this Complaint.

90.     But for the negligence of all the Defendants breaching their duties to immediately report the known Alexis "adverse circumstances" to the DoD CAF via JPAS, Alexis would not likely have been permitted access to the Washington Navy Yard on September 16, 2013.

91.     But for the negligence of the of the Defendant United States of America in breaching its duty to mitigate the risk of possession of a firearm on the

Page 43 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 43

Washington Navy Yard, more likely than not shooter Alexis would not have carried a sawed off shotgun into Building 197 on September 16, 2013.

92. But for the negligence of all the Defendants breaching their duties to immediately and continuously report known "adverse circumstances" about Alexis to the DoD CAF via JPAS prior to September 16, 2013, Alexis would not likely have shot Mary Frances Delorenzo Knight to death.

93. But for the negligence of the Defendant United States of America breaching its duty to mitigate the risk of possession of a firearm and ammunition by Alexis on Washington Navy Yard, Mary Frances Delorenzo Knight would not likely have been shot to death by Alexis on September 16, 2013.

94.    But for the dereliction of duty and negligence by the Defendant United States Navy in discharging its duties according to established applicable Navy instructions:

      a.    The known risk of harm to Navy personnel and civilian employees by known active inside shooter Aaron Alexis would have been properly and promptly assessed according to established applicable Navy instructions.

      b.    The known risk of harm to Navy personnel and civilian employees by known active inside shooter Aaron Alexis would have been properly and promptly reported according to established applicable Navy instructions.

Page 44 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

c.    The known risk of harm to Navy personnel and civilian employees by known active inside shooter Aaron Alexis would have been properly and promptly mitigated according to established applicable Navy instructions.

d.    The known risk of harm to Navy personnel and civilian employees by known active inside shooter Aaron Alexis would have been eliminated by established applicable Navy instructions.

e.    The security clearance (CAC) of known active inside shooter Aaron Alexis would have likely been revoked.

f.    Known active inside shooter Aaron Alexis would not likely have been permitted access and entry to the Washington Navy Yard at all on September 16, 2013.

g.    Known active inside shooter Aaron Alexis would have likely been properly screened and searched for prohibited items (i.e. shotgun and ammunition) on Federal  facilities (Title 18 United States Code §930) prior to being permitted access and entry, if at all, to the Washington Navy Yard on September 16, 2013.

h.    Known active inside shooter Aaron Alexis would have likely been properly screened and searched for prohibited items (i.e. shotgun and ammunition) on Federal  facilities (Title 18 United States Code §930) prior to

Page 45 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

being permitted access and entry, if at all, to Building 197 at the Washington Navy Yard on September 16, 2013.

     e.    Plaintiff Mary Frances DeLorenzo Knight would not have likely been shot and killed on September 16, 2013, by known active inside shooter Aaron Alexis at the Washington Navy Yard.

## PRIOR SHOOTINGS: HEIGHTENED FOREEABLE RISK WORKPLACE VIOLENCE AT GOVERNMENT FACILITIES AND MILITARY INSTALLATIONS

95.    The following incidents constitute notice to Defendants of heightened foreseeable risk of workplace violence at government facilities and Military Installations

| | |
|---|---|
| 1993 | Topeka, Kansas Federal Courthouse bombing (1 killed) |
| 1993 | CIA Langley, Washington D.C. (2 killed) |
| 5/6/93 | USPO Dearborn, Michigan (Also Dana Point Ca.) |
| 1994 | Fairchild AFB, Spokane, Wash. (4 killed) |
| 1995 | Naval Air Systems Command in Arlington, VA (2 wounded) |
| 1995 | Fort Bragg, NC (1 killed, 18 wounded) |
| 1995 | Oklahoma City Murrah Fed Building (168 killed) |
| 1997 | USPO Miami |
| 1998 | U.S. Capitol Police at Capitol (2 killed) |
| 2006 | USPS Goleta, Ca. (7 killed) |

Page 46 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 46

| 2008 | Ft. Hood, Texas (1 killed) |
| 2009 | Army/Navy Career Center Little Rock, Ark. (1 killed) |
| 6/10/09 | U.S. Holocaust Memorial Museum Washington, D.C. (1 killed) |
| 2009 | Ft. Hood, Texas (1 killed) |
| 2009 | Ft. Hood, Texas (13 killed) |
| 10/21/09 | USMC Museum (Pentagon) (Random firings into building) |
| 2010 | Las Vegas Federal Courthouse (2 killed) |
| 2010 | IRS Office Austin, TX. (1 killed) |
| 2010 | Pentagon (2 injured) |
| 2010 | Border patrol Agent Brian Terry, Nogales, Arizona |
| 2011 | U.S. Rep. Gabrielle Giffords, Tucson, Arizona (6 killed) |
| 2011 | MacDill AFB, Tampa, Florida (1 killed) |
| 2011 | Ft. Drum, N.Y. (1 injured) |
| 12/1/11 | Winston Blount U.S. Post Office, Montgomery, Ala. |
| 2/16/12 | Glenn M. Anderson Federal Bldg. Long Beach, Ca. (ICE officer) |
| 2012 | Fort Campbell, Ky. (2 killed) |
| 2012 | Fort Carson, Colo. (2 injured) |
| 2012 | Fort Bragg, NC (2 killed) |
| 2012 | Joint Base Elmendorf-Richardson (Alaska) (1 killed) |

Page 47 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 47

| 2013 | Quantico, Va. (3 killed) |
| 2013 | Fort Knox, Ky. (1 killed) |
| 2013 | Joint Base San Antonio-Fort Sam Houston, Texas (1 injured) |
| 10/7/13 | Washington, D.C. Capitol Speeding Motorist Miriam Carey |
| 10/9/13 | Wheeling, W. Va. Federal Courthouse (Shooter dead). |

## FIREARMS PROHIBITED IN ALL FEDERAL FACILITIES

96.    The prohibited items in the February 2013 ISC standard were prohibited from entering a non-military Federal facility, whether or not the facility had a screening checkpoint. The baseline list of prohibited items includes the possession of firearms and ammunition, both of which are prohibited by Title 18 United States Code § 930. The prohibited list applies to all facility occupants, contractors and the visiting public.

97.    The possession of firearms and ammunition in all Federal  facilities, military and nonmilitary, is prohibited and criminalized by Title 18 United States Code §930.

## FIREARMS PROHIBITED ON NAVY FACILITIES

98.    On January 28, 2009, the Department of the Navy enacted Instruction OPNAVINST 5530.14E (Plaintiff's Exhibit 28) describing the Navy Security Program whose primary objective is to safeguard personnel, property, facilities and

Page 48 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

material and to enforce laws, rules, and regulations at Navy installations, activities, and operational commands.

99. The Navy Security Program requires Region Commanders to ensure that vulnerability assessments of housing areas, facilities, and/or activities at installations meet the established safety requirements. The commanders are tasked to establish a risk management process to identify, assess and control risks "arising from criminal or terrorist activities...." (Plaintiff's Exhibit 28 at page 2-4)

100. The Navy Security Program prohibits the possession of firearms and ammunition on board any Navy installation except for law enforcement officers. Section 0306 "Personal Firearm Safety, Control and Accountability" states: "unless otherwise authorized by applicable law or regulation, personal firearms shall not be possessed, used, introduced, transported, or stored on board a Navy installation... without first obtaining prior written approval of the installation commanding officer (ICO)." The term "firearms" is defined to include "shotguns". (Plaintiff's Exhibit 28 at page 3-5 a)

101. The Navy Security Program also prohibits concealed or loaded firearms including shotguns. Section 0306(g) provides: "concealed or loaded handguns: individual state licenses or permits that authorize individuals to carry concealed handguns are not recognized or valid on Navy installations. Under no circumstances will the transportation of loaded or concealed handguns, shotguns,

Page 49 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 49

rifles be permitted on Navy installations except by duly authorized law enforcement personnel or by military personnel in the performance of their official duties." (Plaintiff's Exhibit 43 and 47)

102. The Navy Security Program prohibits civilian employees from violating the "no firearm policy". Section 0306(h) provides: "violations of section 10306 of this instruction by military personnel may subject them to appropriate administrative and/or disciplinary action under the Uniform Code of Military Justice. Civilian employees may be subject to disciplinary action or administrative action under applicable civilian personnel instructions."

FIREARMS PROHIBITED ON DEPARTMENT OF DEFENSE FACILITIES

103. Possession of firearms on Department of Defense facilities is restricted to DoD personnel engaged in security, law and order or counterintelligence activities. Department of Defense Directive Number 5210.56 (April 1, 2011) states: "arming DoD personnel with firearms shall be limited and controlled.... The overriding factors in determining whether or not to arm the mission and threat. Arming DoD personnel (i.e. administrative, assessment, or inspection not regularly engaged in or directly supervising security or law enforcement activities) shall be limited to missions or threats and the immediate need to protect DoD assets or persons lives." (Plaintiff's Exhibit 24 at ¶ 4(b) at page 2)

Page 50 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

## FIREARMS PROHIBITED ON ARMY FACILITIES

104. Possession of firearms and ammunition on Army facilities are permitted only by law enforcement and security personnel and others who are specifically authorized. (Plaintiff's Exhibit 20, 22 and 25)

105. Army Regulation 190-14 (effective April 12, 1993) implements applicable portions of Department of Defense Directive 5210.56. Army policy provides: "the authorization to carry firearms will be issued only to qualified personnel when there is a reasonable expectation that life or Department of the Army (DA) assets will be jeopardized if firearms are not carried." (Plaintiff's Exhibit 25 at ¶ 1-5(a))

106. Army Regulation 190-14§2-8 prohibits carrying of concealed firearms by military or civilian personnel unless performing law enforcement or security duties.

107. Army Regulation 190-14§2-7 prohibits authorizing certain persons from carrying firearms including (1) those exhibiting unsuitable behavior; (2) those with disqualifying medical conditions, traits or behavioral characteristics; (3) those who security clearance has been revoked or denied; (4) those taking drugs or medications that may impair reaction or judgment."

Page 51 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

## FIREARMS PROHIBITED IN COURTHOUSES

108.  Federal courthouses enjoy the highest level Interagency Security Committee (ISC) security designation ("very high") because they are prominent symbols of US power and authority. As such prominent symbols of US power, DOJ data on potential threats against court personnel and individuals involved in the judicial process show a steady rise in recent years. (Plaintiff's Exhibit 34 at page 8)

109.  The United States Marshals Service (USMS) is the primary provider of court security services to the Federal judiciary and over 400 US Federal court facilities nationwide. Some security services are also provided by the Department of Homeland Security (DHS) Federal Protective Service (FPS). The two main security services provided are (1) court security officers, and (2) security systems and equipment including x-ray machines surveillance cameras, duress alarms, and judicial chambers entry control devices. (Plaintiff's Exhibit 30 at page i)

110.  The possession of guns, firearms and ammunition is absolutely prohibited on Federal facilities including Courthouses. Title 18 United States Code §930; DHS Federal Protective Service Directive Number 15.9.3.1 "Prohibited Items Program" (12-10-12). (Plaintiff's Exhibit 29, 30, 31, 32, 33 and 34)

111.  The USMS relies upon the use of security screening equipment such as metal detectors and x-ray machines at Courthouse facilities to mitigate the risk

Page 52 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

of harm by preventing the introduction of weapons, ammunition, explosives and other prohibited items. (Plaintiff's Exhibit 30 at pages iv and 6)

112.   The escalation of improved judicial security has been prompted by events such as the following:

a.   (2005) Family Members of a Federal Judge Murdered in Chicago.

b.   (2005) A Judge, Court Reporter and Sheriffs Deputy killed at the Fulton County Courthouse in Atlanta, Georgia

c.   (2006) A Nevada State Judge in Reno shot in his office by sniper.

d.   (2009) Plan to bomb the Paul Findley Federal Courthouse in Springfield, Illinois thwarted.

e.   (2010) Deputy U.S. Marshal killed at the Lloyd D. George U.S. Courthouse in Las Vegas.

f.   (2011) Shooting of judge's assistant in the Crawford County, Arkansas Courthouse

g.   (2011) Shooting of County attorney in Grand Marais County, Minnesota Courthouse

h.   (2012) Shooting a police officer and bystander at the Tulsa, Oklahoma Courthouse

Page 53 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

i.    (2013) Shooting of two witnesses and to law enforcement officers at the New Castle County, Delaware Courthouse

j.    (2013) Shooting of two litigants at the Chesterfield County, South Carolina Courthouse

Congressional Research Service (CRS) report of March 24, 2010 entitled "Federal Building and Facility Security" (Plaintiff's Exhibit 33)

113.   The number of violent incidents targeting the judiciary has increased dramatically in recent years. At the Federal level, the U.S. Marshals Service Center for Judicial Security reports the number of judicial threat investigations has increased from 592 cases in fiscal year 2003 to 1258 cases by the end of fiscal year 2011. (Plaintiff's Exhibit 31)

114. At the state and local levels, the Center for Judicial and Executive Security (CJES) research data show that 199 incidents (shootings, bombings and arson attacks) have occurred in state courts from 1970 through 2009:20 during 1970-79; 37 during 1980-89; 64 during 1990-99; and 78 during 2000-09. In addition CJES as documented 11 state courthouse incidents for 2010 and 13 incidents for 2011. (Plaintiff's Exhibit 31)

115.   The District of Columbia Circuit Court of Appeals requires all visitors to Federal Courthouses to undergo a security screening that includes the following:

Page 54 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

a.      Show a photo ID issued by a government agency such as drivers license or bar identification card

b.      Place your purse, briefcase, backpack, electronic devices, and any other item that you are carrying on an x-ray machine to be screened

c.      Remove keys, coins, wallet and all other items in your pockets before walking through a magnetometer

d.      You may be asked to remove your belt, watch, jewelry and shoes (Plaintiff's Exhibit 32)

## FIREARMS PROHIBITED IN AIRPORTS AND AIRPLANES

116.   The Transportation Security Administration (TSA) is an agency of the U.S. Department of Homeland Security vested with the responsibility for security in all modes of transportation including civil aviation security. Title 49 United States Code §114(d). The TSA is responsible for day-to-day Federal security screening operations for passenger air transportation at all airports in the United States where screening is required. (Plaintiff's Exhibit 35, 36, 37, 38, 39, 40 and 41)

117.   Screening is required by statute of all passengers and property including United States mail, cargo, carry-on and checked baggage and other articles that will be carried aboard a passenger aircraft operated by an air carrier or

Page 55 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 55

foreign air carrier in air transportation or in intra-state air transportation. Title 49 United States Code §44901(a); 49 CFR 1540.107.

118. By Federal Statute, anyone seeking to board a commercial airline flight must be screened by the TSA in order to ensure he is not "carrying unlawfully a dangerous weapon, explosive or other destructive substance." Title 49 United States Code §44901(a), 44902(a) (1). The Congress has generally left it to the agency to prescribe the details of the screening process, which the TSA has documented in a set of standard operating procedures not available to the public. Electronic Privacy Information Center v United States Department of Homeland Security, 653 F.3d 1(DC Cir 2011).

119. The possession of firearms, weapons, ammunition, explosives, or incendiaries is prohibited by any individual "when performance has begun of the inspection of the individual person" or "when the individual is attempting to board or on board an aircraft for which screening is conducted". 49 CFR 1540.111(a) this does not apply to law enforcement officers or other authorized persons.

120. The TSA is responsible for security screening of passengers and baggage at over 450 airports in the United States that facilitate air travel for 1.8 million people per day. In 2011 TSA officers intercepted more than 125,000 prohibited items at airport checkpoints of which 1,300 were firearms. (Plaintiff's Exhibit 38)

Page 56 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 56

121. The security screening of TSA passengers has not substantially interfered with interstate air travel. Each year TSA accommodates nearly 640,000,000 aviation passengers. (Plaintiff's Exhibit 37)

## FIREARMS PROHIBITED IN OTHER PROMINENT PLACES OF US POWER AND AUTHORITY IN WASHINGTON DC

122. Other prominent places of U.S. power and authority in Washington D.C. prohibit the possession of firearms and ammunition on the premises and routinely use commonly employed screening devices to detect and intercept firearms including:

    a.    The United States Capitol and all supporting office buildings.

    b.    The White House

    c.    The Supreme Court

    d.    Nationals Park-Washington Nationals Baseball Stadium

    (located in the same neighborhood as the Washington Navy Yard)

    e.    The Smithsonian Museum and Mount Vernon

    f.    FEDEX Washington Redskins Football Stadium

    g.    The FBI Building

    i.    CIA Headquarters in Langley, Virginia

    j.    Newseum

Page 57 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

k.      All Federal Civilian Departments and Agencies of the Federal Government in the greater metropolitan Washington D.C. area.

l.      The Pentagon

m.      The Verizon Center in Washington D.C.

n.      Washington Monument

o.      Library of Congress

p.      The Washington Post

q.      Washington Embassies of leading G-20 countries.

r.      Washington D.C. Network Television stations

s.      Union Station prior to boarding AMTRAK trains

t.      All Federal Courthouses

u.      Fairfax County, VA and Montgomery County, MD Courthouses.

v.      Flight boarding gates at Washington National Airport, Dulles Int'l Airport, Thurgood Marshall BWI Airport.

w.      Washington DC Government Buildings.

x.      Washington Metropolitan Area Transit Authority Headquarters Building.

y.      National Archives Building

Page 58 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

## FORSEEABLE KNOWN ACTIVE SHOOTERS

123.   In 2010, The New York City Police Department (NYPD) conducted a study of 281 active shooter incidents from 1966 to 2010 to identify common characteristics. Because active shooter attacks are dynamic events, the NYPD could not put forward a single set of best practices for private security response to such incidents. However the NYPD did compile a list of recommendations for building security personnel to mitigate the risks from active shooter attacks. See Plaintiff's Exhibit 1

### HEIGHTENED FORSEEABLE THREAT OF KNOWN ACTIVE SHOOTER

124.   In April 2013 the ISC issued an update report of data from its 1998 publication "Dealing with Workplace Violence: A Guide for Agency Planners". The data reported was intended to assist security planners for all buildings and facilities in the United States occupied by Federal employees for nonmilitary activities. The conclusion drawn by the ISC from this data was "no workplace is immune, and any government facility can serve as the setting for an incident of workplace violence." (Plaintiff's Exhibit 6)

125.   The ISC report of April 2013, categorized 4 acts of workplace violence that was foreseeable and preventable by following ISC minimum security standards. One of the foreseeable acts was "employee-on-employee" violence in which "the perpetrator is a current or former agency employee who attacks or

Page 59 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

threatens another current or former employee (s) in the workplace." Use of ISC minimum security standards in a government facility "can enhance the degree of deterrence against an act of workplace violence as well as the degree of mitigation should an act of violence occur." (Plaintiff's Exhibit 7)

126. Also in April 2013, the ISC issued a report on "Best Practices for Armed Security Officers in Federal  Facilities" containing a set of minimum mitigation standards to be applied to all contract armed security officers working in buildings and facilities in the United States occupied by Federal  employees for non-military activities. This report set forth best practices and minimum standards for hiring, training and staffing levels for an armed security force in Federal facilities required to adequately secure all buildings and facilities in the United States occupied by Federal  employees for non-military activities including owned and leased facilities. (Plaintiff's Exhibit 2)

### NATIONAL INDUSTRIAL SECURITY PROGRAM (NISPOM) OPERATING MANUAL

127. The CoSC contract invokes the National Industrial Security Program Operating Manual (NISPOM) (DoD 5220.22M) which defines the security requirements for cleared defense contractors. (Plaintiff's Exhibit 239)

128. SPAWAR is responsible for the CoSC contract administration And Supports Program Executive Office for Enterprise Information Systems (PEO EIS)

Page 60 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

And Naval Enterprise Networks Program Manager Warfare (PMW 205). PEO EIS and PMW 205 are responsible for the program management of the NMCI/CoSC program. (Plaintiff's Exhibit 239 at page 66)

## NOTICE TO DEFENDANTS OF HEIGHTENED FORESEEABLE RISK OF DANGER POSED BY KNOWN ACTIVE SHOOTERS GENERALLY

129.   Defendants knew or reasonably should have known prior to the shooting of Mary Frances Delorenzo Knight of the heightened foreseeable risk of danger posed by known active shooters posing as government contractor employees from the following information available at the time:

(A) In October 2008 the US Department of Homeland Security (DHS) issued a publication "Active Shooter" describing the profile of an active shooter and ways to recognize, prepare for and prevent an active shooter situation. Employers were urged to "recognize potential workplace violence" and that "an active shooter in your workplace may be a current or former employee." Employers were alerted to the "indicators of potential violence by an employee". (Plaintiff's Exhibit 81)

(B) The United States Air Force disseminated the DHS "Active Shooter" (October 2008) information by 2009. (Plaintiff's Exhibit 156)

(C) In January 2010 the Department of Defense published Its Independent Review "Protecting the Force: Lessons from Fort Hood specifically describing the

Page 61 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

heightened foreseeable risk of danger posed by known active shooter. (Plaintiff's Exhibit 159)

(D) In response to the Fort Hood Shooting, in March 2009 the Department of Defense created and incorporated a new training module addressing active shooter threats into anti-terrorism level I online training. (Plaintiff's Exhibit 237) Commanders were ordered to incorporate the "active shooter" scenario, lessons learned from Fort Hood, and other workplace violence case studies into their Installation Emergency Management training programs.

(E) On August 18, 2010 The Secretary of Defense Ordered the Department of Defense to implement best practices to publicize, identify and deal with an active shooter threat. (Plaintiff's Exhibit 237)

(F) The United States Army disseminated Army Regulation 381-12 "Threat Awareness and Reporting Program" on October 4, 2010 including awareness of the risk posed by a known active shooter.

(G) The Department Of Defense issued DoD Instruction Number 5240.26 on May 4, 2012 "Countering Espionage, International Terrorism, and the counterintelligence (CI) Insider Threat" describing the risk of insider threat.

(H) On January 14, 2013, President Barack Obama signed the "Investigative Assistance for Violent Crimes Act of 2012" into law. The law recognized the existence of a foreseeable risk of danger posed by known active shooter.

Page 62 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(I) In April 2013 the ISC issued an update report of data from its 1998 publication "Dealing with Workplace Violence: A Guide for Agency Planners". The data reported was intended to assist security planners for all buildings and facilities in the United States occupied by Federal employees for non-military activities.  The conclusion drawn by the ISC from this data was "no workplace is immune, and any government facility can serve as the setting for an incident of workplace violence." (Plaintiff's Exhibit 6)

(J). The ISC report of April 2013, categorized 4 acts of workplace violence that was foreseeable and preventable by following ISC minimum security standards.  One of the foreseeable acts was "employee-on-employee" violence in which "the perpetrator is a current or former agency employee who attacks or threatens another current or former employee(s) in the workplace." Use of ISC minimum security standards in a government facility "can enhance the degree of deterrence against an act of workplace violence as well as the degree of mitigation should an act of violence occur. (Plaintiff's Exhibit 7)

(K). Also in April 2013, the ISC issued a report on "Best Practices for Armed Security Officers in Federal  Facilities" containing a set of minimum mitigation standards to be applied to all contract armed security officers working in buildings and facilities in the United States occupied by Federal  employees for non-military activities. This report set forth best practices and minimum standards

Page 63 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

for hiring, training and staffing levels for an armed security force in Federal facilities required to adequately secure all buildings and facilities in the United States occupied by Federal employees for non-military activities including owned and leased facilities. (Plaintiff's Exhibit 2)

130. On January 14, 2013, Congress enacted the "Intelligence Authorization Act for Fiscal Year 2013" (public law 112-277) Plaintiff's Exhibit ___) acknowledging the foreseeable risks of active inside shooters and directions the "Secretary of Defense" to establish policy and promulgate to ensure civilian and military law enforcement personal changed with security functions on military installments shall receive active shooters training as described in finding 4.3 of the document entitled "Protecting the Force: Lessons from Ft. Hood" Plaintiff's Exhibit 159

### DUTY TO MITIGATE THREATS OF FORESEEABLE KNOWN ACTIVE SHOOTERS

131. Homeland Security Presidential Directive 12, "Policy for a Common Identification Standard for Federal Employees and Contractors", August 27, 2004, requires that all government employees and contractors who require routine physical access to government facilities and installations receive a standard and secure identification credential. (Plaintiff's Exhibit 10 at page 5)

Page 64 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 64

132.    Chief of Naval Operations Instruction OPNAVINST 5530.14E, "Navy physical security and law enforcement program" January 28, 2009, change 1, April 19, 2010, directs the elimination of local credentials but allowed The Common Access Card to be used as an approved level of access control security. (Plaintiff's Exhibit 11, 28, and 47)

133.    The Common Access Card (CAC) fulfills a duty of mitigation for the risk of compromise to classified information.

134.    However, the Common Access Card (CAC) does not fulfill a mandatory duty of mitigation for the risk of a foreseeable known active shooter. (Plaintiff's Exhibit 10, 12 and 48)

135.    The mandatory duty of mitigation for the risk of a foreseeable known active shooter requires a physical screening for prohibited items including firearms and ammunition prior to permitting access to any Federal facility including the Washington Navy Yard.   (Plaintiff's Exhibit 2-10, 14, 15, 17, 18 and 21)

136.    While    physical    security    of    non-military    Federal    employees, contractor's visitors and facilities has improved since the April 1995 attack on the Federal Building in Oklahoma City, the risk of foreseeable workplace violence has also escalated. (Plaintiff's Exhibit 1-10)

137.    In 2010, there were a reported total of 518 workplace homicides from Bureau of Labor Statistics (BLS). Shootings accounted for 78% of all workplace

Page 65 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

homicides (405 fatal injuries) 17% of such shootings occurred in government facilities. (Plaintiff's Exhibit 6 and 7)

138.   In September 2010, the Government Accountability Office (GAO) issued a congressional report on "Building Security" Federal standards. That report specifically noted "and, like federally owned space, federally leased space can be a target for acts of terrorism, violence, and destruction. A recent string of high-profile incidents, including shootings at the entrance to the Pentagon and a Las Vegas Federal courthouse as well as intentional crash of a small airplane into an Internal Revenue Service office, demonstrate the dangerous nature of risks faced by Federal employees in Federal  buildings and leased space." (Plaintiff's Exhibit 5)

139.   In January 2012, the ISC issued a report on "Security Specialist Competencies" providing security standards and best practices for non-military Federal facilities in the United States. These minimum standards include a comprehensive use of physical access control systems, basic physical security countermeasures, intrusion detection systems, access control systems, video monitoring systems, security barriers, and inspections useful for the detection and deterrence of threats to Federal civilian personnel. (Plaintiff's Exhibit 4)

140.   In February 2013, the ISC issued a report on "Items Prohibited from Federal Facilities: An ISC Standard" establishing a list of prohibited items and a

Page 66 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

guideline process for detailing control of prohibited items into Federal facilities. The ISC best practice standards identified responsibilities for denying entry to those individuals who attempt to enter Federal facilities with such prohibited items at the facilities entry points. This standard was intended to apply to all buildings and facilities in the United States occupied by Federal employees for non-military activities including facilities on leased or otherwise occupied by Federal employees. (Plaintiff's Exhibit 3)

### WHAT THE UNITED STATES GOVERNMENT KNEW ABOUT SHOOTER AARON ALEXIS BEFORE THE SHOOTING DEATH OF MARY FRANCIS DELORENZO KNIGHT SEPTEMBER 16, 2013

141.   In March 2007 shooter Aaron Alexis began suitability screening to join the Navy at the Naval recruiting district (NRD) New York.

142.   During the investigation, the Navy learned that Alexis had been arrested on June 3, 2004 by the Seattle Police Department and charged with felonious "malicious mischief" after shooting at the rear tires of a construction workers vehicle. Alexis described the attack as a "blackout fueled by anger." (Plaintiff's Exhibit 239 at page 22)

143.   The Navy also learned that on November 5, 2006 was named by the Bellevue Washington police as the "involved person" who slashed the tires of five vehicles at Alexis apartment complex.

144.   On May 5, 2007, the Navy permitted Alexis to enlist for eight years of

Page 67 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

active duty.

145.   On March 11, 2008, DoN CAF determine that Alexis was eligible for a secret level clearance and that he did "not pose a security concern at this time."

146.   On August 10, 2008, Alexis was arrested and jailed in DeKalb County Georgia for disorderly conduct by causing damage to furnishings inside a nightclub. Alexis received a non-judicial punishment (NJP) by his commanding officer for being absent without leave (AWOL) while in jail. The disorderly conduct charge was dismissed.

147.   On May 17, 2009, Alexis became intoxicated at a nightclub in Fort Worth Texas and broke his ankle when jumping from the stairs in a parking garage. Again he received a non-judicial punishment (NJP)

148.   On July 12, 2009, the command staff initiated administrative separation proceedings against Alexis.

149.   On December 3, 2009, after a change in command, the administrative separation action was stopped.

150.   On September 4, 2010, Alexis was arrested in Fort Worth, Texas for discharging a firearm in public.

151. A second administrative separation action was then initiated. This separation action was also stopped when the firearm charges were dropped by the Fort Worth District Attorney.

Page 68 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 68

152.  On January 31, 2011, Alexis was permitted to be honorably discharged and assigned a favorable reentry code.

153.  During the time that he worked at the Newport Naval Station, Alexis lived at the Newport Marriott Hotel.

154.  On August 6, 2013 the Naval Station Newport Police Department received the first of four telephone calls from and about Alexis at the Navy Gateway Inns and Suites. Two phone calls (from the hotel front desk clerk and from THE EXPERT travel coordinator) expressed concern that Alexis may harm others. (Plaintiff's Exhibit 51, 239)

155.  Newport Police officers had faxed a copy of their report to the Newport Naval Station after Alexis told them on August 7, 2013, that he was being threatened by unseen people and feared that "some sort of microwave machine" was penetrating his body. (Plaintiff's Exhibit 239)

156.  On August 7, 2013, Alexis was restless, mentally unstable, suffering auditory hallucinations, paranoia, and sleep deprivation. (Plaintiff's Exhibit 239)

157.  Newport Police faxed their report to the Navy an hour after the police spoke with Alexis. The Navy told the Newport Police that they would follow up on it. Navy security agents received and reviewed the police report but decided Alexis was not a threat to the institution or himself. The Navy did not try to personally interview Alexis or revoke his security clearance. Nor did the Navy contact Alexis'

Page 69 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

employer THE EXPERTS, INC., for a status report. The Navy breached its duty to ministerally follow its own policies and procedures requiring follow up of those warning signs, including the following (Plaintiff's Exhibit 239):

1.    Failure of the Navy to recognize the Newport Police Report to be a "security incident/adverse information" under the Navy personnel security program (PSP) or other applicable Navy instructions.

2.    Failure of the Navy to immediately report the "security incident/adverse information" to the DoD central adjudication facility (CAF) or other applicable Navy facility responsible to receive "security incident/adverse information" reports.

3.    Failure of the Navy to immediately report the "security incident/adverse information" to the commanding officer of the Newport Navy Station or other Navy officer responsible to receive "security incident/adverse information" reports.

4.    Failure of the Navy to immediately report the "security incident/adverse information" to the DoD CENTRAL ADJUDICATION FACILITY (CAF) via the Joint Personnel Adjudication System (JPAS) or other DoD Facility responsible to receive "security incident/adverse information" reports

5.    Failure of the Navy to report all of the "security incident/adverse information" information to the DoD Central Adjudication

Page 70 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

Facility (CAF) via the JPAS, or other DoD facility responsible to receive "security incident/adverse information" reports, without attempting to apply or consider any mitigating factors which may exist.

6.     Failure of the Navy to investigate the "security incident/adverse information"

7.     Failure of the Navy DoD, CAF, or other Navy facility responsible to cause suspension, revocation of security clearance eligibility, to cause and automatic suspension of Aaron Alexis clearance eligibility (including Common Access Card (CAC) upon receipt and review of the "security incident/adverse information".

8.     Failure of the Navy to take appropriate action after an appropriate investigation of the "security incident/adverse information".

158.   While in Newport, Rhode Island Alexis contacted human resources department for his employer, THE EXPERTS, INC., multiple times to complain about hearing voices in his hotel room. THE EXPERTS, INC., employees thought Alexis was referring to actual voices, and moved him to new hotels twice.

159.   The U.S. Department of Veteran Affairs' treated Alexis on August 23, 2013, in the emergency room at the VA Medical Center in Providence, R.I. "complaining of insomnia." Actually he was delusional. He was given a "small amount" of medicine to help him sleep and instructed to see his primary care

Page 71 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 71

provider. Five days later he received a small refill from the emergency room at the VA Medical Center in Washington, D.C.

## WHAT THE EXPERTS KNEW ABOUT SHOOTER ALEXIS BEFORE THE SHOOTING

160.  SHOOTER Alexis was employed by THE EXPERTS on two occasions.

161.  Alexis first applied for employment as a technician with THE EXPERTS on September 5, 2012.

162.  Before conducting a criminal investigations background check, prime contractor Defendant HPES authorized THE EXPERTS 28 applicant technicians to begin work.

163.  From September 10, 2012 until December 2012 Alexis worked under the CoSC contract providing services at six project sites in Texas, California and Japan.

164.  Alexis resigned his first position with THE EXPERTS on December 27, 2012.

165.  After Alexis resigned, THE EXPERTS Facility Security Officer (FSO) did not remove Alexis' access to classified information within JPAS. Therefore, Alexis remained eligible for access to classified information.

Page 72 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

166.   Alexis applied for his second position as a technician with THE EXPERTS on June 27, 2013.

167.   From July to September 2013, THE EXPERTS assigned Alexis computer work in several locations including Virginia, Rhode Island and Maryland.

168.   August 4, 2013 Alexis traveled from Norfolk, Virginia to Providence, Rhode Island on assignment to the Naval Undersea Warfare Center (NUWC) at Naval Station Newport, Rhode Island.

169.   On August 4, 2013, Alexis became irrational and angry that a family of passengers in the Norfolk airport were making fun of him and laughing at him for no apparent reason. Alexis approached the family and threatened them although he was unprovoked. The family of Glynda Boyd became so alarmed at Alexis crazy behavior that they summoned the airport security guard to intervene. (Plaintiffs Exhibit 148)

170.   The airport security guard separated Alexis from the family of Glynda Boyd. Alexis then telephoned THE EXPERTS project coordinator who spent 20 minutes calming down an angry Aaron Alexis.

171.   The next morning on August 5, 2013, THE EXPERTS project coordinator reported Alexis strange behavior to the EXPERTS CoSC program team.

Page 73 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

172.   On August 5, 2013, Alexis checked into the Residence Inn hotel in Middletown, Rhode Island. Alexis became upset that other guests at the hotel were intentionally making noise and disturbing him. Alexis telephoned THE EXPERTS travel coordinator requesting assistance in moving him to the Navy Gateway Inns and Suites on Naval Station.

173.   Beginning at 2 PM on August 6, 2013, the Naval Station Newport Police Department received the first of four calls from and about Alexis complaining about noisy neighboring guests and Alexis actions in confronting those hotel guests.

174.   The front desk clerk at the Navy Gateway Inns and Suites received one phone call from THE EXPERTS travel coordinator who was in communication by phone with Alexis and expressed concern that Alexis may harm others at the hotel.

175.   Subsequently, the front desk clerk at the Navy Gateway Inns and Suites telephoned the Naval Station Newport Police and requested that they keep an officer close to the hotel in case Alexis hurt a hotel guest.

176.   The Naval Station Newport Police responded twice to the hotel on August 6, 2013. When the first officers arrived at Alexis hotel room, they discovered that Alexis had taken apart his bed because he irrationally believed someone was hiding under it. The officers also observed that Alexis and taped the

Page 74 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

microphone to the ceiling of his hotel room because he had auditory hallucinations that people were following him and he wanted to record their voices.

177.   During the second response by Naval Station Newport police officers to the hotel, Alexis told them that he had a computer chip embedded in his head and that he was receiving microwave signals.

178.   At 6 PM on August 6, 2013, Alexis telephoned THE EXPERTS travel coordinator and reported that two men and one female had intentionally followed him during his transfer from the Residence Inn to the Navy Gateway Inns and Suites. Alexis told THE EXPERTS travel coordinator that three people were talking about him through the walls of the adjacent hotel room and were using an extremely low-frequency electromagnetic wave machine to keep him awake. Alexis said that the ultrasonic device was physically pinning him to the bed.

179.   These psychotic reports by Alexis were passed on by telephone from THE EXPERTS travel coordinator to THE EXPERTS program manager for the CoSC contract in the early evening of August 6, 2013.

180. THE EXPERTS program manager for CoSC was concerned about the apparent mental instability of Alexis and telephoned the desk clerk at the Navy Gateway Inns and Suites to learn more about his mental condition. The hotel desk clerk read entries written into the hotel desk log earlier that day documenting that Alexis had disrupted other guests in the early morning hours by banging on the

Page 75 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

walls and demanding that neighboring guests stop making noises intended to disturb him.

181.   The hotel desk log also documented that hotel security had responded to Alexis' hotel room and discovered that Alexis had mysteriously taken his bed apart. The hotel desk log further documented that Alexis told THE EXPERTS travel coordinator that three people had followed him from The Residence Inn to the Navy Gateway Inns and Suites and continued yelling at him and following him for no apparent reason than to intentionally upset him.

182.   THE EXPERTS travel coordinator told the desk clerk at the Navy Gateway Inns and Suites that she was very worried and was afraid that Alexis could harm other people in the hotel. THE EXPERTS travel coordinator gave the hotel desk clerk for contact information and out of THE EXPERTS program manager and asked her to call them if Alexis caused any more trouble.

183.   Afterwards, THE Experts Travel coordinator telephoned THE EXPERTS program manager of CoSC and relayed all the information she had previously gathered that day about Alexis.

184.   THE EXPERTS program manager of CoSC thereafter conducted a late evening conference call with her immediate manager and THE EXPERTS Facility Security Officer (FSO) to discuss the disturbing reports concerning Alexis. The management team of the EXPERTS concluded that Alexis should be removed

Page 76 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

from work at Newport and sent back to Fort Worth because they were concerned about his irrational, threatening, and mentally unstable behavior.

185. Following that phone call, THE EXPERTS program manager telephoned Alexis and told him of the decision to remove him from his work assignment at Newport and to send him back to Fort Worth "for rest" due to the stress that he was under. Alexis objected to the decision and said that he wanted to stay and work at Newport.

186. At 11:35 PM on August 6, 2013, THE EXPERTS FSO logged on and accessed the Joint Clearance Access Verification System tool within JPAS (which tool is used to record past clearance information on visitors to sites and to make site visit requests). THE EXPERTS FSO recorded that the previously entered notification of a site visit established for access by Aaron Alexis to NUWC was canceled. No explanation was made for the cancellation.

187. THE EXPERTS FSO intentionally did not record via JPAS to the DoD CAF any known "adverse information" regarding Alexis mental and emotional instability, auditory hallucinations, irrational aggressive behavior which had been acquired during the entire day of August 6, 2013. THE EXPERTS FSO knew that this "adverse information" about Alexis was required to be reported via JPAS to the DoD CAF under the mandate duty of NISPOM.

188. However, THE EXPERTS FSO concealed the "adverse information"

Page 77 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

about Alexis from the DoD CAF.

189.   THE EXPERTS FSO knew that simply canceling the notification of the access site visit by Alexis to NUWC in the Joint Clearance Access Verification System would NOT automatically prevent Alexis from accessing NUWC. Instead, THE EXPERTS FSO knew that THE EXPERTS and a duty to immediately report the "adverse information" about Alexis to the DoD CAF via JPAS and the Commander of the NUWC and that this was required to prevent Alexis from accessing NUWC or any other cleared facility.

WHAT HPES KNEW ABOUT ALEXIS PRIOR TO THE SHOOTING

190.   On August 7, 2013, THE EXPERTS program manager sent an e-mail to HPES representatives who and THE EXPERTS CoSC team stating that Alexis was not feeling well and would not complete the work assignment at Newport as previously scheduled. THE EXPERTS program manager also booked airline tickets for Alexis to return to Fort Worth.

191.   Later in the day on August 7, 2013, Alexis telephoned the HPES second shift deployment supervisor and asked permission to stay in her room at the Marriott Hotel Newport because he irrationally believed that some people had followed him to the Navy Gateway Inn and Suites and he had to move out of his room because he felt threatened by them.

Page 78 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

192.    Alexis had previously known the HPES deployment supervisor when they worked together in Japan. The deployment supervisor agreed to allow Alexis to stay at her Marriott hotel room.

193.    After he got to her room, Alexis told the HPES deployment supervisor that three people who traveled with him on the plane from Norfolk also checked into the same Navy Gateway Inn and Suites Hotel and began making noise and threats against him. Alexis told her that the same people followed him from one hotel to another and in fact had checked into the room below the Marriott Hotel room he was in at the time.

194.    During this conversation Alexis woke up the HPES shift supervisor and claimed to have auditory hallucinations and asked the HPES shift supervisor: "can't you hear that?" referring to the auditory hallucinations. The shift supervisor turned a deaf ear to Alexis and went back to sleep.

195.    Alexis telephoned the City of Newport Police to make an official report that people who traveled with him on the plane from Norfolk were following him and bothering him.

196.    Around 6:20 PM on August 7, 2013, the City of Newport Police responded to the Marriott Hotel due to the telephone call from Alexis that people were following him and harassing him. Alexis told the police officers that he previously had a verbal altercation with a group of people at the Norfolk airport.

Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

Alexis said that this group sent three people to follow him and keep him awake by talking to him and sending vibrations into his body. Alexis first heard this group of people making noises to keep them awake while in the Residence Inn Hotel in Middletown Rhode Island. Now, Alexis told the police that the same three individuals were speaking to him through the walls, floor and ceiling of the Marriott Hotel room. Alexis further said that these individuals were using "some sort of microwave machine" to send vibrations through the ceiling and that these vibrations were penetrating his body to prevent him from sleeping.

197. The Newport police officers recorded the bizarre allegations by Alexis and incorporated them into a police report. (Plaintiffs Exhibit 51)

198. The Newport police officers knew that Alexis was a government contractor working at Naval Station Newport. This prompted the officers to make a telephone call to the naval station Police Sgt. on-duty to pass along the information in case Alexis was a threat.

199. At 9:30 PM on August 7, 2013 the Newport police officer in charge telephoned the on duty Naval Station Police Sgt. and relayed the bizarre allegations made by Alexis.

200. The City of Newport Police Department also faxed a copy of its police report to the Naval Station Newport Security office with a note that said: "FYI on this. Just thought to pass it on to you in the event this person escalates." It was then

Page 80 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

reasonably foreseeable to the City of Newport Police Department that Alexis was a risk for the potential to cause harm to someone based on his apparent auditory hallucinations and mental instability.

201.   Around 10:00 PM on August 7, 2013, the HPES second shift deployment supervisor awoke and decided to call the HPES lead supervisor working at the NUWC to inform him of the bizarre details from her earlier conversation with Alexis that morning.

202.   The HPES lead deployment supervisor told her that THE EXPERTS had already issued an e-mail early that morning announcing that Alexis was not feeling well and would be removed from the Newport project team.

203.   After making the report, the HPES second shift deployment supervisor returned to her hotel room and awakened Alexis. Alexis then told her that the people who had been following him and were previously located in the room below him, have now checked into the room above him and that they were continuing to intentionally make noises to disrupt his sleep. Alexis told her that he wanted to acquire a radar gun in order to hear what they were saying.

204.   Nobody from HPES filed any "adverse information" report to the DoD CAF via JPAS or the Commander of NUWC regarding the auditory hallucinations and mental instability of Alexis.

Page 81 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

205.   At 11:39 August 7, 2013, THE EXPERTS FSO entered a "debrief" action in JPAS. A "debrief" entry merely records and administrative decision that the individual cleared employee no longer requires access to classified information. A "debrief" entry does not discharge the duty of a cleared contractor or its employees to report "adverse information" concerning a cleared employee to the DoD CAF via JPAS. Nor does a "debrief" entry automatically prevent a cleared employee from gaining access to a cleared facility.

206.   The "debrief" entry by THE EXPERTS FSO did not prevent Alexis' access to NUWC or any other cleared facility. Nor did the "debrief" entry terminate Alexis' ability to access any other cleared facility. A "debrief" entry does not convey any concern about Alexis' reliability, mental stability, or trustworthiness.

207.   On August 7, 2013, The HPES second shift deployment supervisor had a second discussion with the HPES lead supervisor about the bizarre behavior including the auditory hallucinations and apparent mental instability of Alexis. The HPES second shift deployment supervisor was concerned enough to also discuss the Alexis encounters with a coworker.

208.   Despite these conversations by and between HPES supervisors and employees, no one from HPES filed any "adverse information" reports to the DoD CAF via JPAS or the Commander of NUWC or any other cleared facility.

Page 82 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

209. The filing of any "adverse information" reports to the DoD CAF and/or Commander of a cleared facility about Alexis' bizarre behavior compromising his mental stability including auditory hallucinations would have resulted in the immediate revocation of Alexis status as a cleared employee. Alexis would have thereafter been immediately denied access to any cleared facility,

210. In the early afternoon of August 7, 2013, THE EXPERTS Human Resources (HR) director discussed with corporate legal counsel the need to initiate an investigation into the information received about Alexis including his contact with the two police departments.

211. As part of the investigation THE EXPERTS program manager telephoned the HPES second shift deployment supervisor and discussed Alexis reports of auditory hallucinations and mental instability. THE EXPERTS HR director mistakenly contacted the Middletown, Rhode Island Police Department to collect police reports regarding Alexis although they had not been involved in investigating Alexis. Instead, The City of Newport Police Department and Naval Station Newport Police had conducted the investigations.

212. Meanwhile, Alexis flew from Newport to Providence airport on August 7, 2013. He stayed the night at the Best Western Hotel in the Providence airport. On August 8, 2013, he flew from Providence airport to the Dallas Fort Worth, Texas airport. During this time no one from THE EXPERTS or HPES filed

Page 83 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

any "adverse information" reports about Alexis' mental instability to the DoD CAF via JPAS.

213. On August 9, 2013, THE EXPERTS HR director continued his investigation of Alexis and telephoned Alexis' mother Cathleen Alexis. THE EXPERTS HR director explained some of the bizarre behavior her son had exhibited over the past few days and asked if she could explain it. Cathleen Alexis told THE EXPERTS HR director that her son had been suffering from paranoia and that this was not the first episode that he had experienced. Cathleen Alexis told THE EXPERTS HR director that her son Aaron needed mental health intervention and counseling.

214. On August 9, 2013, THE EXPERTS CoSC management team, including the HR director and FSO, discuss the actions that should be taken regarding cleared employee Alexis. The management team discussed its duty to file an "adverse information" report regarding cleared employees with DoD CAF via JPAS as part of its continuous evaluation responsibilities under NISPOM.

215. THE EXPERTS CoSC management team decided not to file an "adverse information" report regarding Alexis' paranoid behavior including auditory hallucinations to DoD CAF via JPAS. Instead, the management team concluded that Alexis simply needed "some rest" after which he would be eligible to be reassigned to another CoSC deployment.

Page 84 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

216.   THE EXPERTS CoSC management team did not require Alexis to undergo a "fitness for return to duty" psychological examination before being reassigned to another CoSC deployment. Nor did the management chain require Alexis to obtain mental health intervention and counseling.

217.   NISPOM does not permit a cleared contractor to forgo reporting "adverse information" about a cleared employee to the DoD CAF via JPAS because of a belief that the "adverse information" is based on rumor and innuendo and may infringe on the cleared employee's privacy rights. The duty of a cleared contractor to report "adverse information" about a cleared employee to the DoD CAF via JPAS is not excused on a belief by the contractor that the "adverse information" is based on rumor and innuendo and may infringe on the cleared employee's privacy rights.

218.   On August 9, 2013, following THE EXPERTS management team's decision to return Alexis to a work status, the FSO recorded in JPAS and "indoctrination" action. This action reestablished Alexis as an individual with authorized access to classified information under the cognizance of THE EXPERTS.

219.   Recording of an "indoctrination" action in JPAS does not discharge the contractors duty under NISPOM to report "adverse information" concerning a cleared employee to the DoD CAF via JPAS.

Page 85 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

220.   Between August 12, 2013 at September 6, 2013 THE EXPERTS assigned Alexis to work in cleared facilities as follows:

      (A) Williamsburg, Virginia from August 12-16 2013

      (B) Newport, Rhode Island from August 19-23 2013

      (C) Carderock, Maryland from August 26-30 2013

      (D) Crystal city, Virginia from September 3-6 2013

221.   On August 23 and 28 2013, Alexis made emergency room visits to Veterans Affairs treatment facilities in Providence, Rhode Island and Washington DC respectively with complaints of insomnia. Alexis was having difficulty sleeping because of auditory hallucinations about people intentionally making noise to prevent him from sleeping. The VA doctors prescribed a low-dose antidepressant used for insomnia.

222.   On September 1, 2013, Alexis exchanged several e-mails with the President of Freedom from Covert Harassment and Surveillance (FCHS) complaining that "constant bombardment from some type of ELF (extremely low frequency electromagnetic wave) weapon" that had "almost cost him his job."

223.   At no time prior to September 16, 2013, did THE EXPERTS or HPES ever file an "adverse information" report concerning the bizarre behavior and mental instability of Alexis with DoD CAF via JPAS.

Page 86 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

## THE SHOOTING AT THE WASHINGTON NAVY YARD SEPTEMBER 16, 2013

224.   At 7:44 AM on September 16, 2013, Alexis drove his wretched blue Toyota Prius into the entry control point (ECP) of the Washington Navy Yard.

225.   The Sentry was shown a common access card (CAC) by Alexis to gain entry. The Sentry did not search Alexis, his automobile or its contents including a backpack which contained a sawed off shotgun and multiple rounds of ammunition. No effort was made by the Sentry to search Alexis for the possession of firearms or ammunition.

226.   At 8:02 AM Alexis entered Building 197 carrying a backpack which contained a sawed off shotgun and multiple rounds of ammunition. The entry to Building 197 is staffed with contract security guards. There is no metal detector. There are no wands or other devices used to screen for the possession of firearms or ammunition. There is no procedure for patting down or otherwise screening persons for the possession of firearms or ammunition. The only requirement for entry is a valid building pass which is swiped through an electronic badge reader.

227.   Alexis took an elevator to the fourth floor and entered the bathroom beside the stairwell. He accessed his sawed-off shotgun and ammunition, exited the bathroom and began shooting people.

Page 87 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

228. Mary Frances Delorenzo Knight exited the break room on the 4th floor after Alexis had shot three people. She was the fourth of 12 persons shot to death and four others wounded.

229. At 8:38 AM Alexis fired his last fatal gunshot. He was shot and killed at 9:25 AM.

DEPARTMENT OF DEFENSE INVESTIGATIONS INTO THE SHOOTING

230. After the shootings, Defense Secretary Chuck Hagel ordered investigations by the United States Navy, Department of Defense and an independent investigation. These were completed in November 2013 but not released to the public until March 18, 2014. These investigative findings have now been incorporated into the new refiled lawsuit.

231. The Investigation Report by the Navy was conducted by 30 investigators and 10 support personnel under the direction of Adm. John M Richardson USN. (Plaintiff's Exhibit 239)

232. The key findings of the NAVY INVESTIGATION include:

(A) "Before September 16, Alexis was observed by several people, including his supervisors at THE EXPERTS Inc., and HP Enterprise Services LLC to behave in a way that raised concerns about his mental stability and presented indicators that he may cause harm to others." (Plaintiff's Exhibit 239 at page 3)

Page 88 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 88

(B) "Specifically the company leadership (THE EXPERTS) decided not to inform the government of adverse information concerning Alexis' emotional, mental, or personality condition, even when they had concerns that Alexis may cause harm to others, as required by the National Industrial Security Program Operating Manual." (Plaintiff's Exhibit 239 at page 62)

(C) "The Experts also knew Alexis had experienced previous episodes of paranoia and records reflect The Experts was concerned that Alexis could present a risk of harm to others." (Plaintiff's Exhibit 239 at page 63)

(D) "HP Enterprise Services, LLC, the prime contractor… failed to meet their contractually required responsibility to continuously evaluate Alexis and report adverse information to the Department of Defense Central Adjudication Facility and U.S. Navy Installation Commanders." (Plaintiff's Exhibit 239 at page 64)

(E) "Specifically HP Enterprise Services LLC did not inform the government of adverse information concerning Alexis emotional, mental or personality condition, as was required by the National Industrial Security Program Operating Manual. (Plaintiff's Exhibit 239 at page 64)

(F) " HPES failed to report information concerning Alexis to U.S. Navy installation commanders to prevent access to Naval Station Newport and NUWC as required by the NISPOM. Instead, Alexis' unusual behavior was discussed

Page 89 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

among three HPES employees at Newport." (Plaintiff's Exhibit 239 at page 64)

(G) "By letter dated October 18, 2013, the manager of HPES Industrial Security Office (ISO)... advised that the information known to the HPES employees... raised serious questions concerning Mr. Alexis' state of mind, constituting the kind of "bizarre behavior" that HPES expects its employees to report to the ISO for follow-up investigation...HPES expects its employees to report any incident that calls into question the trustworthiness of cleared employees, and this incident met the threshold." (Plaintiff's Exhibit 239 at page 65)

(H) "The (HPES) ISO manager said that whichever way the report was submitted to the government, HPES would have denied Alexis access to classified information and facilities until HPES could fully understand Alexis' condition." (Plaintiff's Exhibit 239 at page 65)

(I) "... Naval Station Newport Police Department personnel could have taken action to deny Alexis access to the base, and to have Alexis evaluated by a mental health professional if the officers thought Alexis presented a risk of immediate danger to himself or others." (Plaintiff's Exhibit 239 at page 65)

(J) "Since they (Naval Station Newport Police Department personnel) were not trained to consider or report interactions with Alexis through the lens of the continuous evaluation of the PSP (Personnel Security Program), it was not reported." (Plaintiff's Exhibit 239 at page 65)

Page 90 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(K) "This information was not reported to the government as required." (Plaintiff's Exhibit 239 at page 3)

(L) "Had this information been reported, properly adjudicated, and acted upon, Alexis' authorization to access secure facilities and information would have been revoked." (Plaintiff's Exhibit 239 at page 3)

(M) "The access control methods and practices employed by Naval Support Activity Washington and Naval Sea Systems Command to vet unescorted visitors do not comply with local, Department of the Navy, and Department of Defense instructions." (Plaintiff's Exhibit 239 at page 82)

(N) "There are inadequate or incomplete procedures concerning NAVSEA Access control. There is also a lack of compliance with existing procedures and a lack of government oversight to ensure that access controls are properly executed." (Plaintiff's Exhibit 239 at page 83)

(O) "The Physical Security and Law Enforcement Programs at Naval Support Activity Washington and The Physical Security Program at the Naval Sea Systems Command Headquarters are deficient in several areas." (Plaintiff's Exhibit 239 at page 77)

(P) "Contrary to OPNAVINST 5530.14E, NAVSEA does not have an approved physical security plan, has not properly designated and marked restricted areas, and has not performed required physical security surveys or inspections."

Page 91 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 91

(Plaintiff's Exhibit 239 at page 78)

(Q) "Contract security guards are provided for NAVSEA Buildings... 197... by HBC management. The contract security guards are not part of the NSAW NSF and are prohibited from performing law enforcement functions." (Plaintiff's Exhibit 239 at page 78)

(R) "The contractor (HBC Management) is not compliant with current Navy firearms training requirements as specified in OPNAVINST 3591.1F. NTTP 3-07.2.3 requires that the contractor certified that armed guards are qualified to Navy standards." (Plaintiff's Exhibit 239 at page 79)

233. The key findings in the DEPARTMENT OF DEFENSE "Internal Review" Report include:

(A) "... Random vehicle or bag inspections were not conducted in accordance with DoD policy." (Plaintiff's Exhibit 183 at page 2)

(B) "Alexis' employer THE EXPERTS did not report behavior indicating psychological instability and did not seek assistance from a mental health professional or guidance from the Defense Security Service". (Plaintiff's Exhibit 183 at Page 20)

(C) "The review revealed that Random Antiterrorism Measures (RAM) and the vehicle inspections were not being conducted regularly as required under DoDI 2000.16 "DoD Anti-Terrorism (AT) Standards." (Plaintiff's Exhibit 183 at page 45)

Page 92 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 92

(D) "… Without conducting exhaustive searches of facilities and residences, it is impossible to verify illegal weapons have not been smuggled onto DoD installations." (Plaintiff's Exhibit 183 at page 48)

234. The key findings of the Defense Secretary's "Independent Review" include:

(A) "TEI (THE EXPERTS) failed to recognize the seriousness of Alexis' episode in Newport Rhode Island. Despite taking the steps of removing Alexis' access to classified information temporarily, they failed to take appropriate steps to ensure Alexis was able to resume his duties at TEI. TEI further failed to report this to DSS. (Plaintiff's Exhibit 185 at page 45)

(B) On August 18, 2010, the Secretary of Defense Robert M. Gates directed the Department of Defense to implement "Final Recommendations of the Fort Hood Follow-on Review" (Protecting the Force: Lessons from Fort Hood January 2010) (Plaintiff's Exhibits 159 and 237). However the bureaucratic implementation of the Fort Hood recommendations has allowed installations to delay implementation of electronic access control measures "when funding becomes available." (Plaintiff's Exhibit 185 at page 47) (Plaintiff's Exhibit 239 at Page 7)

Page 93 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 93

## CLAIMS FOR RELIEF

### COUNT I: CAUSE OF ACTION AGAINST THE HP ENTERPRISE SERVICES, LLC, (HPES) FOR WRONGFUL DEATH OF MARY FRANCES DELORENZO KNIGHT ARISING FROM NEGLIGENCE (NEGLIGENT SUPERVISION AND TRAINING/NEGLIGENT FAILURE TO WARN)

235.   Plaintiff realleges 1 through 234 above as if fully set forth herein verbatim and further allege:

236.   This is a cause of action for damages against HP Enterprise Services LLC (HPES) arising from the negligent wrongful death of Mary Frances Delorenzo Knight in violation of the District of Columbia Wrongful Death Act (DC Code §16-2701 (2013) for breach of HPES duties of due care to:

(A) Comply with the laws (Federal) and common law of the District of Columbia in a non-negligent manner;

(B) Comply with its duty (Federal and common law) of hiring, supervision and discipline of its employees in a non-negligent manner;

(C) Comply with its duty (Federal and common law) to warn others in a non-negligent manner of a foreseeable zone of danger created by the Defendant imposing a risk of serious injury/death upon the others;

(D) Comply with its duty (Federal and common law) to maintain a safe workplace in a non-negligent manner;

(E) Comply with its duty (Federal and common law) imposed by Federal

Page 94 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

laws in a non-negligent manner including NISPOM.

237. The employment activities of subcontractor THE EXPERTS employees, Aaron Alexis and his company supervisors in Rhode Island were themselves supervised and/or observed in August and September 2013 by prime contractor HPES employed supervisors.

238. NISPOM imposes a legal duty upon all cleared contractors and their employees including HPES to report any known adverse information about other company cleared contractor employees to DoD CAF via JPAS.

239. HPES had a legal duty imposed under federal law (NISPOM) to report to DoD CAF known adverse information about THE EXPERTS employee Alexis even if Alexis was not a direct employee of HPES.

240. Prior to September 16, 2013, Alexis was observed by HPES supervisors to behave in a way that raised reasonable concerns about his mental stability and presented indicators that he may likely cause harm to others. (Paragraphs 188-221, infra). (Plaintiff's Exhibit 239 at page 3)

241. Defendant HPES failed to discharge its contractual, Federal, and common law duties to continuously evaluate Alexis and report known adverse information to the Department of Defense Central Adjudication Facility and U.S. Navy Installation Commanders. (Plaintiff's Exhibit 239 at page 64)

Page 95 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 95

242. Specifically Defendant HPES did not inform the government of known adverse information concerning Alexis 'emotional, mental or personality condition, as was required by the National Industrial Security Program Operating Manual (NISPOM). (Plaintiff's Exhibit 239 at page 62)

243. Defendant HPES failed to report known adverse information concerning Alexis to U.S. Navy installation commanders to prevent access to Naval Station Newport and Naval Undersea Warfare Center (NUWC) as required by NISPOM. Instead, Alexis bizarre behavior suspected by HPES employees to be capable of harming others was simply discussed among three HPES employees at Newport Rhode Island who took no action to disclose/warn others (HPES ISO, The Experts, the Navy, Navy Commanders or the DoD) or prevent serious harm/death to others in harms (Alexis') way. (Plaintiff's Exhibit 239 at page 64)

245. The adverse information known to these HPES employees raised serious questions concerning Alexis' state of mind, constituting the kind of bizarre behavior that HPES was obligated to report to its ISO for follow-up investigation because it called into question the trustworthiness of Alexis as a cleared employee holding a secret security clearance. (Plaintiff's Exhibit 239 at page 65)

246. HPES supervisors  and its ISO would more likely than not have themselves immediately reported the known adverse information about Alexis to the DoD CAF and more likely than not denied Alexis access to classified

Page 96 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

information and facilities until HPES could fully understand Alexis' condition if Alexis known adverse information was disclosed by the HPES employees. (Plaintiff's Exhibit 239 at page 65)

247.   Had this known adverse information been reported by HPES to the DOD CAF, more likely than not, it would have properly been adjudicated and acted upon, and consequently Alexis' authorization to access secure facilities and information would more likely have been revoked. (Plaintiff's Exhibit 239 at page 3)

248.   Had Alexis' authorization to access secure facilities and information been revoked, Alexis would not likely have been granted access to the Washington Navy Yard thereafter on September 16, 2013. (Plaintiff's Exhibit 239 at page 3)

249.   Had Alexis not likely been granted access to the Washington Navy Yard, Alexis would not likely have shot and killed Mary Frances Delorenzo Knight.

250. HPES was told on August 7, 2013, that THE EXPERTS had taken administrative action that day to cancel Alexis visit request to NUWC scheduled for the following day, August 8, 2013. Knowing that Alexis' conduct presented a risk of harm to others. HPES did not report this adverse information to the DoD CAF as required by NISPOM. (Plaintiff's Exhibit 239 at page 62)

Page 97 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

251.  HPES knew THE EXPERTS did not report this adverse information about Alexis to the DoD CAF either.

252.  HPES knew or reasonably should have known that THE EXPERTS itself adjudicated Alexis' no longer a threat to harm others two days later on August 9, 2013 without conducting any fitness for return to duty psychological examination or obtaining any professional mental health  assessment of Alexis.

253.  HPES also knew that THE EXPERTS reversed its administrative decision about Alexis on August 9 based on no professional mental health or other valid assessment by DoD CAF of the known adverse information on Alexis.

254.  HPES knew that it had a duty of continuous reporting to the DODCAF but HPES consciously decided not to report to the DoD CAF this additional adverse information about Alexis being returned to duty despite HPES knowing that Alexis presented a real and present danger of harm to others in the workplace.

255.  HPES concealment of this additional knowledge of adverse information about a cleared employee of another company required by NISPOM is additional evidence of HPES' consciousness of guilt of its own wrongdoing.

256.  HPES negligently breached its duties by:

(A)  Making a determination from HPES own observation that Alexis' bizarre behavior in August 2013 presented a real and present danger of harm to others in the workplace around him and consciously concealing that

Page 98 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

adverse information from the DoD CAF and Navy commanders in violation of its duties under NISPOM and its common law duties.

(B)    Receiving and concealing information obtained from THE EXPERTS that Alexis' bizarre behavior in August 2013 presented a real and present danger of harm to others of the workplace around him but THE EXPERTS was consciously concealing that adverse information and not reporting it to the DoD CAF and Navy commanders as required by NISPOM and its common law duties to hire, supervise and discipline employees and duty to warn of risks of danger and death from an active insider threat in a non-negligent fashion.

(C)    Consciously deciding not to report to the DoD CAF and Navy commanders, and not reporting, this adverse information from THE EXPERTS about a cleared employee with a secret security clearance.

(D)    Receiving and concealing additional information obtained from THE EXPERTS that THE EXPERTS had itself administratively adjudicated Alexis on August 7, 2013 to present a risk of harm to others in the workplace and removing him from duty while concealing and failing to report this adverse information to the DoD CAF and Navy commanders in violation of its duties under NISPOM and its common law duties to hire, supervise, and discipline employees and to warn of risks of danger and death from an active insider threat in a non-negligent fashion.

Page 99 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(E)    Consciously deciding not to report to the DoD CAF and Navy commanders, and not reporting, this adverse information from THE EXPERTS about a cleared employee with a secret security clearance.

(F)    Receiving and concealing information obtained from THE EXPERTS that on August 9, 2013 THE EXPERTS had itself administratively adjudicated Alexis NOT to present a risk of harm to others in the workplace without having a psychological examination of fitness for return to duty or adjudication by the DoD CAF.

(G)    Consciously deciding not to report to the DoD CAF and Navy commanders, and not reporting, this adverse information obtained from THE EXPERTS about a cleared employee with a secret security clearance.

(H)    Receiving and concealing information obtained from THE EXPERTS that on August 9, 2013 THE EXPERTS had itself administratively reinstated Alexis' eligibility for access to classified information despite THE EXPERTS and/or HPES knowledge that Alexis presented a real and present danger of harm to others in the workplace.

(I)    Consciously deciding not to report to the DoD CAF and Navy commanders, and not reporting, this adverse information obtained from THE EXPERTS about a cleared employee with a secret security clearance.

Page 100 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

257. It was clearly foreseeable (i.e. a heightened foreseeability) to HPES that its negligence would likely be a substantial contributing cause of serious injury/death to co-workers of Aaron Alexis including Mary Frances Delorenzo Knight.

258. The wrongful death of Mary Frances Delorenzo Knight on September 16, 2013 occurred within the district limits of the District of Columbia.

259. The wrongful death of Mary Frances Delorenzo Knight was proximately caused by the negligence of HPES.

260. The wrongful death of Mary Frances Delorenzo Knight would not have occurred but for the negligence of HPES.

261. Plaintiff, as the lawfully appointed executor of the estate of Mary Frances Delorenzo Knight is authorized to bring this action in the name of the executor of the estate of deceased Mary Frances Delorenzo Knight pursuant to District of Columbia Code §16-2702 (2013).

262. Plaintiff, as the lawfully appointed executor of the estate of Mary Frances Delorenzo Knight brings this cause of action for all wrongful death damages provided by law Caused to the Estate of Mary Frances Delorenzo Knight and for all damages to the next of kin provided by law pursuant to the District of Columbia Code §12-101 et seq. (2013).

Page 101 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 101

263. The deceased Mary Frances Delorenzo Knight saw her attacker Alexis' shoot other co-employees immediately prior to Alexis taking aim at her and she suffered and experience severe pain, mental anguish and emotional distress prior to her wrongful death.

264. The estate of Mary Frances Delorenzo Knight lost probable future earnings, ability to earn in the future, economic and noneconomic damages and all other damages provided by law and District of Columbia Code §16-2701 et seq. (2013).

265. As a direct and foreseeable result of the negligence of HPES, proximately causing her wrongful death, the next of kin of Mary Frances Delorenzo Knight have suffered damages including severe pain, mental anguish, and emotional distress, loss of probable future earnings, loss of ability to earn in the future, economic and noneconomic damages, reasonable expenses of burial, and other damages provided by law including District of Columbia Code §12-101 et. seq. (2013) and District of Columbia Code §16-2701 et. seq. (2013).

WHEREFORE, Plaintiff prays that the court will:

(A)    Take Jurisdiction of the parties and subject matter of this action.

(B)    Conduct a Jury Trial followed by entry of a Final Judgment against Defendant HP Enterprise Services LLC for any and all damages provided by law in favor of the estate and next of kin including but not limited to, severe pain, mental

Page 102 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 102

anguish, emotional distress, loss of probable future earnings, loss of ability to earn in the future, economic and noneconomic damages, reasonable expenses of burial.

(C)   Award attorneys fees and costs to the Plaintiff for bringing this action.

PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES TRIABLE OF RIGHT BY A JURY.

## COUNT II: CAUSE OF ACTION AGAINST THE EXPERTS, INC., FOR WRONGFUL DEATH OF MARY FRANCES DELORENZO KNIGHT ARISING FROM NEGLIGENCE (FAILURE TO HIRE, SUPERVISE AND DISCIPLINE, FAILURE TO WARN)

266.   Plaintiff realleges 1 through 234 above as if fully set forth herein verbatim and further allege:

267.   This is a cause of action for damages against Defendant THE EXPERTS INC. (THE EXPERTS) arising from the negligent wrongful death of Mary Frances Delorenzo Knight in violation Of the District of Columbia Wrongful Death Act (DC code §16-2701 (2013); DC code §12-101 et seq. (2013) for breach of THE EXPERTS duties of due care to:

(A) Comply with the laws (Federal) and common law of the District of Columbia in a non-negligent manner;

(B) Comply with its duty (Federal and common law) of hiring, supervision and discipline of its employees in a non-negligent manner;

Page 103 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(C) Comply with its duty (Federal and common law) to warn others in a non-negligent manner of a foreseeable zone of danger created by the Defendant imposing a risk of serious injury/death upon the others;

(D) Comply with its duty (Federal and common law) to maintain a safe workplace in a non-negligent manner;

(E) Comply with its duty (Federal and common law) imposed by Federal laws in a non-negligent manner including NISPOM.

(F) THE EXPERTS hired Aaron Alexis as a cleared contractor employee and assigned Alexis to work at Federal facilities including the Washington Navy Yard in the same workplace with federal employees including Mary Frances Delorenzo Knight.

(G) THE EXPERTS had a duty to hire, supervise and discipline employee Aaron Alexis in a non-negligent manner.

(H) THE EXPERTS had a duty to warn coworkers in federal facilities in the same workplace with Aaron Alexis of any risks known to THE EXPERTS posed to these coworkers by Alexis causing serious injury/death to them.

(I) NISPOM imposes a legal duty upon all clear contractors and their employees including THE EXPERTS to report any known adverse information about their cleared contractor employees to  DoD CAF via JPAS and to Navy commanders of federal facilities where THE EXPERTS assigned Alexis to work.

Page 104 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(J) THE EXPERTS had a legal duty imposed under federal law (NISPOM) to report to DoD CAF and Navy commanders of known adverse information about THE EXPERTS employee Alexis.

(K) THE EXPERTS had a legal duty imposed under common law to report to DoD CAF and Navy commanders of known adverse information about THE EXPERTS employee Alexis.

268.  Prior to September 16, 2013, Aaron Alexis was observed by THE EXPERTS supervisors and employees to behave in a way that raised reasonable concerns about his mental stability and presented indicators that he may likely cause harm to others. (Paragraphs 188-221, infra). (Plaintiff's Exhibit 239 at page 3).

269.  Senior managers at THE EXPERTS failed to meet their contractually required responsibility to continuously evaluate their employee Alexis and report adverse information to the Department of Defense Central Adjudication Facility (DoD CAF and Navy installation commanders). (Plaintiff's Exhibit 239 at Page 3)

270.  Specifically, THE EXPERTS company leadership decided not to inform the government (DoD CAF or Navy Commanders) of known adverse information concerning Alexis' emotional, mental, or personality condition, even when they had concerns that Alexis may cause harm to others. (Plaintiff's Exhibit 239 at Page 62)

Page 105 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

271.   Instead of informing the government and Navy commanders, THE EXPERTS company leadership intentionally concealed the known adverse information.

272.   Concealment of the Alexis adverse information by THE EXPERTS is evidence of consciousness of guilt of wrongdoing.

273.   THE EXPERTS also knew Alexis had experienced previous episodes of paranoia and THE EXPERTS was concerned that Alexis could present a risk of harm to others. (Plaintiff's Exhibit 239 at page 63)

274.   THE EXPERTS was aware in August 2013 that Alexis irrationally believed he had been followed by people from Norfolk Virginia and that these people were: (A) speaking to him through the walls; (B) using a machine to pin him to the bed; and (C) intentionally following Alexis each time he changed hotels to escape from them. (Plaintiff's Exhibit 239 at page 63)

275.   THE EXPERTS had collected sufficient credible information that Alexis was experiencing an adverse emotional, mental, or personality event which satisfied the NISPOM reporting criteria and imposed a duty upon THE EXPERTS to report the adverse information to the DoD CAF and Navy installation commanders. (Plaintiff's Exhibit 239 at page 63)

276.   THE EXPERTS breached its duty to report this information concerning Alexis to U.S. Navy installation commanders to prevent access to

Page 106 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

Naval Station Newport, Naval Undersea Warfare Center (NUWC) and the Washington Navy Yard as required by NISPOM. (Plaintiff's Exhibit 239 at page 63)

277.   THE EXPERT failed to report adverse information about Alexis through JPAS to DoD CAF or Defense Security Service (DSS), the Cognizant Security Agency, to allow assessment of Alexis' continued eligibility for access to classified information. (Plan is Exhibit 239 at page 63)

278.   Instead, THE EXPERTS only took an administrative action to cancel Alexis' visit request to NUWC. (Plaintiff's Exhibit 239 at page 63)

279.   The action by THE EXPERTS to administratively cancel Alexis' visit request to NUWC did not adequately discharge its duty to report adverse information under NISPOM to DoD CAF and Navy installation commanders. (Plaintiff's Exhibit 239 at page 63)

280.   Had this known adverse information about Alexis been reported by THE EXPERTS to DoD CAF and Navy installation commanders, more likely than not, it would have properly been adjudicated and acted upon, and consequently Alexis' authorization to access secure facilities and information would likely have been revoked (Plaintiff's Exhibit 239 at page 3)

Page 107 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 107

281.   Had Alexis' authorization to access secure facilities and information been revoked, Alexis would not likely have been granted access to the Washington Navy Yard thereafter on September 16, 2013. (Plaintiff's Exhibit 239 at page 3)

282.   Had Alexis not likely been granted access to the Washington Navy Yard, Alexis would not likely have shot and killed Mary Frances Delorenzo Knight.

283.   On August 7, 2013 THE EXPERTS itself administratively adjudicated Alexis to be a threat of harm to others in the workplace without any professional mental health assessment of Alexis or fitness of return to duty psychological examination by a health care professional. (Plaintiff's Exhibit 183 at page 20)

284.   Thereafter, THE EXPERTS itself administratively canceled Alexis' visit request to NUWC.

285.   Two days later, on August 9, 2013, THE EXPERTS itself administratively adjudicated Alexis to no longer pose a threat of harm to others in the workplace without any professional mental health assessment of Alexis or fitness of return to duty psychological examination by a healthcare professional. (Plaintiff's Exhibit 239 at page 63-64) (Plaintiff's Exhibit 183 at page 20)

286.   Thereafter, THE EXPERTS returned Alexis to active duty despite its knowledge that Alexis presented a real and present danger of harm to others in the workplace.

Page 108 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 108

287. Further, THE EXPERTS returned Alexis to active duty while concealing, and not reporting, its known adverse information about Alexis to the DoD CAF and Navy installation commanders of Federal facilities where THE EXPERTS assigned Alexis to work.

288. THE EXPERTS concealment of this adverse information from the government is evidence of THE EXPERTS consciousness of guilt of its own wrongdoing.

289. THE EXPERTS negligently breached its duties by:

(A) Making a determination from THE EXPERTS own observation that Alexis' bizarre behavior in August 2013 presented a real and present danger of harm to others in the workplace around him and consciously concealing that adverse information from the DoD CAF and Navy commanders in violation of its duties under common law and NISPOM.

(B) Making a company administrative adjudication on August 7, 2013 that Alexis presented a risk of harm to others in the workplace and removing him from duty while concealing and failing to report this adverse information to DoD CAF and Navy commanders in violation of its duties under NISPOM and its common-law duties to hire supervise and discipline employees and to warn of risks of danger and death from an active inside threat into non-negligent fashion.

Page 109 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(C) Consciously deciding not to report to the DoD CAF and Navy commanders, and not reporting, the known adverse information about a cleared employee with a secret security clearance.

(D) Making a company administrative adjudication on August 9, 2013 that Alexis no longer presented a risk of harm to others in the workplace without a professional mental health assessment or fitness for return to duty psychological evaluation by health care professional. (Plaintiff's Exhibit 183 at page 20) (Plaintiff's Exhibit 185 at page 45)

(E) Returning Alexis to active duty and reinstating his eligibility for access to classified information on August 9, 2013 without a professional mental health assessment or fitness for return to duty psychological evaluation by health care professional. (Plaintiff's Exhibit 183 at page 20)

(F) Returning Alexis to active duty and reinstating his eligibility for access to classified information knowing that Alexis presented a real and present danger of harm to others in the workplace. (Plaintiff's Exhibit 183 at page 20)

(G) Consciously deciding not to report to the DoD CAF and Navy commanders, and not reporting, the company's administrative adjudication returning Alexis to active duty on August 9, 2013.

(H) Failing to take effective action to preclude Alexis' continued access to government facilities including retrieving Alexis' government issued credentials

Page 110 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

(common access card). (Plaintiff's Exhibit 239 at page 64) (Plaintiff's Exhibit 185 at page 45)

290.   The wrongful death of Mary Frances Delorenzo Knight on September 16, 2013 occurred within the district limits of the District of Columbia.

291.   The wrongful death of Mary Frances Delorenzo Knight was proximately caused by the negligence of THE EXPERTS.

292.   The wrongful death of Mary Frances Delorenzo Knight would not have occurred but for the negligence of THE EXPERTS.

293.   Plaintiff, as the lawfully appointed executor of the estate of Mary Frances Delorenzo Knight is authorized to bring this action in the name of the executor of the estate of deceased Mary Frances Delorenzo Knight pursuant to District of Columbia Code §16-2702 (2013).

294.   Plaintiff, as the lawfully appointed executor of the estate of Mary Frances Delorenzo Knight brings this cause of action for all wrongful death damages provided by law caused to the Estate of Mary Frances Delorenzo Knight and for all damages to the next of kin provided by law pursuant to the District of Columbia Code §12-101 et seq. (2013).

295.   The deceased Mary Frances Delorenzo Knight saw her attacker Alexis' shoot other co-employees immediately prior to Alexis taking aim at her and

Page 111 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 111

she suffered and experience severe pain, mental anguish and emotional distress prior to her wrongful death.

296.   The estate of Mary Frances Delorenzo Knight lost probable future earnings, ability to earn in the future, economic and noneconomic damages and all other damages provided by law and District of Columbia Code §16-2701 et seq. (2013).

297.   As a direct and foreseeable result of the negligence of THE EXPERTS, proximately causing her wrongful death, the next of kin of Mary Frances Delorenzo Knight have suffered damages including severe pain, mental anguish, and emotional distress, loss of probable future earnings, loss of ability to earn in the future, economic and noneconomic damages, reasonable expenses of burial, and other damages provided by law including District of Columbia Code §12-101 et. seq. (2013) and District of Columbia Code §16-2701 et. seq. (2013).

WHEREFORE, Plaintiff prays that the Court will:

A.   Take jurisdiction of the parties and subject matter of this action.

B.   Conduct a trial followed by entry of a Final Judgment against THE EXPERTS for all Damages provided by law in favor of the Estate and next of kin.

C.   Award attorneys fees and costs to the Plaintiff for bringing this action.

D.   Enter such other and further relief as the court deems just in the premises.

Page 112 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES TRIABLE OF RIGHT BY A JURY.

## COUNT III: CAUSE OF ACTION AGAINST UNITED STATES OF AMERICA d/b/a DEPARTMENT OF NAVY FOR WRONGFUL DEATH OF MARY FRANCES DELORENZO KNIGHT ARISING FROM NEGLIGENCE (DUTY TO KEEP SAFE, DUTY TO WARN, DUTY TO HIRE, SUPERVISE AND TRAIN)

298.   Plaintiff realleges 1 through 234 above as if fully set forth herein verbatim and further allege:

299.   This is a cause of action for damages against the USA (d/b/a Department of the Navy) arising from negligence proximately causing the wrongful death of Mary Frances DeLorenzo Knight pursuant to DC Code §16-2701 (2013)

300.   The wrongful death of Mary Frances DeLorenzo Knight on September 16, 2013 occurred within the limits of the District of Columbia.

301.   The wrongful death of Mary Frances DeLorenzo Knight was proximately caused by the negligence of the USA (d/b/a Department of the Navy).

302.   Plaintiff, as lawfully appointed personal representative, is authorized to bring this action in the name of the personal representative of the estate of deceased Mary Frances Delorenzo Knight pursuant to DC code §16-2702 (2013).

Page 113 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

303. Plaintiff, as personal representative, brings this cause of action for damages caused to the Estate of Mary Frances Delorenzo Knight and for damages to the next of kin pursuant to DC Code §12-101 et seq. (2013)

304. The Defendant USA (d/b/a Department of the Navy) owed a non-delegable duty to the Plaintiff to maintain the premises of the Washington Navy Yard and Building 197 where Mary Frances Delorenzo Knight worked in a safe condition free from foreseeable, unreasonable risks of death from known active inside shooters. DoDi 2000.16 which requires inspections of person and vehicles for the possession of firearms prior to admitting access to Federal facilities/military installations (Plaintiff's Exhibit 252). This duty included:

   a.   Following all established applicable rules, policies and procedures for the safety and protection of persons and facilities on the Washington Navy Yard and Building 197

   b.   Promptly and properly assessing foreseeable risks of death and injury to military and civilian employees on the Washington Navy Yard and Building 197 from known active inside shooters.

   c.   Promptly and properly mitigating foreseeable risks of death and injury to military and civilian employees on the Washington Navy Yard and Building 197 from known active inside shooters.

Page 114 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 114

d.    Following all established applicable rules, policies and procedures to prevent access to the premises of the Washington Navy Yard and Building 197 by persons possessing "prohibited items" under Title 18 United States Code §930 including firearms and ammunition.

e.    Promptly and properly identifying, screening and searching persons accessing the premises of the Washington Navy Yard and Building 197 for possession of "prohibited items" under Title 18 United States code §930 including firearms and ammunition.

f.    Identifying and preventing access to the premises of the Washington Navy Yard and Building 197 by persons in possession of "prohibited items" under title 18 United States code §930 including firearms and ammunition.

g.    Recognizing that the Washington Navy Yard is located in a "high risk" area of DC.

h.    Recognizing that the Washington Navy Yard is located in an area which experiences a high rate of "outdoor gunshot incidents" each year for the past eight years.

305.  The USA (d/b/a Department of the Navy) owed a duty to warn the Plaintiff Mary Frances Delorenzo Knight and other military and civilian employees in Building 197 at the Washington Naval Yard of the risk of injury and/or death

Page 115 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 115

from a known active inside shooter arising from the negligence of the USA in failing to mitigate for the risk of injury and/or death.

306.   The USA (d/b/a Department of the Navy) breached its duty to warn the Plaintiff Mary Frances Delorenzo Knight of the risk of injury and/or death from a known active inside shooter arising from the negligence of the USA in failing to mitigate for the risk by screening and searching for prohibited items including firearms and ammunition possessed by those accessing and entering Building 197 at the Washington Naval Yard. DoDi 2000.16 which requires inspections of person and vehicles for the possession of firearms prior to admitting access to Federal facilities/military installations (Plaintiff's Exhibit 252)

307.   The USA (d/b/a Department of the Navy) owed a duty to properly hire, supervise and train security staff to protect the Plaintiff Mary Frances Delorenzo Knight and military and civilian employees in Building 197 at the Washington Naval Yard by mitigating the risk of injury and/or death from a known active inside shooter.

308.   The USA (d/b/a Department of the Navy) breached its duty to properly hire, supervise and train security staff to protect the Plaintiff Mary Frances Delorenzo Knight by failing to mitigate for the risk of injury and/or death from a known active inside shooter by screening and searching for prohibited items

Page 116 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

including firearms and ammunition possessed by those accessing and entering Building 197 at the Washington Naval Yard.

    (A)   The "DoD Independent Review of the Washington Navy Yard Shooting" dated November 20, 2013, made the following "conclusion and significant finding:

    (1) "… Random vehicle or bag inspections were not conducted in accordance with DoD policy." (Plaintiff's Exhibit 183 at page 2)

    (2) "The review revealed that Random Antiterrorism Measures (RAM) and the vehicle inspections were not being conducted regularly as required under DoDI 2000.16 "DoD Anti-Terrorism (AT) Standards." (Plaintiff's Exhibit 183 at page 45)

    (3) "… Without conducting exhaustive searches of facilities and residences, it is impossible to verify illegal weapons have not been smuggled onto DoD installations." (Plaintiff's Exhibit 183 at page 48)

309.  The decedent Mary Frances Delorenzo Knight suffered and experienced severe pain, mental anguish and emotional distress prior to her wrongful death.

310.  The estate of Mary Frances Delorenzo Knight lost probable future earnings, ability to earn in the future, economic and noneconomic damages in all other damages provided by DC code §16-2701 et seq. (2013)

Page 117 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

311.   As a Direct and foreseeable result of the negligence of the USA, proximately causing her wrongful death, the next of kin of Mary Frances Delorenzo Knight have suffered damages including severe pain, mental anguish and emotional distress, loss of probable future earnings, loss of ability to earn in the future, economic and noneconomic damages, reasonable expenses of burial, and other damages provided by law including DC code §12-101 et seq. (2013) and DC code §16-2701 et seq. (2013)

312.   The United States Navy breached its duty to make required disclosures required by SECNAV M5510-30 to the DoN CAF about Aaron Alexis which hampered the CAF decision to grant Alexis a secret security clearance (Plaintiff's Exhibit 239 at page 59)

313.   The United States Navy breached its duty to make required disclosures required by SECNAV M5510-30 to the DoN CAF including adverse information concerning arrests of Alexis on August 10, 2008 and May 17, 2009 which allowed Alexis continued eligibility to access classified information.

314.   The United States Navy breached its duty to screen persons for the possession of unlawful firearms on a Federal  facility at the point of entry of the Washington Navy Yard as required by title 18 United States code §930 and (OPNAVINST 5530-14E; DoDI 5200.08; SECNAVINST 5500.29C) and the Federal laws set forth in Paragraph 3 supra.

Page 118 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

315. The United States Navy breached its duty to make required disclosures required by SECNAV M5510-30 two the DoN CAF including adverse information concerning the August 7, 2013 Naval Station Newport police report provided to the Naval Station Newport security department about the bizarre behavior and mental instability of Aaron Alexis.

WHEREFORE, Plaintiff prays that the Court will:

A.   Take jurisdiction of the parties and subject matter of this action.

B.   Conduct a Trial followed by the entry of a Final Judgment for all lawful damages in favor of the estate and next of kin of Mary Frances Delorenzo Knight

C.   Award attorneys fees and costs to the Plaintiff.

D.   Enter such other and further relief as the Court deems just in the premises.

PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES TRIABLE OF RIGHT BY A JURY.

## COUNT IV: CAUSE OF ACTION FOR DAMAGES AGAINST JOHN/JANE DOE'S #1-5 FOR DENIAL OF CONSTITUTIONAL RIGHTS (BIVENS CLAIMS)

316. Plaintiff realleges 1 through 234 above as if fully set forth herein verbatim and further allege:

Page 119 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

317.   This is a cause of action for damages against John/Jane Does #1-4 for denial of the Plaintiff's constitutional rights to life and liberty guaranteed by the due process clause of the Fifth Amendment and Federal  common law under Bivens v. Six Unknown Named Agents Of the Federal  Bureau of Narcotics, 403 U.S. 388 (1971)

318.   Federal  employees are personally liable for constitutional deprivations through their (1) direct participation; (2) failure to remedy wrongs after learning about them; (3) creation of policy or custom under which a violation of constitutional practices occur; or (4) gross negligence in managing subordinates because these violations.

319.   The death of Mary Frances Delorenzo Knight was the clearly foreseeable consequence of the Defendant's affirmative actions described herein.

320.   These Defendants are not entitled to qualified immunity since their conduct violated clearly established statutory and constitutional rights known to any reasonable person.

321.   Defendant's conduct rises to the level of gross misconduct, being that there was willful, wanton, and reckless disregard for the rights and safety of deceased Mary Frances Delorenzo Knight.

Page 120 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 120

322.   This is a cause of action for damages against the John/Jane Does #1-4 arising from negligence proximately causing the wrongful death of Mary Frances DeLorenzo Knight pursuant to DC Code §16-2701 (2013)

323.   Defendant John/Jane Does #1-4 include the following:

(A) John/Jane Doe #1 is an unknown security officer employed at the Naval Station Newport Security Department who received "adverse information" regarding shooter Aaron Alexis that was required to be reported immediately to the DoN CAF via JPAS pursuant to SECNAV M-5510 (Navy PSP) and DoD 5200.2-R (DoD PSP Regulations for all DON military members) and EO 10450(Security Requirements for Government Employees)

(B) John/Jane Doe #2 is an unknown security supervisor employed at Naval Station Newport Security Department who received "adverse information" regarding shooter Aaron Alexis that was required to be reported immediately to the DoN CAF via JPAS pursuant to SECNAV M-5510 (Navy PSP) and DoD 5200.2-R (DoD PSP Regulations for all DON military members) and EO 10450(Security Requirements for Government Employees)

(C) John/Jane Doe #3 is an unknown sentry employed by Naval Support Activity Washington (NSAW) Naval Security Force (NSF) at the Entry Control Point (ECP) of the Washington Navy Yard who had a duty to screen shooter Aaron Alexis for the possession of unlawful firearms and ammunition on a Federal

Page 121 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

facility required by title 18 United States code §930;OPNAVINST 5530.14E(Navy

Physical Security and Law Enforcement Program); SECNAVINST 5500.29C(Use

of Deadly Force and the Carrying of Firearms by Personnel of the Department of

the Navy in conjunction with Law Enforcement, Security Duties and Personal

Protection); DoDD 5210.56(Use of Deadly Force and the Carrying of Firearms by

DoD personnel engaged in law enforcement and security duties)

324.   Defendant John/Jane Doe #1 committed gross negligence by placing

Mary Frances DeLorenzo Knight into a for seeable zone of danger of serious

injury/death from an active inside shooter by failing to report "adverse

information" regarding shooter Aaron Alexis that was required to be reported

immediately to the DoN CAF via JPAS pursuant to SECNAV M-5510. But for the

gross negligence of John/Jane Doe #1, shooter Aaron Alexis secret security

clearance would have been revoked/terminated and he would not have been

permitted access to the Washington Navy Yard on September 16, 2013. The death

of Mary Frances Delorenzo Knight would've been prevented by due care of

Defendant John/Jane Doe #1.

325.   Defendant John/Jane Doe #2 committed gross negligence by failing to

immediately report "adverse information" regarding shooter Aaron Alexis to the

DoN CAF via JPAS required by SECNAV M-5510. But for the gross negligence

of John/Jane Doe #2, shooter Aaron Alexis secret security clearance would have

Page 122 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

been revoked/terminated and he would not have been permitted access to the Washington Navy Yard on September 16, 2013. The death of Mary Frances Delorenzo Knight would have been prevented by due care of Defendant John/Jane Doe #2.

326. Defendant John/Jane Doe #3 committed gross negligence by breaching his/her duty to screen shooter Aaron Alexis for possession of unlawful firearms and ammunition on a Federal facility prohibited by title 18 United States code §930 and required by OPNAVINST 5530-14E; SECNAVINST 5500.29C; DoDD 5210.56 and common law. But for the gross negligence of John/Jane Doe #3, shooter Aaron Alexis would not have been permitted access to the Washington Navy Yard while possessing a firearm and ammunition on September 16, 2013. The death of Mary Frances Delorenzo Knight would have been prevented by due care of Defendant John/Jane Doe #3.

327. Defendant John/Jane Doe #4 committed gross negligence by failing to supervise and require the contract security guard for Building 197 to screen shooter Aaron Alexis for possession of unlawful firearms and ammunition on a Federal facility contrary to OPNAVINST 5530.14E and common law, but for the gross negligence of John/Jane Doe #4, shooter Aaron Alexis was not have been permitted access to the Washington Navy Yard Building 197 while possessing a

Page 123 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

firearm and ammunition on September 16, 2013. The death of Mary Frances Delorenzo Knight would have been prevented by due care of John/Jane Doe #4.

328. Defendant John/Jane Does #1-4 were aware that death and/or serious injury of occupants of the Washington Navy Yard Building 197 was likely to occur as a consequence of their actions, but proceeded with reckless indifference to the consequences of the danger they created.

329. The death of Mary Frances Delorenzo Knight by active inside shooter Aaron Alexis was actually, proximately and foreseeably caused by the gross negligence of John/Jane Does #1-4 and each of them.

330. The gross negligence of John/Jane Does #3 and #4 violated Federal statutes and regulations including but not limited to title 18 United States Code §930 and OPNAVINST 5530.14E which are intended to protect a special class of persons including Mary Frances Delorenzo Knight and other occupants of Federal facilities. Defendant John/Jane Doe #3 and #4 gross negligence in violating these Federal Statutes and Regulations constitutes negligence per se.

330. As a direct and proximate result of the gross negligence of John/Jane Does #1-4 inclusive, Plaintiff and the estate of Mary Frances Delorenzo Knight have suffered damages.

331. The wrongful death of Mary Frances Delorenzo Knight on September 16, 2013 occurred within the district limits of the District of Columbia.

Page 124 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

332. The wrongful death of Mary Frances Delorenzo Knight was proximately caused by the negligence of John/Jane Does #1-4.

333. The wrongful death of Mary Frances Delorenzo Knight would not have occurred but for the negligence of John/Jane Does #1-4.

334. Plaintiff, as the lawfully appointed executor of the estate of Mary Frances Delorenzo Knight is authorized to bring this action in the name of the executor of the estate of deceased Mary Frances Delorenzo Knight pursuant to District of Columbia Code §16-2702 (2013).

335. Plaintiff, as the lawfully appointed executor of the estate of Mary Frances Delorenzo Knight brings this cause of action for all wrongful death damages provided by law caused to the Estate of Mary Frances Delorenzo Knight and for all damages to the next of kin provided by law pursuant to the District of Columbia Code §12-101 et seq. (2013).

336. The deceased Mary Frances Delorenzo Knight saw her attacker Alexis' shoot other co-employees immediately prior to Alexis taking aim at her and she suffered and experience severe pain, mental anguish and emotional distress prior to her wrongful death.

337. The estate of Mary Frances Delorenzo Knight lost probable future earnings, ability to earn in the future, economic and noneconomic damages and all

Page 125 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

04/16/2014 3:07 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 125

other damages provided by law and District of Columbia Code §16-2701 et seq. (2013).

338.   As a direct and foreseeable result of the negligence of John/Jane Does #1-4, proximately causing her wrongful death, the next of kin of Mary Frances Delorenzo Knight have suffered damages including severe pain, mental anguish, and emotional distress, loss of probable future earnings, loss of ability to earn in the future, economic and noneconomic damages, reasonable expenses of burial, and other damages provided by law including District of Columbia Code §12-101 et. seq. (2013) and District of Columbia Code §16-2701 et. seq. (2013).

WHEREFORE, Plaintiff prays that the Court will:

A.   Take jurisdiction of the parties and subject matter of this action.

B.   Conduct a Trial followed by the entry of a Final Judgment for all lawful damages in favor of the estate and next of kin of Mary Frances Delorenzo Knight

C.   Award attorneys fees and costs to the Plaintiff.

D.   Enter such other and further relief as the Court deems just in the premises.

PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES TRIABLE OF RIGHT BY A JURY.

Page 126 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial

Respectfully submitted this 16th day of April, 2014

/s/ Sidney L. Matthew
SIDNEY L. MATTHEW, ESQ.
SIDNEY L. MATTHEW, P.A.
Fl. Bar.: 193496
Post Office Box 1754
Tallahassee, Florida 32302
(850) 224-7887
Facsimile: (850) 681-3122
sidmatthew@earthlink.net
Attorney for Plaintiff

JUSTIN GIVENS, ESQ.
JUSTIN GIVENS, P.A.
Fl. Bar.: 52130
Post Office Box 12613
Tallahassee, Florida 32317
(850) 339-8049
givenslaw@gmail.com
Attorney for Plaintiff

Page 127 of 127
Delorenzo v. HPES, et al
Complaint for Damages and Demand for Jury Trial