# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PATRICIA DELORENZO,<br>     Plaintiff,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:15-cv-0216-RMC |
| JAMES B. FRASIER et al.,<br>     Plaintiffs,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:15-cv-1492-RMC |
| JOHN EDWARD PROCTOR,<br>     Plaintiff,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:15-cv-1494-RMC |
| PRISCILLA A. HALMON-DANIELS,<br>     Plaintiff,<br><br>v.<br><br>THE EXPERTS, INC. et al.,<br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:15-cv-1501-RMC |

| | | |
|---|---|---|
| MICHELLE KOHLER,<br>          Plaintiff, | )<br>)<br>) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-1636-RMC |
| | ) | |
| HP ENTERPRISE SERVICES, LLC et al.,<br>          Defendants. | )<br>) | |
| | ) | |
| TRACEY RIDGELL,<br>          Plaintiff, | )<br>)<br>) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-1637-RMC |
| | ) | |
| HP ENTERPRISE SERVICES, LLC et al.,<br>          Defendants. | )<br>) | |
| | ) | |
| ERIN ZAGAMI,<br>          Plaintiff, | )<br>)<br>) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-1638-RMC |
| | ) | |
| HP ENTERPRISE SERVICES, LLC et al.,<br>          Defendants. | )<br>) | |
| | ) | |
| JANE MAE MCCULLOUGH,<br>          Plaintiff, | )<br>)<br>) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-1639-RMC |
| | ) | |
| HP ENTERPRISE SERVICES, LLC et al.,<br>          Defendants. | )<br>) | |

## DEFENDANT HP ENTERPRISE SERVICES, LLC'S
## OMNIBUS MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and to the Court's

November 4, 2015 Scheduling Order, defendant HP Enterprise Services, LLC ("HPES") moves

to dismiss all claims asserted against HPES in the above-captioned complaints (the "Complaints").  In support of this motion, HPES states:

1.     These eight cases all arise from the mass shooting at the Navy Yard in Washington, D.C., on September 16, 2013.  The crimes were committed by Aaron Alexis, a civilian employee of The Experts, Inc. (The Experts"), an HPES subcontractor working as a computer technician at the Navy Yard.

2.     In seven of the eight cases, the Complaints seek damages for the shooting deaths of individuals murdered by Mr. Alexis:

- *Delorenzo v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-0216-RMC

- *Frasier v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1492-RMC

- *Proctor v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1494-RMC

- *Halmon-Daniels v. The Experts, Inc.*, Case No. 1:15-cv-1501-RMC

- *Kohler v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1636-RMC

- *Ridgell v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1637-RMC

- *Zagami v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1638-RMC

The eighth case asserts claims by a plaintiff who alleges she suffered injuries from witnessing the events:  *McCullough v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1639-RMC.

3.     The defendants are businesses that the plaintiffs seek to hold liable for the criminal acts of Mr. Alexis: HPES, which provided information technology services to the Navy under a government contract; The Experts, an HPES subcontractor and the employer of Mr. Alexis; and HBC Management Services, Inc. and The Hana Group, Inc., which provided security services at the Navy Yard.

4.       In total, the Complaints assert 34 counts against HPES.  All but three of those counts involve negligence claims seeking to hold HPES liable for failing to anticipate and prevent Mr. Alexis's criminal acts.[1]  The remaining three counts assert claims for the assault and battery by Mr. Alexis and seek to hold HPES liable on the basis of vicarious liability.[2]

5.       Each of the negligence claims fails to state a claim against HPES.  An essential element of a negligence claim under D.C. law is that the defendant owed a duty of care to the plaintiff.  Each Complaint fails to allege a legally sufficient basis for imposing such a duty on HPES.  *First*, to state a claim against HPES in this situation—where the alleged tort arises from criminal acts of a third-party—it must be alleged that the mass shooting at the Navy Yard was "particularly foreseeable" to HPES.  *Workman v. United Methodist Comm.*, 320 F.3d 259, 263 (D.C. Cir. 2003).  As described in the accompanying Memorandum of Law, the factual allegations made against HPES do not come close to satisfying this demanding standard.  *Second*, plaintiffs' alternate attempt to allege a duty by reference to a Department of Defense manual (known as "NISPOM") that prescribes procedures for protecting classified information and/or workplace safety statutes fails as well.  Under D.C. law, in order to plead such a duty, it must be clear that the third-party criminal conduct was "the very injury" the statute or regulation intended to prevent.  *Romero v. Nat'l Rifle Ass'n of Am., Inc.*, 749 F.2d 77, 83 (D.C. Cir. 1984).  Here, plaintiffs' claims fail because NISPOM was intended to protect against the unauthorized disclosure of classified information and the workplace safety statutes were designed to prevent

---

[1] *Delorenzo* Compl. Count I; *Frasier* Compl. Counts I-II; *Proctor* Compl. Counts III-VI; *Halmon-Daniels* Compl. Counts III-IV, VI; *Kohler* Compl. Counts IV-VII, IX-X; *Zagami* Compl. Counts IV-VII, IX-X; *Ridgell* Compl. Counts IV-IX; *McCullough* Compl. Counts I, III-IV.

[2] *McCullough* Compl. Count II; *Proctor* Compl. Counts VII-VIII.

on-the-job accidents; neither was designed to prevent mass murder.  As a result, the negligence counts against HPES fail as a matter of law.

6.      The three remaining counts seeking to hold HPES liable for the assault and battery by Mr. Alexis fail to state a claim because plaintiffs have failed to allege that Mr. Alexis was acting within the scope of his employment with The Experts when he carried out the shooting; and two of the three claims are also barred by the statute of limitations.

WHEREFORE, defendant HPES requests that the Court dismiss all Counts of the Complaints asserted against HPES for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

ORAL ARGUMENT REQUESTED

Dated: December 11, 2015               Respectfully submitted,

                                       _/s/ John E. Hall_____
                                       John E. Hall (D.C. Bar #415364)
                                       Jason C. Raofield (D.C. Bar #463877)
                                       COVINGTON & BURLING LLP
                                       One CityCenter
                                       850 10th Street, NW
                                       Washington, DC 20001
                                       (202) 662-6000
                                       Email: jhall@cov.com
                                       Email: jraofield@cov.com

                                       *Attorneys for HP Enterprise Services, LLC*

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Civil Rule 7(f), defendant HP Enterprise Services, LLC respectfully requests oral argument on its Omnibus Motion to Dismiss.  HPES estimates that the time required for argument would be three hours.


Dated: December 11, 2015

Respectfully submitted,

 */s/ John E. Hall*
John E. Hall (D.C. Bar #415364)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
jhall@cov.com

*Attorney for HP Enterprise Services, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 11, 2015, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

　　　　　　　　　　　　　　　*/s/ John E. Hall*
　　　　　　　　　　　　　　　John E. Hall (D.C. Bar #415364)
　　　　　　　　　　　　　　　COVINGTON & BURLING LLP
　　　　　　　　　　　　　　　One CityCenter
　　　　　　　　　　　　　　　850 Tenth Street, NW
　　　　　　　　　　　　　　　Washington, DC 20001-4956
　　　　　　　　　　　　　　　(202) 662-6000
　　　　　　　　　　　　　　　jhall@cov.com

　　　　　　　　　　　　　　　*Attorney for HP Enterprise Services, LLC*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICIA DELORENZO,<br>　　　Plaintiff,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)　　Case No. 1:15-cv-0216-RMC<br>)<br>)<br>)<br>) |
| JAMES B. FRASIER et al.,<br>　　　Plaintiffs,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)　　Case No. 1:15-cv-1492-RMC<br>)<br>)<br>)<br>) |
| JOHN EDWARD PROCTOR,<br>　　　Plaintiff,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)　　Case No. 1:15-cv-1494-RMC<br>)<br>)<br>)<br>) |
| PRISCILLA A. HALMON-DANIELS,<br>　　　Plaintiff,<br><br>v.<br><br>THE EXPERTS, INC. et al.,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)　　Case No. 1:15-cv-1501-RMC<br>)<br>)<br>)<br>) |

|  |  |  |
|---|---|---|
| MICHELLE KOHLER,<br>　　　Plaintiff, | ) ) ) ) | |
| v. | ) ) | Case No. 1:15-cv-1636-RMC |
| HP ENTERPRISE SERVICES, LLC et al.,<br>　　　Defendants. | ) ) ) | |
| TRACEY RIDGELL,<br>　　　Plaintiff, | ) ) ) ) | |
| v. | ) ) | Case No. 1:15-cv-1637-RMC |
| HP ENTERPRISE SERVICES, LLC et al.,<br>　　　Defendants. | ) ) ) | |
| ERIN ZAGAMI,<br>　　　Plaintiff, | ) ) ) ) | |
| v. | ) ) | Case No. 1:15-cv-1638-RMC |
| HP ENTERPRISE SERVICES, LLC et al.,<br>　　　Defendants. | ) ) ) | |
| JANE MAE MCCULLOUGH,<br>　　　Plaintiff, | ) ) ) ) | |
| v. | ) ) | Case No. 1:15-cv-1639-RMC |
| HP ENTERPRISE SERVICES, LLC et al.,<br>　　　Defendants. | ) ) ) ) | |

## DEFENDANT HP ENTERPRISE SERVICES, LLC'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## <u>OMNIBUS MOTION TO DISMISS</u>

Defendant HP Enterprise Services, LLC ("HPES") submits this memorandum of law in

support of its contemporaneously-filed motion, pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, to dismiss all claims asserted against HPES in the above-captioned complaints.

## INTRODUCTION

These personal injury tort cases arise from the mass shooting at the Navy Yard in Washington, D.C., on September 16, 2013.  The crimes were committed by Aaron Alexis, a civilian working as a computer technician at the Navy Yard.  Before being killed by law enforcement, Mr. Alexis murdered twelve persons, including the seven victims on behalf of whom wrongful death and survival actions are asserted in these cases.  At the time of the shooting, Mr. Alexis was employed by The Experts, Inc. ("The Experts"), a firm working at the time under a subcontract to HPES, which provided IT services to the Navy.  Seven of the Complaints bring wrongful death and survival actions, and the eighth seeks damages by a survivor for alleged emotional injury.  The Complaints assert negligence claims against HPES and The Experts, and two also assert claims seeking to hold the defendants liable for the assault and battery by Mr. Alexis.  In addition, two of the Complaints assert negligence claims against defendants HBC Management Services, Inc. and The Hana Group, Inc. (collectively, "HBC"), which provided security services at the Navy Yard.

Defendant HPES seeks dismissal of all claims asserted against it.  The negligence claims, which are pled as arising under District of Columbia law, seek to hold HPES liable for failing to anticipate and prevent this criminal violence based on two theories of liability.  The first theory is that because HPES employees knew of an episode of alleged non-violent mental instability by Mr. Alexis one month prior to the shooting, it was foreseeable to HPES that Mr. Alexis would commit this mass murder and, for that reason, HPES had a common law duty to prevent it.  The second theory is that HPES was negligent *per se*, based upon what plaintiffs allege were violations of certain laws and regulations.  As to this second theory, the plaintiffs' principal contention is that HPES violated obligations imposed on U.S. government contractors by the

National Industrial Security Program Operating Manual ("NISPOM"), a Department of Defense manual that establishes procedures for the reporting of "adverse information" about employees who possess security clearances to allow the government to determine whether the individual can continue to be trusted to handle classified information.  The Complaints allege that had such a report been made regarding Mr. Alexis' behavior one month before the shooting, it would have led the government to revoke his security clearance, and that revocation would have had the coincidental effect of preventing Mr. Alexis from accessing the Navy Yard on the day of the shooting.

As discussed in Section II(A) below, plaintiffs' first theory fails because the Complaints do not allege facts supporting the existence of a common law duty requiring HPES to prevent harm resulting from the criminal conduct of a third party.  Under D.C.'s "general rule of nonliability," a defendant typically is not liable for the criminal act of a third party; a "limited exception" applies "only if the crime was particularly foreseeable."  *Workman v. United Methodist Comm.*, 320 F.3d 259, 262–65 (D.C. Cir. 2003) (explaining D.C.'s "heightened foreseeability requirement").  Although the Complaints assert in conclusory terms that HPES's conduct satisfies this "heightened foreseeability" test, merely reciting the D.C. legal standard is not enough to state a claim.  Under modern federal pleading rules, as described in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Complaints must contain factual allegations supporting the assertion.  These Complaints do not come close.  The only well-pled facts relating to foreseeability concern HPES's knowledge of an incident of bizarre but non-violent behavior by Mr. Alexis one month prior to the shooting.  As a matter of law, this information did not make it "particularly foreseeable" that Mr. Alexis would engage in mass murder.

As discussed in Section II(B), plaintiffs' alternate theory, which attempts to evade D.C.'s "heightened foreseeability" requirement by asserting a negligence *per se* theory premised on an alleged violation of a duty imposed by law, fails as well.  To state a negligence *per se* claim, the plaintiff's injuries must be "of the type which the statute was designed to prevent." *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. 1996).  In cases involving the intervening criminal act of a third party, it must be "clear that the third-party criminal conduct was the very injury. . . which the statute intended to prevent." *Romero v. Nat'l Rifle Ass'n of Am., Inc.*, 749 F.2d 77, 83 (D.C. Cir. 1984) (internal quotation marks omitted).  That plainly is not the case here.  NISPOM has nothing to with the prevention of workplace violence; the manual's expressly stated purpose is to safeguard classified information by, among other things, ensuring the trustworthiness of individuals authorized to access such information.  Three of the Complaints also assert a negligence *per se* theory premised on workplace safety statutes, but, as discussed in Section II(C), those statutes are likewise inapplicable since they were designed to prevent workplace accidents, not mass shootings, and do not apply to HPES in any event.  Accordingly, all of the negligence claims should be dismissed.

Two Complaints also seek to hold HPES liable for the assault and battery by Mr. Alexis. As discussed in Section II(D), those claims should be dismissed because the Complaints fail to allege that Mr. Alexis was acting within the scope of his employment with The Experts when he carried out the shooting; and certain of the assault and battery claims are barred by the statute of limitations.

## I.      PLAINTIFFS' ALLEGATIONS AGAINST HPES

According to the facts alleged in the Complaints, which are taken as true for purposes of a motion to dismiss, on September 16, 2013, Aaron Alexis entered Building 197 at the Navy

Yard with a concealed weapon and opened fire on personnel inside.[1]  Mr. Alexis had been

employed as a computer technician by The Experts—a subcontractor under HPES's contract to

provide IT services to the Navy.[2]  Plaintiffs are personal representatives of the estates (or

surviving family members or heirs) of deceased victims, and a witness to the shooting.[3]

### A.   Plaintiffs' Common Law Negligence Claims

Plaintiffs attach a variety of labels to their negligence claims—*e.g.*, "negligent failure to

warn," "negligent credentialing," "negligent undertaking," "negligent hiring, retention, and

supervision"—but the underlying premise of each claim is that it was foreseeable to HPES that

Mr. Alexis would commit mass murder.  The non-conclusory factual allegations purporting to

show such foreseeability are based upon HPES's knowledge of an incident that occurred one

month before the shooting.[4]  That incident took place on August 7, 2013, during the course of

Mr. Alexis's assignment to an IT project at the Newport Naval Station in Newport, Rhode

Island.[5]

---

[1] Halmon-Daniels ¶ 1; Kohler ¶ 15; Zagami ¶ 15; Ridgell ¶ 13; Proctor ¶ 76; Frasier ¶ 1; Delorenzo ¶¶ 226-29; McCullough ¶ 1. (The individual Complaints are referenced in this Memorandum by last name of the lead plaintiff.)

[2] Halmon-Daniels ¶¶ 11-12; Kohler ¶¶ 11, 16; Zagami ¶¶ 11, 16; Ridgell ¶¶ 9, 14; Proctor ¶ 14; Frasier ¶ 12; Delorenzo ¶¶ 12-14, 160-67; McCullough ¶ 11.

[3] Halmon-Daniels ¶¶ 7-8; Proctor ¶¶ 3-4; Delorenzo ¶¶ 5, 7; Kohler ¶¶ 1, 116, 122; Zagami ¶¶ 1, 116, 122; Ridgell ¶¶ 1, 110, 116; Frasier ¶¶ 4-5, 64; McCullough ¶ 1.

[4] Many of the Complaints include lengthy factual allegations regarding Mr. Alexis's history of arrests and other conduct before he was hired by The Experts, as well certain events that occurred just prior to the shooting (*e.g.*, Mr. Alexis's purchase of the weapon), but the Complaints do not properly allege that any of these facts were known to HPES.  *See infra* at pp. 20-24.

[5] The allegations regarding HPES's knowledge of this incident are based largely on a November 8, 2013 investigative report issued by the Department of the Navy (the "JAGMAN Report"), which is attached to, excerpted by, or referenced in the Complaints.  *See* Delorenzo Ex. 239; Halmon-Daniels ¶ 13; Kohler ¶ 21 n.1; Zagami ¶ 21 n.1; Ridgell ¶ 19 n.1; Proctor ¶ 98.  The Court may consider that report in deciding this motion.  *See Tellabs, Inc. v. Makor Issues &* (continued…)

The Complaints generally allege that HPES knew the following:

- At 1:12 a.m. on August 7, 2013, a program manager for The Experts sent an e-mail to HPES representatives stating that Mr. Alexis "was not feeling well" and was being sent home for some rest.[6]

- At 3:00 a.m., Mr. Alexis telephoned an HPES employee to ask permission to stay in her room at the Marriott Hotel because he said he felt threatened by people he claimed had followed him to the Navy Gateway Inn and Suites, where he was staying.[7]  The HPES employee, who knew Mr. Alexis from a previous project in Japan, agreed to let him stay in her room.[8]

- When Mr. Alexis arrived, he told the HPES employee that three passengers from his flight to Newport had checked into his hotel and began making noise and threats against him.  Mr. Alexis then told the HPES employee that these same people had now checked into a room at the Marriott Hotel on the floor below.[9]  At one point, Mr. Alexis asked the HPES employee whether she could hear the people who had followed him.[10]  The HPES employee told Mr. Alexis that she did not hear anything and went back to sleep.[11]

- At 6:20 a.m., Mr. Alexis telephoned the Newport Police, who responded to the Marriott Hotel and took an extensive report about the individuals he believed had followed him from the airport to his prior hotel and then to the Marriott, and that they were using a "microwave machine" to send vibrations

---

*Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Guerrero v. Vilsack*, -- F. Supp. 3d --, 2015 WL 5729229, at *1 (D.D.C. Sept. 30, 2015) (Collyer, J.); *Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215, 218 (D.D.C. 2012); *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46-47 (D.D.C. 2009).  A complete copy of the JAGMAN Report is attached as Exhibit A to the Raofield Declaration.

[6] Halmon-Daniels ¶ 46; Delorenzo ¶ 190; *see also* Kohler ¶ 47; Zagami ¶ 47; Ridgell ¶ 45; Proctor ¶ 44; JAGMAN Report at 35.

[7] Halmon-Daniels ¶ 47; Delorenzo ¶ 191; *see also* Kohler ¶ 43; Zagami ¶ 43; Ridgell ¶ 41; Proctor ¶ 45; McCullough ¶ 14(b); JAGMAN Report at 35.

[8] Halmon-Daniels ¶ 47; Delorenzo ¶ 192; *see also* Proctor ¶ 45; JAGMAN Report at 35.

[9] Halmon-Daniels ¶ 48; Delorenzo ¶ 193; *see also* Kohler ¶ 44; Zagami ¶ 44; Ridgell ¶ 42; Proctor ¶ 46; McCullough ¶ 14(b); JAGMAN Report at 36.

[10] Halmon-Daniels ¶ 48; Delorenzo ¶ 194; *see also* Kohler ¶ 44; Zagami ¶ 44; Ridgell ¶ 42; Proctor ¶ 47; Frasier ¶ 17(k); McCullough ¶ 14(b); JAGMAN Report at 36.

[11] Halmon-Daniels ¶ 48; Delorenzo ¶ 194; *see also* Kohler ¶ 44; Zagami ¶ 44; Ridgell ¶ 42; Proctor ¶ 47; JAGMAN Report at 36.

into his body to prevent him from sleeping.[12]  The Newport Police faxed a copy of this report to Navy personnel in Newport.[13]  There is, however, no allegation that the Newport Police interacted with any HPES personnel.

- After waking up at about 10:00 a.m., the HPES employee left the room to call the HPES lead supervisor to discuss the incident involving Mr. Alexis.[14]  The HPES lead supervisor informed the HPES employee that The Experts had decided to recall Mr. Alexis from the Newport project.[15]

- When the HPES employee returned to the hotel, she woke Mr. Alexis, who told her that the people following him had now moved from the room on the floor below to a room on the floor above, and that they were continuing to make noises in order to disrupt his sleep.[16]  Mr. Alexis told her that he wanted "to acquire a radar gun in order to hear what they were saying."[17]

- After having lunch together, Mr. Alexis left Newport, and the HPES employee returned to the worksite and again discussed the incident with the HPES lead supervisor and also a third co-worker.[18]  At some point, the program manager for The Experts contacted the HPES employee and discussed Mr. Alexis's stay at the Newport Marriott.[19]

Mr. Alexis returned to work the following week, and between August 12 and September

6, 2013, The Experts assigned him to four different project sites before assigning him to the

---

[12] Halmon-Daniels ¶ 50; Delorenzo ¶¶ 196-200; *see also* Kohler ¶ 45; Zagami ¶ 45; Ridgell ¶ 43; Proctor ¶¶ 48-50; JAGMAN Report at 36-37.

[13]  Halmon-Daniels ¶ 50; Delorenzo ¶¶ 198, 200; *see also* Proctor ¶ 52; Kohler ¶ 46; Zagami ¶ 46; Ridgell ¶ 44; JAGMAN Report at 37.  The Newport Police evaluated Mr. Alexis and "concluded he was not an immediate danger to himself or others."  JAGMAN Report at 65.

[14] Halmon-Daniels ¶ 51; Delorenzo ¶ 201; *see also* Kohler ¶ 45; Zagami ¶ 45; Ridgell ¶ 43; Proctor ¶ 53; JAGMAN Report at 37.

[15] Halmon-Daniels ¶ 51; Delorenzo ¶ 202; *see also* Kohler ¶ 45; Zagami ¶ 45; Ridgell ¶ 43; Proctor ¶ 53; JAGMAN Report at 37.

[16] Halmon-Daniels ¶ 52; Delorenzo ¶ 203; *see also* Kohler ¶ 45; Zagami ¶ 45; Ridgell ¶ 43; Proctor ¶¶ 54-55; JAGMAN Report at 37.

[17] Halmon-Daniels ¶ 52; Delorenzo ¶ 203; *see also* Kohler ¶ 48; Zagami ¶ 48; Ridgell ¶ 46; Proctor ¶ 55; JAGMAN Report at 37.

[18] Halmon-Daniels ¶ 54; Delorenzo ¶¶ 207, 212; *see also* Kohler ¶ 49; Zagami ¶ 49; Ridgell ¶ 47; Proctor ¶ 57; JAGMAN Report at 38.

[19] Halmon-Daniels ¶ 56; Delorenzo ¶ 211; *see also* Kohler ¶ 50; Zagami ¶ 50; Ridgell ¶ 48; Proctor ¶ 59; JAGMAN Report at 38.

Navy Yard.[20]  The Complaints do not allege that he engaged in any bizarre or unusual behavior

during this time.  On September 9, 2013, The Experts assigned Mr. Alexis to the Navy Yard.[21]

The Complaints do not allege that he engaged in any bizarre or unusual behavior during the first

week of that assignment.[22]  The shooting occurred early in the morning on the following

Monday, September 16, 2013, which would have been the first day of Mr. Alexis's second week

at the Navy Yard.

     The Complaints allege that, knowing these facts, HPES should have: (1) terminated Mr.

Alexis's employment or otherwise prevented him from accessing the Navy Yard;[23] (2) warned

the government and individuals at the Navy Yard that Mr. Alexis presented a foreseeable risk of

violence;[24] and/or (3) required Mr. Alexis to undergo mental health treatment or evaluation.[25]

According to plaintiffs, if HPES had taken these steps, the shooting would not have occurred.

### B.    Plaintiffs' Negligence *Per Se* Claims

     Although plaintiffs do not assert any claims expressly styled as negligence *per se*, all of

the Complaints rely upon NISPOM as purportedly establishing a duty of care upon which the

---

[20] Proctor ¶ 67; Delorenzo ¶ 200; *see also* Kohler ¶ 56; Zagami ¶ 50; Ridgell ¶ 48; Halmon-Daniels ¶ 59; JAGMAN Report at 39.

[21] Proctor ¶ 69; *see also* JAGMAN Report at 40.

[22] Proctor ¶ 69 ("[O]ther than leaving a disk in a classified computer, no performance issues were noted."); *see also* JAGMAN Report at 40.

[23] Frasier ¶ 67(l); Proctor ¶¶ 137, 148; Halmon-Daniels ¶ 94; McCullough ¶ 16; Kohler ¶ 95; Ridgell ¶ 93; Zagami ¶ 95; Delorenzo ¶ 256(B).

[24] McCullough ¶ 71; Kohler ¶ 104; Ridgell ¶ 102; Zagami ¶ 104; Frasier ¶ 67(b); Proctor ¶ 87; Delorenzo ¶ 256(B); Halmon-Daniels ¶ 101.

[25] McCullough ¶ 14(g); Frasier ¶ 67(g); Delorenzo ¶ 252; Kohler ¶¶ 54, 104; Ridgell ¶¶ 52, 102; Zagami ¶¶ 54, 104; Proctor ¶ 173.

negligence claims against HPES are based.[26]   The Complaints allege that HPES breached its duty under NISPOM to report the Newport incident to the government as "adverse information" bearing on the reliability of Mr. Alexis to handle classified information; and they allege that such a report would have led to the revocation of Mr. Alexis's security clearance and, as a result, he would not have had access to the Navy Yard five weeks later.[27]

In addition, three of the Complaints assert a theory of liability premised on two statutes related to workplace safety: the D.C. Industrial Safety Act and the Occupational Safety and Health Act.[28]   All three Complaints make the identical allegation regarding the applicable duty purportedly established by those statutes: "These duties include but are not limited to a duty to act with reasonable care to take appropriate measures to prevent workplace violence."[29]

### C.      Plaintiffs' Assault and Battery Claims

Finally, two of the Complaints assert claims seeking to hold HPES vicariously liable for the assault and battery by Mr. Alexis.[30]

## II.      ARGUMENT

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks

---

[26] Proctor ¶ 164; Kohler ¶¶ 21, 95; Zagami ¶¶ 21, 95; Ridgell ¶¶ 19, 93; Frasier ¶¶ 42, 66; McCullough ¶¶ 13, 71; Halmon-Daniels ¶ 60; Delorenzo ¶ 236(E).

[27] Delorenzo ¶¶ 242, 247-49; McCullough ¶¶ 1, 13, 15, 71; Proctor ¶¶ 22, 85, 88; Kohler ¶¶ 21, 53, 95-96; Zagami ¶¶ 19, 51, 93-94; Ridgell ¶¶ 21, 53, 95-96; Frasier ¶¶ 41-42, 67(e), 69; Halmon-Daniels ¶ 60, 76.

[28] Ridgell (Count VII); Kohler (Count VII); Zagami (Count VII).

[29] Ridgell ¶ 105; Kohler ¶ 107; Zagami ¶ 107.

[30] McCullough (Count II); Proctor (Counts VII-VIII).

omitted).  These factual allegations "must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and a complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  This standard requires that the plaintiff do more than "plead[] facts that are merely consistent with a defendant's liability"; rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks omitted).

The complaint must show—not merely allege in conclusory terms—that the plaintiff is entitled to relief.  *Twombly*, 550 U.S. at 555 n.3 ("Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief.").  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotation marks omitted).  Conclusory allegations are not entitled to a presumption of truth, and legal conclusions must be supported by factual allegations. *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015).

Here, each of plaintiffs' theories of liability against HPES is legally deficient, and all claims should be dismissed.  The negligence claims, to the extent they are based upon a purported common law duty to anticipate and prevent these crimes, fail because the Complaints do not—and cannot—plead facts showing that the mass murder perpetrated by Mr. Alexis was "particularly foreseeable" to HPES under the heightened standard of foreseeability required by District of Columbia law.  *See* Section II(A).  The negligence *per se* theory premised on HPES's alleged failure to comply with the DOD manual known as NISPOM fails as a matter of law—

even if NISPOM is deemed to be a regulation—because NISPOM was not designed to prevent

acts of violence.  *See* Section II(B).  The negligence *per se* theory premised on the workplace

safety statutes fails because those statutes are designed to prevent on-the-job accidents, not

workplace violence, and the Complaints identify no duty imposed on HPES by those statutes in

any event.  *See* Section II(C).  Finally, the three claims premised on the assault and battery by

Mr. Alexis fail because they are barred by the one-year statute of limitations and/or because Mr.

Alexis was not acting within the scope of his employment when he engaged in murder.  *See*

Section II(D).

    **A.**    **The Complaints Fail to Plead an Essential Element of Negligence
Claims Under D.C. Law—That HPES Owed a Duty to Plaintiffs**

All of the negligence claims are pled as arising under D.C. law,[31] which requires that "to

establish negligence a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a

breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately

caused by the breach."  *District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001) (internal

quotation marks omitted).

The Complaints fail to allege facts establishing the existence of a duty of care owed by

HPES.  As discussed below, under D.C. law, a defendant is under no duty to protect against the

criminal conduct of a third party unless the plaintiff can show the particular criminal conduct

was foreseeable to the defendant.  Here, the Complaints fail to allege facts showing that it was

foreseeable to HPES that Mr. Alexis would engage in an act of violence, let alone mass murder.

---

[31] *See* Kohler (Counts IV-VII, IX-X); Zagami (Counts IV-VII, IX-X); Ridgell (Counts IV-IX);
Proctor (Counts III-VIII); Frasier (Counts I-II); Halmon-Daniels (Counts III-IV, VI); Delorenzo
(Count I) McCullough (Counts I, III-IV).

### 1.    In D.C., Tort Claims Based on the Criminal Conduct of a Third-Party Require "Heightened Foreseeability"

Pursuant to what the D.C. Circuit has described as a "general rule of nonliability," D.C. law does not subject a defendant to tort liability for the criminal act of a third party unless the plaintiff can first meet a heightened burden of showing that it was particularly foreseeable to the defendant that the third party would commit the crime.  *E.g.*, *Workman v. United Methodist Comm.*, 320 F.3d 259, 263 (D.C. Cir. 2003) (D.C.'s heightened foreseeability test is "a limited exception to the 'general rule of nonliability'" for negligence claims based on the intervening criminal act of a third party) (quoting *Romero v. Nat'l Rifle Ass'n of Am.*, Inc., 749 F.2d 77, 83 (D.C. Cir. 1984)).  Courts in the District of Columbia "have described this heightened foreseeability requirement as 'exacting,' 'demanding,' 'precise,' and 'restrictive.'"  *Sigmund v. Starwood Urban Inv.*, 475 F. Supp. 2d 36, 42 (D.D.C. 2007) (citations omitted).

As the District of Columbia Court of Appeals has explained: "Where an injury is caused by the intervening criminal act of a third party, this court has repeatedly held that liability depends upon a more heightened showing of foreseeability than would be required if the act was merely negligent."  *Bailey v. District of Columbia*, 668 A.2d 817, 819 (D.C. 1995) (internal quotation marks omitted).  "Because of the extraordinary nature of criminal conduct, the law requires that the foreseeability of the risk be more precisely shown."  *McKethean v. WMATA*, 588 A.2d 708, 717 (D.C. 1991) (internal quotation marks omitted); *see also Workman*, 320 F.3d at 262 ("We note first that the [D.C.] Court of Appeals has been reluctant to see a defendant held liable for harm caused by the criminal act of a third party."); *Bell v. Colonial Parking, Inc.*, 807 F. Supp. 796, 797 (D.D.C. 1992) ("[I]t is clear that in recent years the D.C. Court of Appeals has adopted a restrictive view of liability for the criminal acts of an intermeddler."); *Romero*, 749 F.2d at 83 ("[C]ivil liability for the intervening, independent criminal acts of third parties is

extraordinary, and District of Columbia courts, in their development of common-law tort rules, have imposed especially stringent requirements to support it.").

As to the doctrinal framework, "the D.C. courts have repeatedly spoken of the heightened foreseeability requirement in terms of duty." *Workman*, 320 F.3d at 265 (citing *Graham v. M&J Corp.*, 424 A.2d 103, 105 (D.C. 1980) and *Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C. 1997)). Thus, a defendant has no duty to prevent criminal acts of a third party unless the "particular harm was foreseeable." *E.g.*, *District of Columbia v. Doe*, 524 A.2d 30, 33 (D.C. 1987) ("[W]e held in *Lacy* that a school had no duty to act to protect the student from a sexual assault by a school janitor unless this particular harm was foreseeable."); *see also Graham*, 424 A.2d at 105 ("Foreseeability is the key element in establishing the landlord's duty [to protect against criminal activity].").

Here, because the negligence claims against HPES are based on the intervening criminal act of Mr. Alexis, plaintiffs "bear[] the burden of establishing that the criminal act was so foreseeable that a duty ar[ose] to guard against it." *See Potts*, 697 A.2d at 1252 (internal quotation marks omitted); *see also Bruno v. W. Union Fin. Servs., Inc.*, 973 A.2d 713, 718 (D.C. 2009) ("If the intervening criminal act can fairly be said to be that which could not have been reasonably anticipated, plaintiff may not look beyond the intervening act for his recovery.") (internal quotation marks omitted).

The standard is not satisfied merely by the foreseeability of general wrongdoing; rather, D.C.'s "heightened foreseeability" test requires plaintiffs to show that the particular type of crime committed by Mr. Alexis was foreseeable to HPES. "[The D.C. Circuit] has read the District of Columbia Court of Appeals' decision in *Lacy* as requiring proof that a specific type of crime, and not just crime in general, be particularly foreseeable before liability can be assessed

against the non-criminal actor." *Briggs v. WMATA*, 468 F. Supp. 2d 8, 11 (D.D.C. 2006) (citing

*Romero*, 749 F.2d at 79-80). Thus, in order for a duty to arise, "generalized notice . . . is

insufficient: to show foreseeability, the evidence must demonstrate 'that the defendant had

reason to anticipate the type of *particular* criminal attack that actually occurred.'" *G'Sell v.*

*Carven*, 724 F. Supp. 2d 101, 108 (D.D.C. 2010) (emphasis in original) (quoting *Bd. of Trs. of*

*Univ. of D.C. v. DiSalvo*, 974 A.2d 868, 873 (D.C. 2009) ("Consideration of the few cases where

we have held that a defendant had a duty to protect the plaintiff from a criminal act shows that

where sufficient foreseeability was found, the facts in evidence established that the defendant

had reason to anticipate the type of particular criminal attack that actually occurred.")).

### 2. The "Heightened Foreseeability" Requirement Is Not Met by the Facts Alleged Against HPES

Although most of the Complaints allege in conclusory fashion that the "heightened

foreseeability" test is met as to HPES,[32] the factual allegations of the Complaints do not support

this assertion. As discussed above, the only well-pled facts purporting to support such

foreseeability relate to HPES's knowledge of the incident in Newport on August 7, 2013. *Supra*

at pp. 6-9. That incident, however, did not make it "particularly foreseeable" that Mr. Alexis

would engage in a mass shooting at the Navy Yard five weeks later. The alleged behavior

observed by HPES did not involve violence or even a threat of violence. In fact, the HPES

employee who witnessed Mr. Alexis's behavior in Newport felt safe enough to allow him to stay

in her room while she slept. *Supra* at p. 7.

---

[32] Delorenzo ¶ 257 ("clearly foreseeable (i.e., a heightened foreseeability)"); Proctor ¶ 134 ("particularly foreseeable"); Kohler ¶ 94 ("highly foreseeable"); Zagami ¶ 68 ("highly foreseeable"); Ridgell ¶ 67 ("highly foreseeable"). Three of the Complaints don't even allege heightened foreseeability in conclusory terms. *See* Frasier ¶ 16 ("reasonably foreseeable risk of harm"); Halmon-Daniels ¶ 92 ("unreasonable risk of personal injury"); McCullough ¶ 14 ("foreseeable and imminent danger of violence").

Moreover, Mr. Alexis worked at four other Navy project sites over the next month. *Supra* at p. 8.  Yet there is no allegation that HPES observed any unusual or troubling behavior by Mr. Alexis between the August 7 incident in Newport and the September 16 shooting at the Navy Yard.  The Complaints do not allege that Mr. Alexis indicated to HPES—during the Newport incident or otherwise—an intention to engage in violence.  Nor does any Complaint allege that HPES was aware of any history of violent or threatening behavior by Mr. Alexis.  Thus, the Complaints do not plausibly allege that HPES was aware that Mr. Alexis posed a risk of violence of any kind, let alone a risk of the mass murder that he perpetrated at the Navy Yard.

In an analogous case, *G'Sell v. Carven*, 724 F. Supp. 2d 101 (D.D.C. 2010), the plaintiffs had been assaulted in a common area of an apartment building.  They sued, among others, the building's owner and its management company for negligence.  The complaint alleged that the building's security officer had failed to take action following an incident earlier the same day in which the criminal assailants were lying naked on the floor near the elevator, engaging in simulated sexual acts.  *Id.* at 106, 108.  Applying the "heightened foreseeability" requirement, the court dismissed the claim under Rule 12(b)(6) on the basis that there was no duty to protect the plaintiffs from the criminal sexual assault that occurred later that same day.  The court noted that during the earlier incident the assailants had "engaged in obnoxious behavior, but they were not being violent or harassing third parties."  *Id.* at 108.  The court further explained that, even if the assailants' earlier behavior violated D.C. law prohibiting indecent or lewd conduct, "their *non-violent behavior* did not make it foreseeable that they would *violently* attack plaintiffs."  *Id.* at 108 n.5 (emphasis added).

Here, the assertion that the Navy Yard shooting was foreseeable to HPES is based on the incident in Newport more than a month before the Navy Yard shooting.  While the alleged facts

reasonably suggested an episode of mental instability by Mr. Alexis, as in *G'Sell*, the behavior was entirely non-violent.  In fact, the Complaints acknowledge that trained law enforcement officers interviewed Mr. Alexis during the Newport incident and observed first-hand the very same conduct observed by the HPES employee, *supra* at pp. 7-8, and those officers "concluded he was not an immediate danger to himself or others," *supra* at note 13.  There simply are no factual allegations supporting the conclusory assertion that HPES should have anticipated that Mr. Alexis would engage in a workplace mass shooting five weeks later.  *See also Collier v. District of Columbia*, 46 F. Supp. 3d 6, 15–16 (D.D.C. 2014) (Collyer, J.) (granting motion to dismiss claim against instigator of a bar fight for allegedly "foreseeable" injuries suffered by security guards at the hands of responding police officers).

Moreover, in contrast to the defendant building owner in *G'Sell*, which at least could be argued to have had a legal relationship to tenants and visitors to its building, here there was no relationship of any kind between HPES and the decedents.  *See, e.g.*, *Workman*, 320 F.3d at 263-64 (noting that a duty is more likely to be found were the relationship between the parties is of a type that "suggests a duty of protection").  Unlike a landlord or a business that hosts visitors, HPES did not (and for obvious reasons, could not) control the Navy Yard premises, and there is no allegation that workers at the Navy Yard were subject to the control of, or otherwise protected by, HPES.  *See Collier*, 46 F. Supp. 3d at 16 (granting motion to dismiss in part because the plaintiff "has not alleged that his relationship with [the defendant] was a 'special relationship'").

Finally, in *G'Sell*, the complaint alleged the defendants were "on notice that the two men were capable of outrageous, repugnant, and criminal conduct."  724 F. Supp. 2d at 108.  The court explained that this type of "generalized notice . . . is insufficient:  to show foreseeability, the evidence must demonstrate 'that the defendant had reason to anticipate the type of *particular*

criminal attack that actually occurred.'" *Id.* (quoting *DiSalvo*, 974 A.2d at 873) (emphasis in original). Here, plaintiffs do not allege HPES had reason to anticipate that Mr. Alexis would commit murder, let alone perpetrate a mass shooting. Nor do they allege that HPES knew of facts suggesting that Mr. Alexis posed a special risk of harm to individuals working at a government facility like the Navy Yard—as opposed to the public at large. Yet, that degree of particularity is precisely what D.C.'s exacting "heightened foreseeability" standard requires to support a claim against someone other than the criminal actor.[33]

The question for the Court in these cases is whether the type of odd but non-violent behavior observed by the HPES employee (as well as the Newport Police) made it so foreseeable that Mr. Alexis would engage in a mass shooting at the Navy Yard that it is fair to impose a duty on HPES to have sought to prevent it. *See Potts*, 697 A.2d at 1252. As the District of Columbia Court of Appeals has explained: "The question is not simply whether a criminal event is foreseeable, but whether a duty exists to take measures to guard against it. Whether a duty exists is ultimately a question of fairness." *Cook v. Safeway Stores, Inc.*, 354 A.2d 507, 509-10 (1976).

The expansive duty plaintiffs seek to create here would be unprecedented and grossly unfair. At a time when many Americans struggle with mental health issues—including veterans of the wars in Iraq and Afghanistan—plaintiffs would have this Court conclude that anyone who

---

[33] *See, e.g.*, *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 642 (D.C. 2005) (en banc) (noting the D.C. Court of Appeals has "rejected liability as a matter of law where foreseeability (hence duty) was not limited by any evidentiary reference to a precise location or class of persons"); *Lacy*, 424 A.2d at 323-24 ("[I]t is arguable that the [trial] court, by conditioning liability on the foreseeability of 'assaults' rather than the foreseeability of 'sexual assaults,' was more helpful to appellants than the law permits"); *Clement v. Peoples Drug Store*, 634 A.2d 425, 429 (D.C. 1993) (rejecting claim against employer involving shooting death of employee absent specific risk of violence at the particular shopping mall); *Bruno*, 973 A.2d at 720 ("[T]he evidence here . . . lacks the precision necessary to limit foreseeability to this particular act [robbery by force and violence] to this location [inside the gas station] and this class of persons [customers within the gas station].") (brackets in original).

observes an individual exhibiting symptoms of an apparent mental illness must assume that the

person will commit an act of *criminal violence*, even when the behavior is entirely non-violent.

Further, plaintiffs would have this Court impose an ill-defined duty to take steps to prevent it,

despite not knowing when or how the supposed violence might occur.  To invent a "duty" in

these circumstances would be unfounded, and it would require this Court to turn D.C.'s "general

rule of nonliability" on its head.  That is particularly true given the inherent difficulty in

evaluating mental health disorders.  In *Hicks v. United States*, 511 F.2d 407 (D.C. Cir. 1975), the

Court noted "the elusive qualities of mental disorders" and stated:

> Generalizations must be avoided as much as possible in the area of
> psychiatry.  Negligence cannot be imputed to the [defendant]
> merely because of a mistake.  A claim of negligence must be
> considered in light of the elusive qualities of mental disorders and
> the difficulty of analyzing and evaluating them . . . .  Error and
> uncertainty considered alone must often be accepted without
> labeling them negligence.

*Id.* at 415.

Hicks is an example of the rare case in which the murder *was* foreseeable, because it

involved abundant specificity and particularity as to the risk of actual violence, the timing, and

the person in jeopardy.  There, a patient with a long history of assaulting his wife had been

committed to a mental health facility after threatening to murder her; and during a visit from his

wife he blamed her for his incarceration and yelled that he was going to kill her when he was

released.  *Id.* at 409-11.  The hospital filed a report with the court that failed to disclose this

history, and the patient was released and murdered his wife.  *Id.* at 421.  In affirming judgment

against the hospital for negligence, the Court explained: "The homicide of course was a wrongful

act intervening between his release and the death, but the fact that he would again attack his wife

was foreseeable, even that he might do so with fatal consequences."  *Id.* at 422.

By contrast, there is simply no basis for imposing a duty on HPES to have prevented the mass shooting by Mr. Alexis.  As one appellate court wrote recently in affirming summary judgment for the father of an individual who had been diagnosed with bipolar and schizoaffective disorder and had shot and killed two individuals with a shotgun:  "[S]uffering from a mental illness does not automatically equate [to] violent behavior.  The issue is whether Jerry Hartman's violent behavior was foreseeable to [his father]."  *White v. Mansfield-Richland*, No. 12-CA-116, 2013 WL 3936036, at *1, 8 (Ohio Ct. App. July 18, 2013).  There, just two weeks before the shooting, the son had called 911 because he believed his father was threatening his mother; the police took the son to the hospital for psychiatric evaluation, after which he was released.  *Id.* at *1.  Although the father was aware of his son's mental illness, he was not aware of any "violent tendencies toward others," and so had no "duty to prevent the senseless acts caused by" his son.  *Id.* at *8.

Here, the Complaints plausibly allege that the behavior observed by the HPES employee at the hotel in Newport indicated Mr. Alexis was experiencing mental health problems.  As in *G'Sell*, however, no amount of discovery will change the fact that Mr. Alexis's non-violent behavior did not make it foreseeable to HPES that he would violently attack individuals at the Navy Yard five weeks later.  The negligence claims asserted against HPES should be dismissed.

### 3.     Plaintiffs Cannot Satisfy the Heightened Foreseeability Standard on the Basis of Facts Not Known to HPES

In addition to the allegations as to what HPES knew regarding the incident in Newport on August 7, 2013, the Complaints include numerous factual allegations regarding Mr. Alexis's background that were *not* known to HPES.  In particular, the Complaints discuss a history of arrests (without conviction) and other conduct during the period June 2004 to September

2010—all of which pre-dated Mr. Alexis's honorable discharge from the Navy in January 2011 and his subsequent employment with The Experts beginning in September 2012.[34]

The Complaints do not—and cannot—allege that HPES knew any of this history. The Complaints do not even properly allege that HPES *should have known* any of those facts. The *Frasier* Complaint, at paragraph 17, employs the improper pleading tactic of alleging that, *collectively*, the "Defendants knew or reasonably should have known" a long list of facts known *today*, including that Mr. Alexis had purchased a shotgun two days before the shooting, and even that he had sawed off the barrel and carried the weapon undetected onto the Navy Yard the day of the shooting.[35] The *Halmon-Daniels* Complaint, at paragraph 95, asserts without explanation that HPES "had actual and/or constructive knowledge of Alexis's propensity for gun violence." The *Proctor* Complaint, at paragraph 27, includes the conclusory assertion that "The Experts background check[s] failed to uncover Alexis's prior arrest record and were insufficient." Similarly, three Complaints allege that The Experts performed a background check prior to hiring Mr. Alexis, and then make the blanket assertion that "[d]espite the numerous arrests in his background that were a matter of public record, Mr. Alexis was hired by The Experts following

---

[34] Halmon-Daniels ¶¶ 15-30; Delorenzo ¶¶ 141-52; Kohler ¶¶ 23-32; Zagami ¶¶ 23-32; Ridgell ¶¶ 21-30; Proctor ¶¶ 9-12; Frasier ¶¶ 17-25; JAGMAN Report at 21-29.

[35] The *Frasier* and *McCullough* complaints fail to meet even the most basic requirements of modern federal pleading rules in that they make no effort to distinguish between the defendants with respect to knowledge, duty, breach or causation. *Frasier* ¶¶ 17, 42, 65-69, 74-78; *McCullough* ¶¶ 14, 64-95. *See Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (dismissing complaint because "a plaintiff cannot satisfy the minimum pleading requirements under Rule 8 of the Federal Rules of Civil Procedure by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct") (internal quotation marks omitted); *Melegrito v. CitiMortgage Inc.*, No. C 11-1765, 2011 WL 2197534, at *6 (N.D. Cal. June 6, 2011) ("Under Rule 8(a), grouping multiple defendants together in a broad allegation is insufficient to provide the defendants with fair notice of the claims against them and the grounds for relief."); *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 819 (7th Cir. 2013) (affirming dismissal of complaint that described "what defendants collectively did, without imputing concrete acts to specific litigants").

his background check."[36]  There are, however, no factual allegations to support an assertion that

HPES should have known of Mr. Alexis's history of arrests or other conduct.

Allegations that a defendant "'knew, or should have known,' absent some factual

elaboration, are conclusory and insufficient to satisfy *Twombly*'s pleading threshold."  *See

Willett v. United States*, 24 F. Supp. 3d 1167, 1180 (M.D. Ala. 2014) (dismissing negligence

claim despite allegation that hospital "knew or should have known" of employee's prior sexual

assaults on sedated patients because complaint failed to allege "the basis upon which any

[hospital] employee should have known about the prior sexual assaults"); *see also, e.g.*, *Stevens

v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 128 (D.D.C. 2012) (dismissing "negligent hiring,

supervision, and retention" claim because "bare, conclusory assertions, in the form of

unenlightening legal-speak, that Sodexo 'knew or should have known' are insufficient to survive

Sodexo's Motion to Dismiss"); *Moore v. Willis*, 307 Or. 254, 259 (1988) ("Including the words

'knew or should have known' in a complaint does not automatically satisfy the requirement of

alleging foreseeability. . . . Whether a defendant should have known something is a judgment

about a particular set of circumstances rather than a fact from which conclusions are drawn.  An

allegation that a defendant knew something may be an allegation of fact, but an allegation that he

should have known something is merely a conclusion drawn from other facts.").

The Complaints do not provide *any* factual allegations of the type necessary to establish

that HPES—before the shooting—"should have known" of the non-conviction conduct alleged

to have occurred between 2004 and 2010.  To the contrary, Mr. Alexis had been honorably

---

[36] Kohler ¶ 32; Zagami ¶ 32; Ridgell ¶ 30.

discharged from the Navy in January 2011,[37] and as a condition of his subsequent employment as

a technician by The Experts, HPES had required its subcontractor to perform a criminal

*convictions* check and drug screening test.  This background check was performed (twice) and,

of course, did not reveal any of the *arrests* or other alleged conduct.[38]

Likewise, plaintiffs do not—and cannot—allege the existence of a general obligation for

employers to conduct a criminal *arrest* check when hiring employees.  In fact, the D.C.

legislature has prohibited employers from doing so.  *See, e.g.*, D.C. Code § 32-1342(a)(1)

(prohibiting employers from making "an inquiry about or requir[ing] an applicant to disclose or

reveal an arrest"); *see also* D.C. Code § 2-1402.66(b)(1)(C) (permitting requests for "a listing

*only* of adult *convictions* for which the sentence was completed not more than 10 years before")

(emphasis added).  Moreover, D.C. law specifically requires criminal background checks for

certain specified categories of employees, strongly suggesting that even criminal conviction

checks are not generally required.  D.C. Code § 44-552 (healthcare workers); D.C. Code § 4-

1501.03 (childcare providers); D.C. Code § 24-211.41 (correctional employees); *see also Keen v.

Miller Envtl. Grp.*, 702 F.3d 239, 246 (5th Cir. 2012) (noting that "the unanimous caselaw from

around the country says that there is no such generalized duty on employers to conduct pre-

employment background checks on all new hires," and that "[t]his conclusion is strengthened by

the fact that Mississippi's legislature has mandated that employers conduct criminal background

checks on all new hires within certain specific fields").

---

[37] Proctor ¶ 12; Delorenzo ¶ 152; *see also* JAGMAN Report at 29.

[38] Proctor ¶¶ 24, 26; Kohler ¶ 32; Zagami ¶ 32; Ridgell ¶ 30; Delorenzo ¶ 13; *see also* JAGMAN Report at 31-32.

Thus, HPES is not alleged to have had actual knowledge of any of the alleged conduct by Mr. Alexis other than the incident at the hotel in Newport, and plaintiffs have not plausibly alleged that HPES should have known any of the other conduct identified in the Complaints. *See, e.g.*, *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) ("We do not assume the truth of legal conclusions, nor do we accept inferences that are unsupported by the facts set out in the complaint.") (internal citation and quotation marks omitted).

Because the information alleged to have been known to HPES did not make it "particularly foreseeable" that Mr. Alexis would engage in the type of criminal violence that ultimately occurred, the claims against HPES do not fall within the "limited exception to the general rule of nonliability" under D.C. law and should therefore be dismissed.

**B.      As a Matter of Law, the Complaints Fail to State a Claim of Negligence *Per Se* for HPES's Alleged Violation of NISPOM**

In an attempt to evade the heightened foreseeability requirement of D.C. law, the Complaints—with varying levels of specificity—identify NISPOM as purportedly establishing a duty of care upon which the negligence claims against HPES are based.[39]

Under the doctrine of negligence *per se*, a plaintiff may rely on a standard of conduct identified in "a statute or regulation" as establishing the applicable standard of care owed by the defendant. *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. 1996). A negligence *per se* claim, however, may only be based on a violation of such a duty where "the alleged injuries were of the type which the statute was designed to prevent." *Id.*; *see also id.* at 579 ("At a minimum, however, the statute or regulation relied on must promote public safety and have been 'enacted to

---

[39] *See* Proctor ¶ 164; Kohler ¶¶ 21, 95; Zagami ¶¶ 21, 95; Ridgell ¶¶ 19, 93; Frasier ¶¶ 42, 66; McCullough ¶¶ 13, 71; Halmon-Daniels ¶ 60; Delorenzo ¶ 236(E).

protect persons in the plaintiff's position . . . .'") (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 557 (D.C. Cir. 1993)).

In cases involving the intervening criminal act of a third party, a duty may be found to exist only where the legislature or regulator foresaw criminal conduct and imposed a specific duty on the defendant in an effort to prevent it.  As then-Judge Scalia explained in *Romero*, in the negligence *per se* cases finding a defendant liable for the criminal acts of a third party, "it was clear that the third-party criminal conduct was the very injury. . . which the statute intended to prevent."  749 F.2d at 83 (internal quotation marks omitted).  In *Romero*, the widow of a victim killed with a stolen gun asserted a claim against the business from which the gun was stolen. The Court rejected a negligence *per se* theory under the D.C. Firearms Act because "neither the nature of the provision in question nor its legislative history clearly indicates a purpose of preventing crimes by gun-thieves."  *Id.*

Here, by premising negligence claims on HPES's alleged failure to comply with certain reporting obligations under NISPOM, the Complaints appear to assert a negligence *per se* theory of liability.  Under NISPOM, employees of government contractors (like Mr. Alexis) must hold a government-issued security clearance—referred to as a "personnel security clearance"—in order to have access to classified information; if a contractor becomes aware of information potentially bearing on the reliability of one of its "cleared employees" to safeguard classified information, it is required to report that information so the government can consider whether to revoke the individual's security clearance.  The Complaints allege that HPES breached its obligations under NISPOM by failing to report information to the government regarding the mental health of Mr. Alexis following the incident in Newport.  According to the Complaints, if HPES had reported

that information, Mr. Alexis's security clearance would have been revoked and he would not have had access to the Navy Yard five weeks later. *Supra* at p. 10.

Thus, this negligence *per se* theory seeks to hold HPES liable—even if Mr. Alexis's particular criminal conduct was not foreseeable to HPES—simply by alleging that HPES breached a duty to report information to the government under NISPOM.  As a matter of law, that theory of liability is meritless for the simple reason that NISPOM is designed to prevent the unauthorized disclosure of classified information—it is not designed to prevent violent crime and does not establish any duty owed to third parties like the plaintiffs in these cases.[40]

### 1.     NISPOM and the Obligation to Report "Adverse Information"

NISPOM is part of the National Industrial Security Program, the administrative scheme governing the disclosure of classified information to government contractors and the scope of the contractors' obligation to safeguard that information.  As discussed below, notwithstanding the many complexities of NISPOM, there is nothing complex about its purpose.

The National Industrial Security Program was established pursuant to Executive Order 12829 for the express purpose of safeguarding classified information disclosed to government contractors:

> **Section 101.**  Establishment.  (a) There is established a National Industrial Security Program.  The purpose of this program is to safeguard classified information that may be released or has been released to current, prospective, or former contractors, licensees, or grantees of United States agencies.

58 Fed. Reg. 3479 (1993).

---

[40] NISPOM is not a statute or regulation; it is a "manual" issued by the Department of Defense pursuant to an Executive Order.  For purposes of this motion, however, HPES seeks dismissal on the basis that, even if NISPOM were deemed to be a regulation, it does not establish a legal duty in tort to prevent the violent criminal conduct of a third party.

In Section 201, the Executive Order called for the issuance of the National Industrial

Security Program Operating Manual ("NISPOM"), the stated purpose of which was the

protection of classified information:

> **Section 201.**  *National Industrial Security Program Operating Manual.*  (a) The Secretary of Defense . . . shall issue and maintain a National Industrial Security Program Operating Manual ("Manual"). . . . (b) The Manual shall prescribe specific requirements, restrictions, and other safeguards that are necessary to preclude unauthorized disclosure and control authorized disclosure of classified information to contractors, licensees, or grantees.

*Id.* § 201.  The Secretary of Defense was also delegated responsibility "for determining the

eligibility for access to classified information of contractors, licensees, and grantees and their

respective employees."  *Id.* § 202(a).

NISPOM was issued by the Secretary of Defense in January 1995, and the current

version was issued in February 2006.  Consistent with the purpose identified in the Executive

Order, the very first section of NISPOM states its purpose in clear and unambiguous language:

> **1-100.  Purpose.**  This Manual is issued in accordance with the National Industrial Security Program (NISP).  It prescribes the requirements, restrictions, and other safeguards to prevent unauthorized disclosure of classified information.

Raofield Decl. Ex. B (NISPOM) § 1-100.[41]

Thus, the purpose of NISPOM is and has always been to prevent the unauthorized

disclosure of classified information.  That is true notwithstanding the potential for confusion that

may result from NISPOM's use of terms such as "personnel security" and "industrial security,"

---

[41] Because plaintiffs rely upon and quote NISPOM in their Complaints, a copy of the manual is attached as Exhibit B to the Raofield Declaration.  *See Tellabs*, 551 U.S. at 322 (courts routinely consider "documents incorporated into the complaint by reference" in ruling on a motion to dismiss).

which merely refer to personnel security clearances and the security of classified information disclosed to government contractors and their employees.  Simply stated, NISPOM was never intended to prevent acts of violence, let alone mass murder, and none of the duties it imposed on contractors were designed for that purpose.

The requirement that government contractors report "adverse information" coming to their attention regarding individuals holding a security clearance has nothing to do with preventing acts of violence; instead, information is "adverse" if it tends to demonstrate the inability of the individual to safeguard classified information.  This is clear both from the section of NISPOM establishing the reporting obligation,[42] as well as from NISPOM's broad definition of adverse information: "[a]ny information that adversely reflects on the integrity or character of a cleared employee, that suggests that his or her ability to safeguard classified information may be impaired, or that his or her access to classified information clearly may not be in the interest of national security."  Raofield Decl. Ex. B (NISPOM) App'x C.  Indeed, "adverse information" includes things as mundane as the fact that an individual is experiencing financial difficulties, such as "wage garnishments."  Raofield Decl. Ex. C (Dep't of Def. Indus. Sec. Letter 2011–04, Sept. 23, 2011) at 1.[43]

---

[42] "**1-300.  General.**  Contractors are required to report certain events that have an impact on the status of the facility clearance (FCL), that impact on the status of an employee's personnel security clearance (PCL), that affect proper  safeguarding of classified information, or that indicate classified information has been lost or compromised. . . . Contractors shall provide complete information to enable the CSA to determine whether classified information is adequately protected."  Raofield Decl. Ex. B (NISPOM) § 1-300.

[43] The court may consider Industrial Security Letter 2011-04 in ruling on this motion because it is a public record issued by the U.S. Department of Defense Security Service, of which the court may take judicial notice.  *See Tellabs*, 551 U.S. at 322 (when ruling on a motion to dismiss courts may consider "matters of which a court may take judicial notice"); *see also LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Abraham*, 347 F.3d 315, 325 (D.C. Cir. 2003) (taking judicial notice of letter by the Secretary of Energy).

### 2.      NISPOM Was Not Designed to Prevent the Injuries Alleged Here

The Complaints assert that NISPOM established a duty of care owed by HPES to the victims of the Navy Yard shooting.  In support of this theory, the Complaints allege that: (1) Mr. Alexis held a security clearance that permitted him to access classified information; (2) the behavior in Newport one month before the Navy Yard shooting constituted "adverse information" that HPES was obligated to report to the government pursuant to NISPOM; and (3) HPES breached this duty by failing to report this information.  According to the Complaints, if HPES had reported this information, Mr. Alexis's security clearance would have been revoked, and (coincidentally) Mr. Alexis would not have had access to the Navy Yard five weeks later.[44]

Even accepting those allegations as true, the negligence *per se* theory fails.  Under D.C. law, a plaintiff may state a claim for negligence *per se* by alleging that the defendant violated a "statutory or regulatory standard . . . enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred."  *Chadbourne v. Kappaz*, 779 A.2d 293, 295 (D.C. 2001).  A negligence *per se* claim fails, however, unless the plaintiff's "injuries were of the type which the statute was designed to prevent."  *McNeil*, 686 A.2d at 578.  In cases involving the criminal act of a third party, this requires that it be "clear that the third-party criminal conduct was the very injury . . . which the statute intended to prevent."  *Romero*, 749 F.2d at 83 (internal quotation marks omitted).

As discussed above, however, the purpose of the National Industrial Security Program is expressly provided in the Executive Order pursuant to which NISPOM was created:  "The purpose of this program is to safeguard classified information . . . ."  *See* 58 Fed. Reg. 3479 at

---

[44] Delorenzo ¶¶ 242, 247-49; McCullough ¶¶ 1, 13, 15, 71; Proctor ¶¶ 22, 85, 88; Kohler ¶¶ 21, 53, 95-96; Zagami ¶¶ 19, 51, 93-94; Ridgell ¶¶ 21, 53, 95-96; Frasier ¶¶ 41-42, 67(e), 69; Halmon-Daniels ¶ 60, 76.

§ 101.  In addition, by its own terms, NISPOM's purpose is to "prescribe[] the requirements, restrictions, and other safeguards to prevent unauthorized disclosure of classified information." *See* Raofield Decl. Ex. B (NISPOM) § 1-100.  It is beyond dispute, therefore, that the purpose of NISPOM is to safeguard classified information, not to prevent acts of workplace violence.

Where a regulation imposes requirements, but those requirements are not "enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred," it provides no basis for a claim of negligence *per se*.  *Lewis v. United States*, 83 F. Supp. 3d 198, 210 (D.D.C. 2015) (Armed Forces Rule could not support negligence *per se* claim where "[n]othing in the language of the Rule or in [plaintiff's] filings indicates that [the Rule] was designed to prevent" the emotional distress injury alleged); *see also Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158, 190 (D.D.C. 2014) (alleged violation of D.C.'s Homeless Services Reform Act could not support negligence *per se* claim where the "relevant subsection of the [Act] is directed at protecting individuals from exposure to severe weather" and there was "no allegation that the injuries suffered by the [plaintiffs] occurred because they were exposed to severe weather"); *Harvey v. Mohammed*, 841 F. Supp. 2d 164, 182–83 (D.D.C. 2012) (rejecting negligence *per se* claim premised on certain federal regulations where it was not a "primary purpose" of the regulations to protect individuals like the decedent from the harm that occurred), *rev'd in part on other grounds*, 798 F.3d 1042 (D.C. Cir. 2015).

NISPOM was not designed to prevent acts of violence; rather, its purpose is to prevent the unauthorized disclosure of classified information.  As such, plaintiffs cannot rely on NISPOM—which does not even create a private right of action—as the basis for a claim of negligence *per se*.  *See also Doe v. Fulton-DeKalb Hosp. Auth.*, 628 F.3d 1325, 1339 (11th Cir. 2010) (claim for negligent hiring of sexually abusive substance abuse counselor could not be

based on failure to keep written employment records in violation of state regulation as the purpose of the regulation was merely "to provide for the licensing and inspection of narcotic treatment programs").

In a decision with particular relevance here, the California Court of Appeals held that laws requiring the reporting to federal immigration officials of the arrest of immigrants involved in drug offenses could not provide a basis for a negligence *per se* claim arising from subsequent violent crimes by the individuals involved. *Bologna v. City & Cnty. of San Francisco*, 192 Cal. App. 4th 429, 438 (2011). In *Bologna*, the plaintiffs contended that the City of San Francisco was negligent *per se* for failing to report the immigration status of individuals arrested for drug offenses. *Id.* at 435. In particular, one individual named Ramos, who had been arrested multiple times but not reported to federal authorities as an undocumented immigrant, later shot and killed three individuals. *Id.* at 432–33. The complaint alleged that "if at the time of any of Ramos's prior arrests San Francisco officials had reported Ramos to United States Immigration and Customs Enforcement ('ICE'), it is a certainty that ICE would have initiated removal proceedings against him and that Ramos would have been deported." *Id.* at 433. As in the present case, the complaint alleged that the shooting would not have taken place but for the alleged violation of the reporting obligation.

The court dismissed the negligence *per se* claim because the statute at issue was not designed to prevent acts of violence. *Id.* at 437–38. Under California law, like D.C. law, a negligence *per se* claim can be based on a violation of a statute or regulation only if the injury to the plaintiff is of the type the statute was designed to prevent. *Id.* at 435. In *Bologna*, the court found that the purpose of the statute was to combat drug trafficking through deportation rather than criminal prosecution. *Id.* at 436–37. As a result, despite the "incidental" public benefit

from deportation of violent drug offenders, the court dismissed the negligence *per se* claim. *Id.* at 437–38.

Here, plaintiffs' claims are based on the intervening criminal act of a third party, Mr. Alexis, involving the shooting deaths of multiple individuals. As in *Bologna*, the Complaints allege that, but for the violation of the obligation to report "adverse information" regarding Mr. Alexis to federal officials, the government would have revoked Mr. Alexis's security clearance and the Navy Yard shooting would not have happened. However, as in *Bologna*, the purpose of the reporting obligation under NISPOM has nothing to do with the prevention of violence. As such, the negligence *per se* theory premised on a violation of NISPOM fails as a matter of law.

**C.    The Negligence *Per Se* Theory Based on the D.C. Industrial Safety Act and the Occupational Safety and Health Act Fails as a Matter of Law**

Three of the eight Complaints also assert a negligence *per se* theory premised on two statutes: the D.C. Industrial Safety Act ("ISA"), D.C. Code §§ 32–801 to -812 (2001), and the Occupational Safety and Health Act ("OSHA"). Ridgell Compl. (Count VII); Kohler Compl. (Count VII); Zagami Compl. (Count VII). Each Complaint makes the identical allegation regarding the applicable duty purportedly established by those statutes: "These duties include but are not limited to a duty to act with reasonable care to take appropriate measures to prevent workplace violence." Ridgell ¶ 105; Kohler ¶ 107; Zagami ¶ 107. The negligence *per se* theory based on these statutes is without merit and subject to dismissal for two reasons.

First, under D.C. law, as explained above, a plaintiff may rely on a standard of conduct identified in a statute or regulation to support a negligence *per se* claim only if the plaintiff's "injuries were of the type which the statute was designed to prevent." *McNeil*, 686 A.2d at 578; *Romero*, 749 F.2d at 83 (in cases involving the criminal act of a third party, it must be "clear that the third-party criminal conduct was the very injury . . . which the statute intended to prevent")

(internal quotation marks omitted).   Neither the ISA nor OSHA was designed to prevent acts of workplace violence.   The ISA was designed to prevent workplace accidents.   *E.g.*, *Martin v. George Hyman Constr. Co.*, 395 A.2d 63, 70-71 (D.C. 1978) (prevention of workplace "accidents"); *Velasquez v. Essex Condo. Ass'n*, 759 A.2d 676, 679–80 (D.C. 2000) (prevention of "industrial accidents").[45]   OSHA was designed to prevent industrial accidents and occupational diseases.   *E.g.*, *Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1205-06 (10th Cir. 2009) (noting "the absence of *any* specific OSHA standard on workplace violence" because "OSHA is aware of the controversy surrounding firearms in the workplace and has consciously decided *not* to adopt a standard") (emphasis in original).[46]

Second, under D.C. law, "a statute or regulation offered to establish a standard for negligence *per se* purposes must not merely repeat the common law duty of reasonable care, but must set forth 'specific guidelines to govern behavior.'"   *McNeil*, 686 A.2d at 579; *see also, e.g.*, *Joy*, 999 F.2d at 558 ("There is ample authority in D.C. law for the proposition that an alleged violation of a statute or regulation gives rise to a claim of negligence per se only when that statute or regulation sets forth specific guidelines to govern the behavior.").   Here, neither ISA nor OSHA identifies any relevant standard of care; and the Complaints do not assert that either established *any* "specific guidelines" of the type necessary to support a negligence *per se* claim.

Thus, Count VII of the *Kohler*, *Ridgell*, and *Zagami* complaints should be dismissed.

---

[45] There is not a single reference to workplace violence in ISA's legislative history.  *See, e.g.*, 87 Cong. Rec. 7658 (1941); H.R. Rep. No. 918 (1941); S. Rep. No. 675 (1941).

[46] The Complaints fail to specify whether the claims are premised on the federal OSHA statute, 29 U.S.C. §§ 651–78 (1970), or its D.C. counterpart, the D.C. Occupational Safety and Health Act, D.C. Code §§ 32–1101 to -1124 (2001).  The statutes are the same in all material respects. *See* D.C. Code § 32–1103(a)(1) (2001) (embodying the same aims of preventing occupational accidents and illnesses as the federal OSHA statute).

**D.      The Claims Seeking to Hold HPES Vicariously Liable for the Assault and Battery by Mr. Alexis Fail to State a Claim**

Two of the Complaints include claims seeking to hold HPES liable for the assault and battery by Mr. Alexis.  *See McCullough* Count II ("Assault & Battery"), *Proctor* Count VII ("Vicarious Liability—Wrongful Death"), and *Proctor* Count VIII ("Vicarious Liability—Survival").

The claims fail because the Complaints do not—and cannot—allege that these horrific crimes were carried out within the scope of Mr. Alexis's employment as a computer technician.[47] An employer may only be held vicariously liable for the tortious conduct of its employee if the conduct occurred "within the scope of his or her employment."  *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 24 (D.D.C. 2008).  Conduct is within the scope of employment only if the conduct: (1) is of the kind the employee is employed to perform; (2) occurs substantially within the authorized time and space limits; and (3) is actuated, at least in part, by a purpose to serve the master.  Restatement (Second) of Agency § 228 (1958); *see also Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 431 (D.C. 2006) (following the Second Restatement's test).[48]  "The key inquiry is the employee's intent at the moment the tort occurred."  *Majano v. United States*, 469 F.3d 138, 142 (D.C. Cir. 2006).

Here, the Complaints contain the conclusory assertion that, at the moment of the shooting, Mr. Alexis was "acting within the scope of employment."  McCullough ¶ 82; *see also*

---

[47] Mr. Alexis "was an employee of The Experts and a subcontractor to HPES."  Proctor ¶ 198.  Nevertheless, this motion seeks dismissal on grounds independent from the fact that Mr. Alexis was not HPES's employee.

[48] The Third Restatement of Agency articulates a similar test, *see* § 7.07 (2006), though the District of Columbia Court of Appeals has not adopted this test, *see District of Columbia v. Bamidele*, 103 A.3d 516, 525 & n.6 (D.C. 2014) (reaffirming D.C.'s reliance on the Second Restatement's approach).

Proctor ¶ 213.  In order to state a claim, however, a plaintiff "must plead facts which, if true,

demonstrate that the alleged conduct of [an employee] was an outgrowth of their work

assignments, or an integral part of their business activities, interests or objectives." *Keys v.*

*WMATA*, 408 F. Supp. 2d 1, 4 (D.D.C. 2005); *see also, e.g.*, *Stevens*, 846 F. Supp. 2d at 129

(dismissing complaint alleging employee was acting "within the scope" of employment "without

explaining how these criminal activities would possibly be within the scope of *any* [employee's]

employment") (emphasis in original); *Butera & Andrews v. IBM Corp.*, 456 F. Supp. 2d 104, 112

(D.D.C. 2006) (dismissing claim because "plaintiff does not allege that the complained-of

attacks were committed by the [defendant] to further his employer's interests") (internal

quotation marks omitted).  The Complaints here include no such factual allegations.

The bare fact that Mr. Alexis's job as a computer technician is what allowed him "to

enter the Washington Navy Yard" on September 16, 2013—the day of the shooting—is not

enough to make the shooting itself within the scope of his employment.  Proctor ¶ 201; *see also,*

*e.g.*, *id.* ¶ 86.  In *Schecter*, 892 A.2d at 431, the Court determined as a matter of law that an

employer could not be held liable for a theft by home deliverymen, even though the theft

occurred during the job and while the men had access to the house as part of their job.  *See also*

*id.* at 427 ("[T]he moment the agent turns aside from the business of the principal and commits

an independent trespass, the principal is not liable.") (internal quotation marks omitted).

Similarly, in *Boykin v. District of Columbia*, 484 A.2d 560 (D.C. 1984), the Court ruled as a

matter of law that the District could not be liable for a sexual assault on a blind, deaf and mute

student by a school employee.  The fact that the employee's work "afforded him the opportunity

to" commit the crime was "insufficient to make the District vicariously liable . . . ."  *Id.* at 563–

64.  That was the case even though the "assignment necessarily included some physical contact"

with the student.  *Id.* at 562 ("We do not believe that a sexual assault may be deemed a direct

outgrowth of a school official's authorization to take a student by the hand or arm in guiding her

past obstacles in the building.").

It is clear from the face of the Complaints that the mass shooting was "wholly

unprovoked, highly unusual, and outrageous" and not within the scope of Mr. Alexis's

employment as a technician.  *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 32 (D.C. 1979)

(holding as a matter of law, that an employee's assault on a taxicab driver was not within the

scope of employment because it was "in no degree committed for [the employer's] benefit, to

further its interest, or to serve its purposes").

In addition, Count II of the *McCullough* Complaint and Count VIII of the *Proctor*

Complaint seeking to hold HPES vicariously liable for the assault and battery by Mr. Alexis are

barred by the one-year statute of limitation for assault and battery because the Complaints were

filed nearly two years after the Navy Yard shooting.  *See* D.C. Code § 12-301(4); *Jones v.

Servellon*, No. 94-1038-LFO, 1996 WL 554513, at *3 (D.D.C. Sept. 18, 1996) (claim for assault

and battery time-barred because "the applicable statute of limitations for *respondeat superior*

depends upon the nature of the torts alleged to have been committed by the servant"); *Casey v.

Ward*, 67 F. Supp. 3d 45, 53 (D.D.C. 2014) ("The statute of limitations for a claim brought

pursuant to the Survival Act is the statute of limitations applicable to the underlying claim

. . . .").[49]

Accordingly, the claims seeking to hold HPES liable for the assault and battery by Mr.

Alexis should be dismissed.

---

[49] Count VII of the *Proctor* Complaint asserts a claim under D.C.'s wrongful death statute and is
governed by the two year statute of limitations for wrongful death.  *See* D.C. Code § 16-2702.

III.     <u>**CONCLUSION**</u>

For the foregoing reasons, HPES respectfully requests that all counts asserted against it in the pending Complaints be dismissed.


Dated: December 11, 2015                    Respectfully submitted,


                                             _/s/ John E. Hall_____
                                            John E. Hall (D.C. Bar #415364)
                                            Jason C. Raofield (D.C. Bar #463877)
                                            COVINGTON & BURLING LLP
                                            One CityCenter
                                            850 10th Street, NW
                                            Washington, DC 20001
                                            (202) 662-6000
                                            Email: jhall@cov.com
                                            Email: jraofield@cov.com

                                            *Attorneys for HP Enterprise Services, LLC*