## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PATRICIA DELORENZO,<br>        Plaintiff,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>        Defendants. | : | Case No. 1:15-cv-0216-RMC |
| JAMES B. FRASIER et al.,<br>        Plaintiffs,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>        Defendants. | : | Case No. 1:15-cv-1492-RMC |
| JOHN EDWARD PROCTOR,<br>        Plaintiff,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>        Defendants. | : | Case No. 1:15-cv-1494-RMC |
| PRISCILLA A. HALMON-DANIELS,<br>        Plaintiff,<br><br>v.<br><br>THE EXPERTS, INC. et al.,<br>        Defendants. | : | Case No. 1:15-cv-1501-RMC |
| MICHELLE KOHLER,<br>        Plaintiff,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>        Defendants. | : | Case No. 1:15-cv-1636-RMC |
| TRACEY RIDGELL,<br>        Plaintiff,<br><br>v.<br><br>HP ENTERPRISE SERVICES, LLC et al.,<br>        Defendants. | : | Case No. 1:15-cv-1637-RMC |

| | | |
|---|---|---|
| ERIN ZAGAMI,<br>　　　Plaintiff, | : <br> : <br> : | |
| v. | : <br> : | Case No. 1:15-cv-1638-RMC |
| HP ENTERPRISE SERVICES, LLC et al.,<br>　　　Defendants. | : <br> : <br> : | |
| JANE MAE MCCULLOUGH,<br>　　　Plaintiff, | : <br> : <br> : <br> : | |
| v. | : <br> : | Case No. 1:15-cv-1639-RMC |
| HP ENTERPRISE SERVICES, LLC et al.,<br>　　　Defendants. | : <br> : <br> : | |

**OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS COMPLAINT OF DEFENDANT THE EXPERTS, INC.**

**TABLE OF AUTHORITIES**

<u>C</u>ASES

<u>Aktepe v. United States</u>, 105 F.3d 1400 (11th Cir. 1997) ............................................................24

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009)................................................................................. 28-29

<u>Bailey v. District of Columbia</u>, 668 A.2d 817 (D.C. 1995)............................................................32

** <u>Baker v. Carr</u>, 369 U.S. 186 (1962) ............................................................................ Passim

<u>Bancoult v. McNamara</u>, 445 F.3d 427 (D.C. Cir. 2006).........................................................17

<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007) ......................................................................28

** <u>Board of Trustees of Univ. of D.C. v. DiSalvo</u>, 974 A.2d 868 (D.C. 2009) ................ 31-33, 40

<u>Boykin v. District of Columbia</u>, 484 A.2d 560 (D.C. 1984)..........................................................41

<u>Carmichael v. Kellogg, Brown & Root Servs., Inc.</u>, 572 F.3d 1271 (11th Cir. 2009) ...... 22-23, 25

<u>Collier v. D.C.</u>, 46 F. Supp. 3d 6, 15-16 (D.D.C. 2014) (Collyer, J.)...........................................32

<u>D.C. v. Bamidele</u>, 103 A.3d 516................................................................................................41

<u>D.C. v. Beretta, U.S.A., Corp.</u>, 872 A.2d 633 (D.C. 2005) ...........................................................40

** <u>Dep't of Navy v. Egan</u>, 484 U.S. 518 (1988) ............................................................. 17-19, 22

<u>G'Sell v. Carven</u>, 724 F. Supp. 2d 101 (D.D.C. 2010).............................................................32, 40

Jones v. R.I. Associates, LLC., No. CIV.A. 02-01820RMC, 2005 WL 1475367, at *4
    (D.D.C. June 22, 2005) ............................................................................................ 31-32

Lin v. United States, 539 F. Supp. 2d 173 (D.D.C. 2008) (Collyer, J.) ........................................14

McNeil Pharm. V. Hawkins, 686 A.2d 567 (D.C. 1996) ...............................................................30

Phillips v. Hope Vill., Inc., No. CIV.A. 02-0700 (RMC), 2005 WL 1279167 (D.D.C.
    May 31, 2005) ...........................................................................................................31, 36

Romero v. Nat'l Rifle Ass'n of Am., Inc., 749 F.2d 77 (D.C. Cir. 1984) ....................................32

Schneider v. Kissinger, 310 F. Supp. 2d 251 (D.D.C. 2004) (Collyer, J.) ..................................15

Schneider v. Kissinger, 412 F.3d 190 (D.C. Cir. 2005) ...........................................................14, 18

Settles v. Redstone Dev. Corp., 797 A.2d 692 (D.C. 2002) ........................................................32

Sigmund v. Starwood Urban Inv., 475 F. Supp. 2d 36 (D.D.C. 2007) ........................................31

Sigmund v. Starwood Urban Retail VI, LLC, 617 F.3d 512 (D.C. Cir. 2010) .............................15

Smith v. Halliburton Co., No. CIV.A. H-06-0462, 2006 WL 2521326 (S.D. Tex. Aug. 30,
    2006) ..........................................................................................................................18, 22

Stevens v. Sodexo, Inc., 846 F. Supp. 2d 119 (D.D.C. 2012) ......................................................41

**Taylor v. Kellogg Brown & Root Servs., Inc., 658 F.3d 402 (4th Cir. 2011) .............. 22, 26-27

** Tiffany v. United States, 931 F.2d 271 (4th Cir. 1991) ..........................................................21

U.S. Info. Agency v. Krc, 905 F.2d 389 (D.C. Cir. 1990) ............................................................19

Wilson v. James, No. 13-CV-01351, 2015 WL 5952109 (D.D.C. Oct. 13, 2015) ......................19

**  Workman v. United Methodist Comm. on Relief of Gen. Bd. of Global Ministries of
    United Methodist Church, 320 F.3d 259 (D.C. Cir. 2003) .........................................31, 33, 38

## STATUTES

D.C. Code § 12-301(4) .................................................................................................................42

## RULES

58 Fed. Reg. 3479 .........................................................................................................................30

Federal Rule of Civil Procedure 12(b) .............................................................................1, 2, 14, 18, 28

Federal Rule of Civil Procedure 8(a)(2) ................................................................................. 28-29

## INTRODUCTION

There is no question that these cases arise out of a great tragedy – the murder of innocent people by Aaron Alexis at the Washington Navy Yard on September 16, 2013.  The question before the Court, rather, is whether Alexis' employer, TEI, bears legal responsibility to Plaintiffs' decedents and to Jane Mae McCullough for those actions under theories of negligence *per se*, negligence, and assault and battery.  At the threshold lies the question of whether those claims are even justiciable, given the substantial and inescapable role the United States Department of the Navy – the elephant in the room (but not in the caption) – played in granting Alexis his security clearance, letting him keep it while enlisted, serving him up to the civilian world with a gold seal of approval, and overseeing the industrial security program and base security at the Navy Yard.  Plaintiffs view all of these issues as central to their claims.  Thus, the allegations supporting Plaintiffs' claims are inextricably intertwined with these responsibilities and actions (all of which are solely and constitutionally committed to the Executive Branch), lack judicially discoverable and manageable standards, and, inescapably, will cast the Navy in an extraordinarily poor light.  It necessarily follows that Plaintiffs' claims – on their face – raise non-justiciable political questions requiring dismissal under Rule 12(b)(1).

Even if the claims were justiciable, Plaintiffs' claims sounding in negligence *per se* and negligence fail to state a claim for which relief can be granted because there exists no legal duty running from TEI to Plaintiffs' decedents and McCullough.  TEI's obligations under the National Industrial Security Program did not give rise to any such duty, contractually or otherwise.  As for the common law negligence claims, nothing within the four corners of Plaintiffs' Complaints creates a plausible inference that, under this District's stringent heightened foreseeability standard, Alexis' mass murder was foreseeable, whether at the time of his hiring (and re-hiring) or at any time during his employment with TEI.  And the claims of assault and battery must be

dismissed for the simple reason that Alexis was not acting within the scope of his employment in committing such heinous acts.[1]  For all of these reasons, the Complaints must be dismissed pursuant to Rule 12(b)(6).

## STATEMENT OF FACTS

### I.      FACTS RELEVANT TO TEI'S HIRING AND RE-HIRING OF ALEXIS

This is not a case in which a plaintiff faces the challenge of pleading facts largely unknown to the public or solely within the knowledge or control of the defendant.  Nor is it a case in which a plaintiff simply hopes that what factual allegations can be mustered are sufficient to survive a motion to dismiss.  To the contrary, the facts as alleged by Plaintiffs here recite the results of one of the most exhaustive criminal investigations in recent history by federal agencies and by Congress, backed by all of the investigative powers and potential sanctions at their disposal.[2]  To cite just two examples, thirty investigators from the Department of the Navy spent more than a year investigating the attack and ultimately issued a 114-page investigative report that was available to all Plaintiffs.  See Nov. 8, 2013 Report of the Investigation into the Fatal Shooting Incident at the Washington Navy Yard on September 16, 2013 and Associated Security, Personnel, and Contracting Policies and Procedures (the "Navy Report").[3]  Similarly, the Department of Defense issued an 82-page report after three separate teams of investigators and the Under Secretary of Defense for Intelligence completed a thorough investigation of the attacks.  See Department of Defense Internal Review of the Washington Navy Yard Shooting – A Report to the Secretary of Defense (dated November 20, 2013) (the "DoD Report").[4]

---

[1]    Some of the assault and battery claims are also barred by the applicable statute of limitations.

[2]    As one Plaintiff puts it, the Navy and the Department of Defense had "unique and special access to witnesses, documents, and other sources of evidence that no private person could possibly replicate without the aid of civil discovery."  Halmon-Daniels Compl. at ¶ 13.

[3]    A copy of the Navy Report is attached to the Delorenzo Compl. as Ex. 239.

[4]    A copy of the DoD Report is attached to the Delorenzo Compl. as Ex. 183.

The factual record developed by these reports – and as cited verbatim by Plaintiffs in their Complaints – is highly and uniquely developed.  Thus, the question of whether Plaintiffs could plead any set of facts sufficient, for example, to satisfy this District's heightened foreseeability standard, is particularly poignant here.  For the same reason, the question of non-justiciability is ripe for disposition at this stage of the proceedings

### A.      What TEI Knew at the Time It Hired Alexis in September 2012 and Re-Hired him in June 2013.

Before hiring Alexis in September 2012, TEI had available to it, and reviewed, several significant pieces of information from Alexis' service and discharge records from his prior enlistment in the Navy.  To any prospective employer, these records reflected that, in the eyes of the Navy, Alexis was a model sailor with an active, Secret-level security clearance who was highly employable both within the Navy and in the civilian world.   TEI further reviewed the results of the background check on Alexis required by its contract with HP Enterprise Services (the "HPES/TEI Agreement"), which revealed no criminal convictions in the preceding seven years, no history of drug use, and no blemishes on his driving record. [5]  To TEI, indeed to any prospective employer, Alexis appeared to be a prime candidate for hire.

### 1.      The Navy Had Given Alexis a Gold Seal of Approval at the Time of His Discharge.

After nearly four years of service on active duty, Alexis was discharged by the Navy on January 31, 2011, with an honorable characterization of service.  See Halmon-Daniels Compl. at ¶ 29; Delorenzo Compl. at ¶ 152; Delorenzo Compl. Ex. 239, at 29.  The Navy assigned Alexis

---

[5]      The HPES/TEI Agreement is repeatedly referenced throughout Plaintiffs' Complaints.  See, e.g., Frasier Compl. at ¶¶ 10-11; Proctor Compl. at ¶¶ 5-7, Delorenzo Compl. Ex. 239, at 30-31.  A copy of the HPES/TEI Agreement is attached hereto as Exhibit 1.  See Slate v. Pub. Def. Serv. for the D.C., 31 F. Supp. 3d 277, 287 (D.D.C. 2014), appeal dismissed (Dec. 4, 2014) (noting that when deciding a motion to dismiss, a court may consider "documents ... incorporated by reference in the complaint ... or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.") (citation omitted).

at that time a favorable re-enlistment code (RE-1), which signaled that the Navy would readily reenlist Alexis if he so chose.[6]  Delorenzo Compl. at ¶ 152; Delorenzo Compl. Ex. 239, at 29.  In addition, the Navy provided Alexis with a "detachment of individual" evaluation, which noted that Alexis was "promotable" and that retention was "recommended."  Id.  Alexis' medical records from his active duty service contained no adverse information or indications of mental illness.  Delorenzo Compl. Ex. 239, at 30.  Alexis' discharge record noted that the Department of the Navy Central Adjudication Facility ("DONCAF") had completed the necessary security clearance process on Alexis and had granted him access to classified information up to the Secret level.  Delorenzo Compl. at ¶ 145; Delorenzo Compl. Ex. 239, at 25.  The clearance remained active post-discharge for a period of twenty-four (24) months, and it was thus still active at the time TEI considered Alexis for employment in September 2012.  Reasonably relying on the Navy's gold seal of approval, TEI hired Alexis as a computer technician.  Delorenzo Compl. at ¶ 161; Ridgell Compl. at ¶ 29.

TEI reviewed these records again in June 2013 when it decided to rehire Alexis (after a short period away from the company).  See Delorenzo Compl. Ex. 239, at 32.  Nothing in these records suggested that Alexis was capable of mass murder; to the contrary, they showed that Alexis was a highly qualified candidate who had honorably served in the Navy and had merited a Secret security clearance.  Simply, Alexis was a highly suitable candidate for the job duties under the subcontract at hand.

---

[6]   This specific reentry code is used by the Navy in part "to assist recruiters in assessing suitability for reenlistment" and to communicate to civilian employers that the individual at issue is highly suitable for hiring.  Id.

**2.    Alexis Passed and Re-Passed the Background Check Required by the HPES/TEI Contract (and *Not* By D.C. Law) at the Time of His Hiring and Re-Hiring.**

Employers in the District of Columbia are not required to conduct a background check of any kind on employees prior to hiring.[7]  Nonetheless, TEI ordered a drug test, a driving record check, and a criminal convictions check[8] on Alexis pursuant to Section 6.4 of the HPES/TEI Agreement.  None of these tests revealed anything about Alexis that would have caused TEI to doubt he was fit to be hired.   His drug test was negative.  Delorenzo Compl. Ex. 239, at 31-32.  His driving record was clean.  Id.  And his criminal convictions check revealed no criminal convictions at any time in the seven years prior to September 2012.  Id.  TEI ran this comprehensive background check again in June 2013 with the same result – Alexis' drug test, driving record, and criminal conviction record were all clear.  Id.

**B.    What TEI Did *Not* Know, and Had No Reason to Know, at the Time It Hired Alexis in September 2012**

TEI based its decision to hire Alexis in September 2012 on the information it was able to obtain about him at that point in history – information such as Alexis' honorable discharge from the Navy, the Navy's assignment of a favorable reenlistment rating, and Alexis' clear criminal, driving, and drug records. TEI was not aware – and could not be aware – of every fact related to Alexis' past, because the Navy failed (or refused) to disclose fully what it knew about Alexis or what the Navy itself had failed to discover.  The Navy failed to disclose that Alexis had lied about his criminal past, that he had been repeatedly disciplined (and twice nearly discharged), or that he had been arrested several times on charges that included the use of a gun and a knife.  As

---

[7]    See the discussion at ARGUMENT Part II.B.2.c, *infra*.

[8]    See Exhibit 1, which is attached hereto.  Exhibit F to the attached required TEI to exclude from service any candidate who had been convicted of one of a series of listed crimes during the seven (7) years prior to the test.  See Exhibit A, at § 2.2(a), (d), and (e).  Because Alexis' record was clear of any criminal convictions between September 2005 and September 2012, Alexis was a qualified candidate to work at an HPES worksite.

the DoD Report makes clear, "Alexis' Navy command did not report in the security system of record multiple incidents of adverse information during Alexis' active duty service." Delorenzo Compl. Ex. 183, at 19-20. As a result, TEI "had no insight into Alexis' chronic personal conduct issues during his Navy service when they hired him." Id.

      **1.**      **The Navy Suitability Investigation and OPM Background Check at the Time of Alexis' Enlistment Failed to Discover a Tire Shooting Incident in 2004.**

In March 2007, Alexis began suitability screening at Naval Recruiting District (NRD) New York. Delorenzo Compl. Ex. 239, at 22. On March 22, 2007, Alexis was found medically suitable for enlistment after he reported no past mental or physical conditions. Id. at 23. That same day, the Office of Personnel Management (OPM) initiated the Entrance National Agency Check (ENTNAC) on Alexis. Id. The ENTNAC, however, did not include a police records check on Alexis because he had reported no criminal activity during his screening interview. Id. The OPM further required Alexis to complete an Electronic Personnel Security Questionnaire (EPSQ) to determine whether he would be provided access to classified information.[9] Id. On his EPSQ, Alexis answered "No" to all questions pertaining to prior treatment for mental health conditions, arrests, convictions, traffic fines greater than $150, prior use of illegal drugs, abuse of alcohol, or financial delinquencies. Id.

On April 6, 2007, OPM provided NRD New York with the results of the ENTNAC and revealed that Alexis had been materially untruthful during the screening process. Significantly, OPM uncovered an FBI Identification Record citing that Alexis had been arrested for a "malicious mischief" felony in June 2004 in Seattle, Washington. Id. at 24. NRD New York subsequently obtained Alexis' written account of the felony arrest and collected the police

---

[9]    The EPSQ is part of the National Agency Check with Law and Credit, which the OPM used to determine whether he would be provided access to classified information. Delorenzo Compl. Ex. 239, at 23.

records relating to the incident.  Id.  The Commander, Navy Recruiting Command (CNRC) reviewed these documents and ultimately adjudicated that Alexis remained suitable for enlistment, despite this felony arrest.[10]  Id.

In late August 2007, OPM closed the National Agency Check with Law and Credit and issued a report to DONCAF for use in adjudicating Alexis' eligibility for access to classified information.  Id. at 25.  That report again noted that Alexis had failed to disclose that he had been arrested in 2004 in Seattle.  Id. at 59.  The report further revealed that Alexis had lied about having serious financial issues, including numerous unpaid debts that had been assigned to collection agencies and unpaid traffic citations.  Id.  While OPM did obtain Alexis' account of these discrepancies, its investigation failed to verify the specific details regarding the arrest (namely that the arrest involved discharging a firearm in anger in a public place), the sources of Alexis' income between 2003 and 2007, and why Alexis failed to disclose his troubled finances. Id. at 59-60.  Even though DONCAF was fully aware that Alexis had provided these false, misleading, and contradictory statements to CNRC and OPM, it did not withhold Alexis' eligibility determination or request that OPM address the gaps in the original report.  Id. DONCAF instead ignored them altogether and granted Alexis a Secret security clearance on March 11, 2008.  Id. at 25, 60-61.

### 2.    The Navy Repeatedly Failed to Discipline Alexis, to Administratively Discharge Him, and to Suspend His Security Clearance Despite Multiple Arrests for Disorderly Conduct, Including the Use of Weapons.

Alexis' record during his period of active duty from March 2007 to January 2011 was far from spotless.  In less than three years:

- Alexis was arrested and jailed in DeKalb County, Georgia in August 2008 for disorderly conduct after he was removed from a night club for damaging property and for yelling profanities outside the club.  Id. at 26-27.

---

[10]    Alexis enlisted on May 5, 2007.  Delorenzo Compl. Ex. 239, at 24.

- Alexis was arrested in September 2010 in Fort Worth, Texas for discharging a firearm through the ceiling of his apartment into the apartment of his upstairs neighbor.  Id. at 28.

- Alexis received non-judicial punishment from his commanding officer on two occasions – first, in August 2008 after his disorderly conduct arrest and, second, in May 2009 after he drunkenly leapt from a staircase in Fort Worth, Texas and broke his ankle.  Id. at 27.

- Alexis received a performance evaluation that noted "significant problems" and that retention was "not recommended." Id. at 28.

- On two occasions, the Navy initiated administrative separation procedures designed to remove Alexis involuntarily from active duty. Id.

The Navy was fully aware of these infractions and was aware that Alexis had been arrested in 2004 (prior to his enlistment).  Id. at 22-30.  Nonetheless, the Navy failed to discipline Alexis in any significant manner.  The Navy abandoned the administrative separation procedures twice and failed to discharge Alexis for his serious infractions.  Id.  The Navy "reported none of this adverse information in [the Navy Joint Personnel Adjudication System]" and "did not consider reporting his conduct in any security system of record."  Delorenzo Compl. Ex. 183, at 19.  Instead, the Navy promoted Alexis, allowed him to continue serving in the Navy, and allowed him to keep his security clearance.  Delorenzo Compl. Ex. 239, at 28.  Upon discharge, the Navy failed to disclose any of this information.  Instead, the Navy discharged Alexis with an honorable characterization of service and a favorable reentry code and obscured the truth about his past to future employers like TEI.  As a result, whatever aspect of Alexis' future conduct may have been foreseeable to the Navy by January 2011 was invisible to TEI at the time it hired him in September 2012.

## II.     FACTS REGARDING ALEXIS' ACTIONS IN AUGUST AND SEPTEMBER 2013

### A.     What TEI Knew About Alexis in Early August 2013

On August 4, 2013, Alexis was in the Norfolk, Virginia airport waiting for his flight to

Providence, Rhode Island to report for his next work assignment at the Naval Undersea Warfare

Center in Newport, Rhode Island.  Delorenzo Compl. Ex. 239, at 32; Ridgell Compl. at ¶¶ 32-33.

Alexis became angry because he believed a nearby passenger was making fun of him.  Id.

Alexis called a travel coordinator at TEI, and reported what was happening.  Id.  That

coordinator reassured Alexis and recommended he speak with airport security if he required

assistance.  Id.  Alexis did so and boarded the plane to Providence without further incident.  The

TEI coordinator subsequently updated the members of TEI's Continuity of Service Contract

("CoSC") project team regarding the call with Alexis.  Delorenzo Compl. Ex. 239, at 32; Proctor

Compl. at ¶ 30.

On August 5, 2013, Alexis contacted Brenda Haberman (TEI's Human Resources

Specialist) and asked for assistance in moving from the Residence Inn in Middletown, Rhode

Island to another hotel because of excessive noise at the Residence Inn.  Delorenzo Compl. at ¶

172.  Haberman agreed to do so and moved him to the Navy Gateway Inn & Suites on the

Newport Naval Base in Newport, Rhode Island.  Delorenzo Compl. Ex. 239, at 32-33.

Alexis contacted Haberman again at approximately 6:00 p.m. on August 6, 2013 and

explained that he believed three individuals had followed him from the Residence Inn to the

Navy Gateway Inn, were talking about him in an adjacent room, and were using a machine to

keep him awake. [11]  Id. at 33-34; Zagami Compl. at ¶ 37.  Haberman called the front desk clerk

at the Navy Gateway Inn to obtain more information.  Delorenzo Compl. Ex. 239, at 34; Zagami

Compl. at ¶ 39.  The clerk read from the desklog and explained that Alexis had been disrupting

---

[11]     Later that evening, Alexis recounted this story to Clamp, the program manager at TEI.  Id. at 35.

other guests by making noise and by knocking on the walls.  Delorenzo Compl. Ex. 239, at 34.
The clerk also reported that Alexis had "disheveled the bed."  Id.  According to the clerk,
Haberman stated she was afraid Alexis might "harm others."  Proctor Compl. at ¶ 113.  For
purposes of this motion, of course, that allegation must be taken as true.  As the Navy Report
itself also noted, however, Haberman denied ever having made such a statement.  Delorenzo
Compl. Ex. 239, at 34.

       After these calls, Haberman contacted a project manager at TEI, Joanne Clamp, to report
the information she had gathered and to schedule a call with the TEI CoSC project team to
discuss the reports concerning Alexis and his ability to fulfill his contractual duties.  Zagami
Compl. at ¶ 39.  Based on the information provided to Haberman by the Newport desk clerk and
by Alexis himself, the team decided to return Alexis to Fort Worth, Texas for rest.  Delorenzo
Compl. Ex. 239, at 35; Halmon-Daniels Compl. at ¶¶ 44-46.  While Alexis initially objected and
wanted to remain in Rhode Island to work, the TEI team convinced him otherwise and removed
him from the Newport assignment.  Id.  Clamp then notified HPES in writing that Alexis was not
feeling well and would not complete his assignment in Rhode Island.  Id.  Later on the evening
of August 6th, TEI's Facility Security Officer, David Carlyn, accessed the Joint Personnel
Adjudication System (JPAS) and cancelled Alexis' visit authorization to enter the Naval
Undersea Warfare Center.  Delorenzo Compl. Ex. 239, at 35.  Carlyn also entered a debrief
action in JPAS, which recorded the administrative decisions that Alexis no longer required
access to classified information because he would not be reporting to work.  Id. at 37-38.

       On August 7, 2013, Clamp contacted Summer Cole, the deployment supervisor employed
by HPES at the Newport job location.  Delorenzo Compl. Ex. 239, at 35-37; Proctor Compl. at ¶
53.  Cole communicated that Alexis had spent the night in her room at the Marriott Hotel in
Newport because of the alleged noise at the Navy Gateway Inn.  Delorenzo Compl. Ex. 239, at

35-37; Ridgell Compl. at ¶ 41; Proctor Compl. at ¶¶ 45, 53-54.  Also on August 7, TEI's

Director of Human Relations, Jamie Franco, initiated an investigation into the information

provided by Alexis, the desk clerk, and Summer Cole in Newport.  Delorenzo Compl. Ex. 239, at

38; Halmon-Daniels Compl. at ¶¶ 55-58. As part of the investigation, Franco attempted to obtain

copies of the police reports made by the officers who responded to calls from Alexis and the

hotel, but mistakenly contacted the wrong police department and did not obtain the records.  Id.

Franco also contacted Alexis' mother on August 9, 2013 to bring her into the conversation

regarding her son.  Id.  Alexis' mother at that time stated that Alexis had been paranoid in the

past and that this was not the first episode he had experienced.  Id.

The TEI CoSC project team met on August 9, 2013 to discuss actions that should be

taken regarding Alexis.  Delorenzo Compl. at ¶¶ 214-215; Ex. 239, at 39; Halmon-Daniels

Compl. at ¶ 59. After some discussion, the team decided that Alexis was fully capable of

performing his job duties and that he could be reassigned after a few days of rest.  Id.  The team

also assessed the statements made regarding Alexis to determine whether an adverse information

report should be made to the Department of Defense Central Adjudication Facility pursuant to

NISPOM.  Delorenzo Compl. Ex. 239, at 39.  NISPOM is explicit that "[r]eports based on rumor

or inuendo should not be made." Delorenzo Compl. Ex. 114, at § 1-302(a) (emphasis added).

The team concluded that because nearly all of the information regarding Alexis' actions was

second hand and could not be confirmed, no report should be made pursuant to the express

directives of NISPOM, was required at that time, especially since doing so may have infringed

on Alexis' privacy rights.  Delorenzo Compl. at ¶¶ 214-18; Ex. 239, at 39.  Carlyn then recorded

in JPAS an "indoctrination" action, which reestablished Alexis as an individual authorized to

access classified information.  Id.

Importantly, any and all of TEI's knowledge of Alexis' behavior in early August 2013 came second hand and only over the phone, from Alexis himself or from individuals who had interacted directly with him.  No representative of TEI ever witnessed, first hand, any of the behavior discussed above.  No one from TEI observed Alexis' behavior at the Norfolk Airport or in the hotels in Newport.  Others did, some of whom were security and police officers on whom the law imposes a direct duty to protect the physical safety of others:

- Post-9/11 security at the Norfolk Airport interacted with Alexis during the incident in question and allowed him to board his plane without limitation. Delorenzo Compl. Ex. 239, at 32; Ridgell Compl. at ¶¶ 32-34;

- The Newport Naval Station Police observed first hand that Alexis had taken apart his hotel bed and had taped a microphone to the ceiling to record the voices of people he believed may have been following him. Delorenzo Compl. Ex. 239, at 33.  They heard him explain that he believed he had a chip in his head and was being controlled by microwaves.  Id.  After assessing the situation on site, the Naval Station Police left without detaining Alexis "because they believed he was not a threat, nor in need of immediate care or treatment."  Id.;

- The Newport Police Department responded to a call from Alexis on August 7, 2015 and heard the same story from Alexis that he had told to the Naval Station Police.  Delorenzo Compl. Ex. 239, at 36; Ridgell Compl. at ¶ 43.  After interacting with Alexis in person, the Newport Police concluded Alexis was not a danger to himself or others and left the hotel without detaining him Id.;

- Summer Cole, an HPES supervisor on site in Newport, received a 3:00 a.m. phone call from Alexis on August 7, 2013 in which Alexis asked to sleep in Cole's hotel room at the Marriott for the evening. Ridgell Compl. at ¶¶ 41-42; Delorenzo Compl. Ex. 239, at 35-36. She agreed, even after he explained that he believed he had been followed to Newport and to the Marriott by the same three individuals.  Id.  At no time during that evening did Cole ever believe that Alexis was dangerous; in fact, she dismissed his story out of hand and allowed him to sleep in the other bed in her room all night.  Id.

In the matter of two days, Alexis interacted directly with individuals charged by law with ensuring public safety – airport security officers, hotel security personnel, Navy police officers,

and city police officers.  He spent a night in the room of his HPES supervisor.  Each of these individuals observed Alexis first hand, heard his stories, witnessed and assessed his behavior, and observed the state of his hotel rooms.  *None* of them concluded that he was a danger to himself or others.

### B.      What the Experts Knew About Alexis Between August 12, 2013 and September 16, 2013

The CoSC project team's decision to return Alexis to work appeared to be validated over the following month, as Alexis worked at four different Navy installations without incident:  in Williamsburg, Virginia from August 12-16; in Newport, Rhode Island from August 19-23; in Carderock, Maryland from August 26-30; and in Crystal City, Virginia from September 3-6.  Delorenzo Compl. at ¶ 220; Ex. 239, at 39; Proctor Compl. at ¶ 67.  Throughout these four weeks, Alexis performed well, and no significant performance or behavior issues were noted.  Delorenzo Compl. Ex. 239, at 40; Proctor Compl. at ¶ 69.  TEI received no reports of strange behavior or threats of violence of any kind.  Id.   It was not until September 16, 2013 that any representative of TEI again heard any news about Alexis.

### C.      What TEI Did Not Know, and Had No Reason to Know, About Alexis from Early August 2013 to September 16, 2013

None of the Complaints, and none of the government reports on which they are based, allege or report that TEI had any contemporaneous knowledge, or any reason to know, of the following facts.  First, that Alexis had contacted the "Freedom from Covert Harassment and Surveillance" group on or about September 1, 2013 and had suggested to that group that he was under "constant bombardment from some type of ELF weapon."  Proctor Compl. at ¶ 68; Delorenzo Compl. Ex. 239, at 40.  Second, TEI did not know that Alexis had visited two U.S. Department of Veteran's Affairs treatment facilities on August 23, 2013 (in Providence, Rhode Island) and on August 28, 2013 (in Washington D.C.) with complaints of insomnia, that Alexis

13

had been prescribed a low dose antidepressant (Trazadone), or that when asked during one visit if he had thoughts of harming someone else, Alexis answered, "no."  Delorenzo Compl. Ex. 239, at 39-40.  Finally, TEI did not know that Alexis had purchased a shotgun, ammunition, and a hacksaw in September 2013.  Id.

* * * *

At no time prior to September 16, 2013 did TEI become aware of facts that suggested Alexis was capable of mass murder, and Plaintiffs have not (and cannot) cite to any facts otherwise.

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS RAISE NON-JUSTICIABLE POLITICAL QUESTIONS REQUIRING DISMISSAL.

A complaint must be dismissed for lack of subject matter jurisdiction if it implicates a non-justiciable political question.  See, e.g., Schneider v. Kissinger, 412 F.3d 190, 193 (D.C. Cir. 2005) (affirming dismissal of non-justiciable political questions, noting "[t]he principle that the courts lack jurisdiction over political decisions that are by their nature 'committed to the political branches to the exclusion of the judiciary' is as old as the fundamental principle of judicial review.") (citation omitted).  Where the allegations of the complaint, on their face, present non-justiciable political questions, the Court may dispose of the claims at the motion to dismiss stage. See, e.g., Lin v. United States, 539 F. Supp. 2d 173, 178 (D.D.C. 2008) (Collyer, J.) aff'd, 561 F.3d 502 (D.C. Cir. 2009)  When reviewing the complaint to determine whether it should be dismissed for lack of jurisdiction under Rule 12(b)(1), the Court must more closely scrutinize the Plaintiffs' factual allegations than is required when deciding a Rule 12(b)(6) motion, and it may consider materials outside the pleadings.  Id. at 177.  The Court should not hesitate to dismiss the claims here, given that the allegations rest on detailed, particularized facts developed through numerous governmental investigations, which make clear that Plaintiffs' claims present political

questions.  Because essential elements of Plaintiffs' claims necessarily implicate non-justiciable political questions, they are properly subject to dismissal for lack of jurisdiction.

To determine whether a lawsuit presents a political question, the Court must undertake a "discriminating inquiry" into the facts presented.  Baker v. Carr, 369 U.S. 186, 217 (1962).  The Supreme Court in Baker set forth six factors for assessing whether a particular case presents a non-justiciable political question.  Id.  The Court should dismiss a case on political question grounds if one or more of the Baker factors is present.  See Schneider v. Kissinger, 310 F. Supp. 2d 251, 258 n.7 (D.D.C. 2004) (Collyer, J.) aff'd, 412 F.3d 190 (D.C. Cir. 2005) ("Dismissal may be appropriate if only 'one of these formulations is inextricable from the case at bar[.]'") (quoting Baker, 369 U.S. at 217).

Here, Plaintiffs have alleged a series of negligence claims, all of which share the same fundamental elements: duty, breach of duty, proximate cause, and damages.  See, e.g., Sigmund v. Starwood Urban Retail VI, LLC, 617 F.3d 512, 514 (D.C. Cir. 2010).[12]  These claims, however couched, posit two theories as to the essential element of duty: (1) a duty arising under the National Industrial Security Program Operating Manual ("NISPOM") and regulations intended to protect classified information; and (2), a duty arising from the allegedly heightened foreseeability of Alexis' criminal actions.  Both theories, as pleaded, inextricably involve political questions surrounding national security and military judgments and implicate three of the Baker factors: the first factor (a textually demonstrable constitutional commitment of an issue

---

[12]   We note that, of the various common law claims sounding in negligence, one is not recognized under District of Columbia law at all:  "Negligent Credentialing" (see McCullough Compl. at Count III) .  This tort is recognized in some other jurisdictions only in the medical malpractice context as it relates to a hospital's duty to exercise care in extending privileges to its physicians.  Moreover, after substantial research, we find *no* cases in which any court within the District of Columbia discusses the elements of a negligent credentialing claim, even in the malpractice context.  See 98 A.L.R.5th 533 (originally published in 2002) (citing no cases from the District of Columbia in its extensive state-by-state review of negligent credentialing claims).

to a coordinate political department), the <u>second</u> factor (a lack of judicially discoverable and manageable standards for resolving the case), and the <u>fourth</u> factor (the impossibility of the Court's undertaking independent resolution without expressing lack of the respect due to coordinate branches of government).  <u>See</u> <u>Baker</u>, 369 U.S. at 217.   Because Plaintiffs' negligence claims will inescapably require inquiry into issues that are within the exclusive purview of the coordinate political branches of government, the claims are non-justiciable and should be dismissed as a matter of law.

A.      **Essential Elements of Plaintiffs' Claims Sounding in Negligence *Per Se* Raise Non-Justiciable Political Questions.**

Plaintiffs seek to hold TEI liable under a negligence *per se* theory by positing that TEI owed their decedents and McCullough a duty to report adverse information about Alexis into JPAS in August 2013, breached that duty by failing to do so, and that such breach was the proximate cause of the harm to their decedents and McCullough because:

> [h]ad this known adverse information about Alexis been reported by THE EXPERTS to DoD CAF and Navy Installation commanders, *more likely than not, it would have properly been adjudicated and acted upon*, and consequently Alexis' authorization to access secure facilities and information *would likely have been revoked*. . . . Had Alexis [sic] authorization to access secure facilities and information been revoked, Alexis would *not likely have been granted access to the Washington Navy Yard* thereafter on September 16, 2013.

Delorenzo Compl. at ¶¶ 280-81 (emphasis added.)[13]  These "what the Navy likely would have done" allegations are central, and thus fatal, to Plaintiffs' negligence *per se* theory because they necessarily and inescapably raise non-justiciable political questions under three of the <u>Baker</u>

---

[13]    <u>See also</u> Frasier Compl. at ¶¶ 35-42; Kohler Compl. at ¶ 53, (citing various regulations; Count VII); Ridgell Compl. at ¶ 51, (citing various regulations; Count VII); Zagami Compl. at ¶ 53 (citing various regulations; Count VII); McCullough Compl. at ¶¶ 71-72; Proctor Compl. at ¶¶ 84-85; Halmon-Daniels Compl. at ¶ 60.  In raising its non-justiciability argument at the threshold, TEI in no way concedes that the negligence *per se* claim is legally cognizable.  <u>See</u> Argument, Part II.A., <u>infra</u>.  But as a matter of judicial power and restraint, arguments concerning subject matter jurisdiction should be raised at the outset.

factors. Accordingly, all of Plaintiffs' claims grounded in this theory must be dismissed for lack

of subject matter jurisdiction.

### 1.    Plaintiffs' NISPOM-Based Claims Invoke Issues that are Constitutionally Committed to the Executive Branch.

Plaintiffs' reliance on NISPOM to establish a claim sounding in negligence *per se*

violates the first <u>Baker</u> factor.  The Constitution explicitly vests the political branches with

authority over national security.  U.S. Const. art. I, § 8, cls. 1, 10; § 9, cl. 2; U.S. Const. art. II, §

2.  <u>See also</u> <u>Bancoult v. McNamara</u>, 445 F.3d 427, 433 (D.C. Cir. 2006) (noting that issues

related to national security are one of the "quintessential sources of political questions").  The

relation of NISPOM to national security is clear; it is the operating manual for the National

Industrial Security Program, which is set by the National Security Council.  <u>See</u> Delorenzo

Compl., Ex. 114, at § 1-101(a).  The express purpose of NISPOM is to control "the authorized

disclosure of classified information released by U.S. Government Executive Branch Departments

and Agencies to their contractors."  <u>Id.</u> at § 1-100.  NISPOM is issued and maintained by the

Secretary of Defense, who is also responsible for determining contractors' eligibility for access

to classified information.  <u>Id.</u> at §§ 1-101(b)-(c).  By considering how, if at all, TEI was allegedly

negligent under NISPOM here, the Court would necessarily be required to decide security issues

that are constitutionally committed to the executive branch.

Plaintiffs argue that had TEI made an adverse incident report regarding Alexis pursuant

to NISPOM in JPAS, his security clearance *may* have been revoked by a Department of Defense

adjudicator and his access to the Washington Navy Yard *may* have been denied.[14]  These "what-

ifs" – decisions concerning the issuance or revocation of a security clearance and access to

military installations – are matters within the sole purview of the executive branch and are not to

be second-guessed by the judiciary unless Congress has specifically provided otherwise.  <u>See</u>

---

[14]    Delorenzo Compl. at ¶¶ 280-82.

Dep't of Navy v. Egan, 484 U.S. 518, 526–29 (1988) (holding that non-executive bodies do not have authority to review the substance of an underlying decision to deny or revoke a security clearance based on adverse information about the applicant, because the protection of classified information must be committed to the broad discretion of the agency responsible).[15]  As the D.C. Court of Appeals has made clear, "it is within the role of the *executive* to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role." Schneider, 412 F.3d at 196 (quotation omitted; emphasis added).[16]

The judiciary is similarly unable to pass judgment on issues surrounding the physical security of the Washington Navy Yard, which is also a discretionary function committed exclusively to the executive.  See, e.g., Smith v. Halliburton Co., No. CIV.A. H-06-0462, 2006 WL 2521326, at *5 (S.D. Tex. Aug. 30, 2006) (dismissing claims against government contractor under Rule 12(b)(1), noting that by alleging contractor negligently failed to provide security on a military installation, plaintiffs were in effect alleging that the *military* was negligent in providing security, thereby presenting a non-justicable political question).  If this Court were to adjudicate issues regarding the issuance or revocation of Alexis' security clearance, or the subsequent granting of his access to the Washington Navy Yard, as Plaintiffs here ask it to do, it would be in direct violation of the first Baker factor, because such determinations are exclusively within the purview of the executive branch.  Moreover, as described immediately below, the Court lacks any manageable standards for making such determinations.

---

[15]   The general standard for determining whether a security clearance should be granted or revoked depends on whether the clearance is "clearly consistent with the interests of the national security." Id. at 528 (citing numerous regulations).

[16]   See also Oryszak v. Sullivan, 565 F. Supp. 2d 14, 18 (D.D.C. 2008) aff'd, 576 F.3d 522 (D.C. Cir. 2009) (holding that plaintiff's claims regarding the revocation of his security clearance were not subject to judicial review as "the determination whether to grant or to revoke a security clearance is committed by law to the discretion of the Executive Branch.").

**2.     There are a Lack of Judicially Discoverable and Manageable Standards for Resolving the Issues Necessarily Implicated by Plaintiffs' NISPOM-Based Claims.**

The Court must decline to speculate, as Plaintiffs ask it to do, as to what Department of Defense or Navy adjudicators would or would not have done with respect to Alexis' security clearance and what the Navy would have done with respect to his access to the Washington Navy Yard, had TEI made an entry into JPAS regarding Alexis' conduct in August 2013.[17]  The Supreme Court has specifically indicated that there are few, if any, standards for adjudicating a security clearance decision: "[t]he attempt to define not only the individual's future actions, but those of outside and unknown influences renders the grant or denial of security clearances an inexact science at best."  Egan, 484 U.S. at 529 (internal quotation and alterations omitted).  This Circuit has similarly recognized that the protection of classified information must be committed to the broad discretion of the agency responsible, because "outside nonexpert bodies" cannot determine "what constitutes an acceptable margin of error in assessing the potential risk."  U.S. Info. Agency v. Krc, 905 F.2d 389, 395 (D.C. Cir. 1990) (quoting Egan, 484 U.S. at 529) (internal quotations omitted); see also Wilson v. James, No. 13-CV-01351, 2015 WL 5952109, at *16 (D.D.C. Oct. 13, 2015) (declining to adjudicate security-related actions as non-justiciable and noting that the D.C. Court of Appeals "consistently has barred judicial review when evaluating a plaintiff's claim would require a court to second-guess the merits of a security clearance-related decision.").  And it is precisely that "acceptable margin of error in assessing the potential risk" that lies at the heart of Plaintiffs' NISPOM-based claims.

Given the inexact standards surrounding the propriety of revoking a security clearance – which is a determination left to the discretion of executive branch departments – the Court is not

---

[17]   See, e.g., Halmon-Daniels Compl. at ¶ 88; Proctor Compl. at ¶ 174, ¶ 191; Frasier Compl. at ¶¶ 68-69; Delorenzo Compl. at ¶¶ 280-82.

positioned to examine whether the Department of Defense or the Navy would have revoked

Alexis' security clearance and how that would have affected his access to the Navy Yard.  How

the Department of Defense or the Navy would have acted is entirely speculative and cannot be

determined through the ordinary means of discovery.  In fact, the Navy Report itself indicates

that even if TEI *had* made an entry into JPAS regarding Alexis' conduct in Rhode Island, such

an entry would not necessarily have prevented Alexis from accessing the Navy Yard on

September 16, 2013.  Delorenzo Compl. Ex. 239, at 84 ("Specifically, a visit request *was not*

*reviewed* prior to granting access to Building 104 and *Alexis' clearance was not verified in JPAS*

prior to granting access to Building 197.") (emphasis added).  In the absence of any judicially

discoverable or manageable standards for evaluating how an executive branch department with

plenary authority would have handled Alexis' security clearance and base access under

circumstances different from those that occurred, Plaintiffs' claims arising under NISPOM are

non-justiciable under the second <u>Baker</u> factor and should be dismissed.

> **3.     The Court Cannot Resolve Issues Surrounding TEI's Compliance
> with NISPOM Without Expressing a Lack Of Respect for the
> <u>Executive Branch.</u>**

Finally, the Court cannot resolve Plaintiffs' claims without expressing a lack of respect

for the executive departments that are ultimately responsible for ensuring compliance with

NISPOM and security at the Navy Yard.  Plaintiffs' complaints are grounded in government

investigation reports that are highly critical of the handling of the National Industrial Security

Program and base security at the Navy Yard by the Department of Defense and the Navy.

Indeed, the many failures cited in these reports concerning the Navy's granting of a security

clearance to Alexis and its maintenance in the face of multiple arrests and misconduct during

Alexis' enlistment bear directly on the question of what the Department of Defense and the Navy

may or may not have done in August 2013 in the face of an adverse incident report.  This is why

compliance with executive-issued regulations is a determination to be left to the executive branch, and why judicial inquiry into those determinations runs afoul of the fourth <u>Baker</u> factor. <u>See, e.g.</u>, <u>Tiffany v. United States</u>, 931 F.2d 271, 282 (4th Cir. 1991).

In <u>Tiffany</u>, a pilot's estate sued the United States when the pilot was killed in a crash with an intercepting Air Force jet.  Plaintiff argued that the court could decide the case without expressing lack of respect for coordinate political branches because the government already had regulations, manuals, and procedures in place to govern the conduct of which she complained. <u>Id.</u> at 279.  The court rejected this argument for three reasons.  First, the existence of regulations to govern the defendant's conduct does not turn an otherwise non-justiciable dispute into a justiciable one.  <u>Id.</u>  Second, the existence of regulations designating certain procedures does not automatically give rise to an actionable duty in tort to comply with those regulations.  <u>Id.</u> at 280. And third, the regulations in question reserved a great deal of discretion to the parties subject to them.  <u>Id.</u> at 281.  The court thus concluded that it could not impose tort liability for failure to comply with the regulations without expressing a lack of respect for "those branches of government whose expertise is greater and whose political accountability is more direct."  <u>Id.</u> at 282.

As in <u>Tiffany</u>, it is immaterial that regulations and procedures related to the reporting of adverse information are in place to govern the conduct of military contractors.  The existence of policies and procedures here for reporting adverse information cannot overcome the non-justiciable nature of Plaintiffs' claims; those standards are set, carried out, and overseen *exclusively* by the executive.  <u>See</u> Delorenzo Compl. Ex. 114, at § 1-101.  Furthermore, as is described more fully in Section II.B.1, the procedures set forth in NISPOM do not create private rights of action arising in tort, but are instead designed and implemented for the purpose of protecting the security of classified information.  Finally, and perhaps most important to the

political question analysis, the procedures set forth in NISPOM reserve a great deal of discretion to Department of Defense and Navy adjudicators, who, upon review of a JPAS incident report, may or may not revoke a security clearance based on considerations of national security that are beyond the expertise of the judiciary.  See Egan, 484 U.S. at 527; Delorenzo Compl. Ex. 114, at § 2-200(b).

Accordingly, this Court cannot examine TEI's compliance with NISPOM without also examining, speculating about, and passing judgment on the decisions and actions of executive branch departments.  Given their authority over matters of national security, these departments are alone vested with the responsibility for adjudicating the merits of a security clearance decision arising under NISPOM.

## B.  Proof of Plaintiffs' Remaining Claims Sounding in Negligence Raise Non-Justiciable Political Questions.

Federal courts do not hesitate to dismiss negligence-based claims against governmental entities and contractors when resolution of critical issues in the case would call into question the propriety of decisions made by the executive branch, especially decisions concerning the military.  See, e.g., Taylor v. Kellogg Brown & Root Servs., Inc., 658 F.3d 402 (4th Cir. 2011); Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271 (11th Cir. 2009).[18]  The complaints here allege that TEI was negligent at the time it hired Alexis or at the time he entered

---

[18]  See also Shimari v. CACI Premier Tech., Inc., No. 1:08-CV-00827-GBL, 2015 WL 4740217, at *16 (E.D. Va. June 18, 2015) (dismissing claims against military contractors on political question grounds);  Whitaker v. Kellogg Brown & Root, Inc., 444 F. Supp. 2d 1277, 1282 (M.D. Ga. 2006) (dismissing as barred by political question doctrine wrongful death claims seeking to hold military contractor liable for negligence); Smith v. Halliburton Co., No. CIV.A. H-06-0462, 2006 WL 2521326, at *7 (S.D. Tex. Aug. 30, 2006) (dismissing negligence claims against military contractor as posing non-justiciable political question).

the Washington Navy Yard because TEI "knew or should have known" that he posed a threat to the safety of others.[19]

But TEI's decisions to hire and retain Alexis between September 2012 and September 2013 were based (in great part) upon what was reported to it by the Navy (an executive branch department) regarding Alexis' time as an active duty sailor.  While it indicated that Alexis maintained a security clearance, had been honorably discharged, and was eligible for re-enlistment, the Navy utterly failed to disclose the very acts upon which Plaintiffs' claims are premised – including Alexis' arrests, dishonesty, and misconduct giving rise to multiple (though ultimately discontinued) disciplinary actions.  One essential element of Plaintiffs' negligence claims – a duty arising under this District's stringent heightened foreseeability standard – inexorably turns on what TEI "knew or should have known" about Alexis at the time it hired him, which in itself inexorably turns on the Navy's own failings at the time it enlisted, retained, and discharged Alexis.  Because those claims invoke the first, second, and fourth <u>Baker</u> factors, they must be dismissed as non-justiciable.

1.    **Plaintiffs' Negligence Claims Invoke Issues that are Constitutionally Committed to Another Branch.**

It is without question that the Constitution explicitly vests the political branches with authority over the military.  U.S. Const. art. I, § 8, cls. 11-16; U.S. Const. art. II, § 2.  In fact, "[t]here can be little doubt that military judgments generally fall into" the first <u>Baker</u> category. <u>Carmichael</u>, 572 F.3d at 1281.  The political question doctrine applies any time a case involves analysis of a sensitive military decision, regardless of whether it is a battlefield command or a more mundane administrative function.  <u>See</u> <u>id.</u> at 1287 ("While decisions relating to [battlefield or combat activities] are paradigmatically insulated from judicial review, it is neither necessary

---

[19]   <u>See, e.g.</u>, Frasier Compl. at ¶ 17; Proctor Compl. at ¶ 94; Halmon-Daniels Compl. at ¶ 79; Kohler Compl. at ¶¶ 79-80; Ridgell Compl. at ¶¶ 77-78; Zagami Compl. at ¶¶ 79-80.

nor sufficient for the purposes of the political question doctrine that military decisions relate to such matters.").

A close examination of Plaintiffs' claims sounding in negligence reveals the extent to which the decisions of executive branch departments are implicated here.  See Aktepe v. United States, 105 F.3d 1400, 1404 (11th Cir. 1997) (affirming dismissal of claims posing political questions and noting that despite appellants' efforts to cast their case as a common negligence action, the "allegations of the complaint launch a far more sweeping assault on the Navy's practices [in communication, training, and drill procedures] than Appellants acknowledge."). While the complaints in this case might appear to raise seemingly straightforward negligence claims, a close examination indicates that judgments made by the military pervade the application of the heightened foreseeability standard to this case.  These negligence claims – which essentially boil down to whether TEI should have hired a particular former service member with a government-issued security clearance – require, at the pleading stage, consideration of the following:

- the sufficiency of the investigation into Alexis' background by the Navy and the OPM;
- the military's decision to grant Alexis a Secret-level security clearance;
- the military's decision not to report Alexis' repeated arrests and instances of misconduct during his time in the service;
- the military's decision to suspend adjudicative proceedings against him on multiple occasions; and
- the military's decision honorably to discharge him with a secret-level security clearance despite these issues.

Indeed, the extensive role of the military and OPM – and how the decisions and procedures of those executive departments are implicated in this case – is made clear from the DoD Report.  That report explains:

- "The *Office of Personnel Management (OPM) background investigation* was missing critical information."
- "The *Navy granted Alexis a security clearance* with specified conditions, but there was no oversight mechanism in place to ensure compliance."
- "Alexis' *Navy command did not report in the security system* of record multiple incidents of adverse information during Alexis' active duty service."
- "Alexis' employer, *The Experts, Inc., had no insight into Alexis' chronic personal conduct issues during his Navy service* when they hired him and placed him in a position that required access to classified information."

Delorenzo Compl. Ex. 183 at 3 (emphasis added).

On the face of the allegations supporting Plaintiffs' common law negligence claims, it is evident that this case presents non-justiciable political questions. Plaintiffs seek to hold TEI liable for its failure to know information that was never disclosed to it by the Navy. See id. If this Court were to undertake an examination of what TEI "knew or should have known," when that information was never provided by the Navy, the first Baker factor would necessarily be implicated, thereby rendering these negligence claims non-justiciable.

**2.    There are a Lack of Judicially Discoverable and Manageable Standards for Deciding the Negligence Claims, which Cannot be Resolved Without Expressing a Lack of Respect for a Coordinate Political Branch of Government.**

Where it is impossible to ascertain a contractor's liability for the plaintiff's harm without also determining the military's liability for an act under its plenary control, the suit should be dismissed as invoking a non-justiciable political question. See Carmichael, 572 F.3d at 1294-95 (affirming dismissal of negligent supervision, training, and hiring claims against contractors where contractor training and supervisory policies were intertwined with military policies). Here, it is impossible to evaluate TEI's liability without also determining the Navy's liability for actions under its plenary control, including its decisions regarding Alexis' eligibility for

enlistment, the reporting of his misconduct during his military service, the granting and maintenance of his security clearance, and his discharge characterization and re-enlistment classification.  The Court does not have the necessary standards for evaluating the Navy's decisions on these issues, and to do so would necessarily express a lack of respect for this executive department, in violation of both the second and fourth <u>Baker</u> factors.  <u>See, e.g.</u>, <u>Taylor</u>, 658 F.3d at 411-12.

The Fourth Circuit's decision in <u>Taylor</u> is especially instructive here.  There, the court affirmed dismissal of a service member's negligence claim against a military contractor for injuries sustained from an electric shock allegedly caused by the contractor's negligence.  <u>Id.</u> Though the military itself did not exercise direct control over the contractor's conduct, the court dismissed the claims as posing non-justiciable political questions, because examining both the merits and the contractor's defenses would require questioning "actual, sensitive judgments made by the military."  <u>Id.</u> at 411.  Specifically, the claims ran afoul of the second and fourth <u>Baker</u> factors, because the court had no standards for evaluating who should be authorized to work on generators supplying power to a military base, and "any such judicial assessment thereof would show a lack of respect for the executive branch."  <u>Id.</u> at 412, n.13.

This same logic applies here.  Plaintiffs seek to impute knowledge of Alexis' past that was exclusively within the control of the Navy and other governmental agencies, and which was never disclosed in Alexis' discharge process or in JPAS, including:  pre-enlistment suitability and background investigations that failed to uncover the 2004 tire shooting incident; multiple arrests and other incidents while enlisted in the Navy, some involving the use of deadly weapons; and the Navy's ultimate determination to characterize Alexis' discharge as honorable and assign him a favorable reenlistment rating.  Each of these facts is inextricably intertwined in any analysis of the allegations supporting Plaintiffs' common law negligence claims, which this

Court cannot adjudicate at this stage of the proceedings, because it is without discoverable or manageable standards for first analyzing the decisions made by the military. These decisions go directly to what TEI "knew or should have known," allegations that are central to the Court's heightened foreseeability analysis.

The Court's undertaking of such an examination, whether focused on TEI's hiring of Alexis in September 2012, its re-hiring of him in June 2013, or the events of August 2013, would necessarily require it to focus on the totality of what TEI knew about Alexis that would have caused his mass murder to be highly foreseeable. It is respectfully submitted that the Court cannot do so without expressing a lack of respect for the executive department responsible for making the many sensitive judgments that directly impacted what TEI knew or did not know about Alexis. The Navy was in the only position to know and report the conduct on which Plaintiffs rely in their efforts to meet the heightened foreseeability standard applicable to their negligence claims. Unlike TEI, the Navy *was* aware of Alexis' history of questionable behavior, but at no time did those behaviors lead to the Navy's revoking his security clearance or discharging him with anything other than an honorable characterization. The Navy was similarly aware of Alexis' multiple arrests but failed to proceed with two administrative separation actions despite those arrests. Delorenzo Compl. Ex. 239, at 22-30. The Navy instead discharged Alexis with a valid, active clearance, an honorable discharge, and a positive re-enlistment classification. Id. These judgments by the Navy are in great part what ultimately led to Alexis' eligibility for hire by TEI. As in Taylor, dismissal is appropriate here because, on the face of these complaints, the essential element of duty underlying Plaintiffs' negligence claims inescapably calls into question the actual, sensitive judgments of the military.

Accordingly, TEI respectfully requests that the Court dismiss the claims sounding in negligence *per se* and negligence as a matter of law for want of subject matter jurisdiction pursuant to Rule 12(b)(1).

## II.        THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF.

Even if Plaintiffs' claims could be adjudicated without raising non-justiciable political questions, the claims fail to state a claim under Rule 12(b)(6).  As for Plaintiffs' negligence claims, the allegations supporting such claims fail to plead the essential element of any duty owed by TEI to Plaintiffs' decedents and to McCullough.  And Plaintiffs' vicarious liability claims for assault and battery fail because Alexis was not acting within the scope of his employment when he committed mass murder.

### A.        Motion to Dismiss Standard Under Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted).  These factual allegations "must be enough to raise a right to relief above the speculative level," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). This standard requires that the plaintiff do more than "plead[] facts that are merely consistent with a defendant's liability;" rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

The complaint must show – not merely allege in conclusory terms – that the plaintiff is entitled to relief.  Twombly, 550 U.S. at 555 n.3 ("Rule 8(a)(2) still requires a 'showing,' rather

than a blanket assertion, of entitlement to relief."). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (internal citation and quotation marks omitted). Conclusory allegations are not entitled to a presumption of truth, and legal conclusions must be supported by factual allegations. Iqbal, 556 U.S. at 681. In simplest terms, Plaintiffs are required to plead facts that, taken together, demonstrate a plausible claim for relief. This obligation is of particular importance in a case involving heightened foreseeability.

### B.      TEI Did Not Owe a Duty to Plaintiffs' Decedents or McCullough

As demonstrated above in the discussion of the political question doctrine, one of the essential elements of any of Plaintiffs' negligence claims, however couched, is a duty running from TEI to Plaintiff's decedents and to McCullough. Plaintiffs' complaints attempt to allege the existence of such a duty either under a negligence *per se* theory or "heightened foreseeability" theory. Each of these theories is addressed in turn, and we explain why, as a matter of law, neither has merit.

### 1.      No Duty to Plaintiffs' Decedents or McCullough Arose Under the National Industrial Security Program.

As discussed in Part I above, many of the allegations in Plaintiffs' complaints seek to avoid the stringent requirements of this District's heightened foreseeability standard by attempting to make out a negligence claim under a negligence *per se* theory; specifically, that TEI owed a duty to protect the physical security of Plaintiffs' decedents and McCullough under NISPOM and breached that duty by failing to file an adverse information report in August 2013. See, e.g., Delorenzo Compl. at ¶ 236(E). But as set forth in detail in that portion of the Motions to Dismiss filed by HPES to dispose of the negligence *per se* claims in these cases, which TEI

29

respectfully incorporates by reference here,[20] a negligence *per se* claim may only be based on a violation of a duty if "the alleged injuries were of the type which the statute was designed to prevent." McNeil Pharm. V. Hawkins, 686 A.2d 567, 578 (D.C. 1996).[21]  NISPOM is designed and intended to protect the unauthorized disclosure of classified information; it is not designed to prevent violent crime or protect human life.  See 58 Fed. Reg. 3479, § 101(a) (1993) ("The purpose of this program is to safeguard classified information that may be released or has been released to current, prospective, or former contractors, licensees, or grantees of United States agencies.").  See also Delorenzo Compl. Ex. 114, at § 1-100.  Accordingly, an alleged violation of NISPOM does not establish a duty owed to third parties such as Plaintiffs' decedents and McCullough, and Plaintiffs' theory of liability is without merit as a matter of law.

## 2.     No Duty to Plaintiffs' Decedents or McCullough Arose Under this District's Stringent Heightened Foreseeability Requirement.

With the benefit of hindsight informed by years of government investigation, collection of previously undisclosed facts, and intense scrutiny from the media and various federal agencies, Plaintiffs seek to impute all of that hindsight and knowledge to TEI in an effort to establish – at the pleading stage – that the mass murder committed by Alexis was highly foreseeable both at the time TEI hired him and throughout its employment of him.  Under the law of this District, however, the question is not whether Alexis' acts should have been highly foreseeable in light of what everyone knows *now*, but whether his mass murder was, as a matter

---

[20]   TEI also incorporates by reference the argument made by HPES with respect to the negligence *per se* claims raised in three of the complaints purportedly arising under the Occupational Health and Safety Act (OSHA) and the D.C. Industrial Safety Act (ISA), D.C. Code §§ 32-801 to-812 (2001).  Because OSHA and ISA are specifically designed to prevent workplace *accidents* and *illness* (and not intentional, violent criminal conduct), they similarly do not give rise to any duty of care on the part of TEI.  Accordingly, the claims raised in Count VII of the Kohler, Ridgell, and Zagami complaints should be dismissed.

[21]   NISPOM is not a statute or regulation, but a "manual" issued by the Department of Defense pursuant to Executive Order.  However, because Plaintiffs attempt to establish liability under it, TEI seeks dismissal on the basis that even if NISPOM were deemed to be a regulation, it does not establish a legal duty in tort to prevent the violent criminal acts of a third party.

of law, highly foreseeable to TEI given the limited number of facts about Alexis TEI *actually knew then*, when it hired Alexis or when TEI representatives interacted with him in August 2013. Plaintiffs do not – and cannot – allege that it was highly foreseeable to TEI that Alexis would commit mass murder at those specific moments in time prior to September 16, 2013. Their negligence claims fail accordingly.

### a.   The Heightened Foreseeability Standard

Where claims are made against a defendant for harm caused by the criminal act of another, the standard is substantially heightened and requires that the crime was particularly foreseeable to the defendant. Board of Trustees of Univ. of D.C. v. DiSalvo, 974 A.2d 868, 871 (D.C. 2009) ("The heightened foreseeability standard in District of Columbia law is premised on the assumption that the court must limit the extent to which defendants become the insurers of others' safety from criminal acts."). Courts of this Circuit have "repeatedly spoken of the heightened foreseeability requirement in terms of duty." Workman v. United Methodist Comm. on Relief of Gen. Bd. of Global Ministries of United Methodist Church, 320 F.3d 259, 265 (D.C. Cir. 2003). The defendant's requisite duty of care arises *only* when the specific harm alleged was particularly foreseeable to the defendant. See, e.g., Phillips v. Hope Vill., Inc., No. CIV.A. 02-0700 (RMC), 2005 WL 1279167, at *4 (D.D.C. May 31, 2005). It is not sufficient to allege that it was foreseeable that some harm might occur; plaintiffs must instead allege *that the particular harm that occurred was foreseeable to the defendant*. DiSalvo, 974 A.2d at 871.

The heightened foreseeability standard is exacting, extremely difficult to meet, and requires Plaintiffs at the motion to dismiss stage to offer precise, particularized allegations in support of their claims. See, e.g., Sigmund v. Starwood Urban Inv., 475 F. Supp. 2d 36, 42 (D.D.C. 2007) (collecting cases describing the heightened standard as "exacting," "demanding," "precise," and "restrictive"); Jones v. R.I. Associates, LLC., No. CIV.A. 02-01820RMC, 2005

WL 1475367, at *4 (D.D.C. June 22, 2005) (Collyer, J.) ("Where an injury is caused by the

intervening criminal act of a third party, this court has repeatedly held that liability depends upon

'a more heightened showing of foreseeability' than would be required if the act was merely

negligent.") (quoting <u>Bailey v. District of Columbia</u>, 668 A.2d 817, 819 (D.C. 1995)).  <u>See also</u>

<u>Romero v. Nat'l Rifle Ass'n of Am., Inc.</u>, 749 F.2d 77, 83 (D.C. Cir. 1984) ("[C]ivil liability for

the intervening, independent criminal acts of third parties is extraordinary, and District of

Columbia courts, in their development of common-law tort rules, have imposed especially

stringent requirements to support it.").

The question of whether a defendant owes a duty to a plaintiff under a particular set of

circumstances is entirely a question of law that must be determined by the court.  <u>Settles v.</u>

<u>Redstone Dev. Corp.</u>, 797 A.2d 692, 695 (D.C. 2002).  Negligence claims that fail to establish a

duty of care can be disposed of on a motion to dismiss.  <u>See, e.g.</u>, <u>Collier v. D.C.</u>, 46 F. Supp. 3d

6, 15-16 (D.D.C. 2014) (Collyer, J.) (granting motion to dismiss claims "couch[ed] … in the

language of negligence" for failure to assert that defendant owed plaintiff a heightened duty of

care where acts giving rise to plaintiff's injuries were caused by the intentional acts of a third

party); <u>G'Sell v. Carven</u>, 724 F. Supp. 2d 101, 108 (D.D.C. 2010) (granting defendants' motion

to dismiss negligence claims because plaintiff failed to meet heightened foreseeability standard

where harm was caused by third-parties' criminal acts).

### b.   No Duty to Plaintiffs' Decedents or McCullough Arose at the Time TEI Hired or Re-Hired Alexis.

The law of this District is exceedingly clear – to establish the existence of a duty on the

part of TEI, Plaintiffs must plausibly allege that the danger of the specific criminal act

perpetrated by Alexis – mass murder – was so foreseeable to TEI that a duty arose to protect

against it.  <u>DiSalvo</u>, 974 A.2d at 872-73 ("It is not sufficient to establish a general possibility that

the crime would occur, because … the mere possibility of crime is easily envisioned and

32

heightened foreseeability requires more precision."); see also Workman, 320 F.3d at 262 (a

defendant may be liable for harm caused by the criminal act of another only if that specific crime

was "particularly foreseeable.").  Nothing alleged in the complaints as to the totality of what TEI

actually knew at the time it hired or re-hired Alexis comes close to satisfying these exacting

standards:

- TEI knew the Navy had honorably discharged Alexis, assigned him the most favorable re-enlistment code, and provided Alexis with an evaluation that noted he was "promotable" and that retention was "recommended."  Delorenzo Compl. Ex. 239, at 29;

- TEI knew that Alexis had passed the necessary security clearance processes and remained eligible for access to classified information up to the SECRET level.  Id. at 25;

- TEI knew that Alexis' drug test came back negative and that his driving record was clear.  Id. at 31-32; and

- TEI knew that Alexis had not been convicted of any crime in the seven years prior.  Id. at 32.

*None* of these facts suggest in any manner that Alexis was dangerous or violent or had a history

with firearms.  They demonstrate no threat to the specific victims of Alexis' crime.  And they in

no way make it highly foreseeable that Alexis would commit the specific crime that he did –

mass murder.  See DiSalvo, 974 A.2d at 871.

These facts instead suggested that Alexis was who the Navy delivered out into the world

in January 2011: an apparently golden candidate with an active security clearance and a clean

record of health and conduct.  That the Navy knew a vastly different story has no bearing on

TEI's knowledge or liability, because the Navy failed to disclose what it truly knew about Alexis

– that he had been arrested twice for gun related charges, that he had lied during his enlistment

screening, and that he had almost been involuntarily removed from the Navy on two occasions.

Delorenzo Compl. Ex. 239, at 25-30; Proctor Compl. at ¶ 13.  TEI never knew of these facts until

after September 16, 2013 and could not consider them in its decision to hire Alexis.

### c.  Plaintiffs' Assertion that TEI "Should Have Known" About Alexis' Previous Bad Behavior is Baseless.

Throughout the complaints, Plaintiffs argue that TEI should have done more to uncover

the truth about Alexis' prior arrests, his erratic behavior, and his spotty military record.  This

argument fails as a matter of law.  TEI's only obligation – legal, contractual, or otherwise – to

conduct a background check of Alexis arose pursuant to its contract with HPES, and that

background check revealed no red flags of any kind.  Accordingly, no duty arose between TEI

and Plaintiffs' decedents or McCullough as a result of this information.

In the District of Columbia, employers like TEI are not required to conduct a criminal

background check of any kind on employees prior to hiring.[22]  TEI instead ran a background

check on Alexis pursuant to the HPES/TEI Agreement and complied with its requirements.

Specifically, the checks conducted by TEI complied fully with the requirements of Exhibit F of

the HPES/TEI Agreement, which provided that TEI must exclude from service any candidate

who had been *convicted* of one of a series of listed crimes during the seven (7) years prior to the

check.  See Ex. 1 at § 2.2(a), (d), and (e).  TEI conducted this search on September 19, 2012, and

confirmed that Alexis' record was clear of any criminal convictions between September 2005

---

[22]   While certain jobs involving work with vulnerable populations do require mandatory background checks in the District of Columbia, IT Professional is not one of them.  See, e.g., D.C. Code § 44-552 (healthcare workers);  D.C. Code § 24-211.41 (department of corrections employees);  D.C. Code § 4-1501.01-.11 (childcare providers).  There exists no general statute in this District that requires employees to conduct criminal background checks before hiring any employee.  In fact, reflecting District of Columbia public policy, recent changes to the D.C. Code through the Fair Criminal Record Screening Amendment Act of 2014 restrict the use and scope of background checks.  D.C. Code § 2-1402.66 makes it a violation of law to require any person to produce a copy of their arrest record.  In fact, D.C. law specifically prohibits employers from inquiring into a job applicant's arrest record or any criminal accusation against them that did not result in a conviction.  See D.C. Code § 32-1342.

and September 2012.[23]  Delorenzo Compl. Ex. 239, at 32.  This information, together with the

Navy's honorable discharge characterization and favorable re-enlistment code, confirmed that

Alexis was a qualified candidate.  TEI was aware of no facts whatsoever that suggested Alexis

was unsuitable for employment, let alone that he would commit the crimes he did.

     Plaintiffs attempt to avoid this truth by claiming a duty exists nonetheless because TEI

somehow should have known of Alexis' prior arrests before September 2012, even though they

did not appear in the background checks it conducted and were never disclosed by the Navy in

Alexis' discharge papers.  This argument similarly fails.  Most obviously, none of the complaints

plausibly allege that TEI had actual knowledge of these incidents, or access to information about

these incidents, prior to hiring Alexis on September 5, 2012 (or prior to his second hiring on July

8, 2013).  In fact, at least one Plaintiff admits that it was unlikely that TEI had knowledge about

the arrests.  See Proctor Compl. at ¶ 27.  The DoD Report similarly concludes that TEI "had no

insight into Alexis' chronic personal conduct issues during his Navy service when they hired

him."  Delorezo Compl. Ex. 183, at 20.  Absent *actual knowledge* of Alexis' prior arrests and

pre-hiring behavior, the facts surrounding those events obviously cannot be used to establish that

the crime resulting in Plaintiffs' injuries was particularly foreseeable to TEI.

### d.  No Duty to Plaintiffs' Decedents or McCullough Arose in August 2013.

     Throughout their complaints, Plaintiffs repeatedly make the conclusory allegation that

Alexis' behavior in early August 2013 made it highly foreseeable that he would commit mass

murder less than five weeks later.  See, e.g., Ridgell Compl. at ¶ 67; Halmon-Daniels Compl. at ¶

76.  Such conclusory allegations hold no water under the Iqbal/Twombly standards.  As for the

factual assertions made by Plaintiffs that purport to support this blanket assertion, this Court

---

[23]   TEI ran this comprehensive background check again in June 2013 with the same result –
Alexis's record was entirely clear.  Delorenzo Compl. Ex. 239, at 32.

should find that such alleged facts did not, as a matter of law, give rise to a duty on the part of TEI to protect against Alexis' criminal acts under the heightened foreseeability standard. While Alexis' behavior in Norfolk, Virginia and in Newport, Rhode Island in early August 2013 may, when viewed in a light most favorable to Plaintiffs' allegations, have been bizarre at times, it was not, in any way, predictive of murder. It did not involve a firearm or other deadly weapon. And it certainly did not involve or forecast Alexis committing mass murder, harming his co-workers, or even threatening to hurt anyone. A close examination of this incident makes clear that it was not foreseeable – let alone highly foreseeable – to TEI that Alexis would commit mass murder with a firearm more than a month later.[24]

Plaintiffs allege that TEI knew in August 2013 that Alexis believed he was being followed, that he had been disrupting other guests at the Navy Gateway Inns & Suites by making noise and by knocking on the walls, and that he had disheveled the bed. Delorenzo Compl. Ex. 239, at 33-34; Zagami Compl. at ¶ 37. Plaintiffs similarly allege that TEI contacted Alexis' mother on August 9, 2013 and that she communicated that Alexis had experienced paranoia in the past. Kohler Compl. at ¶ 52. Plaintiffs' do not and cannot allege, however, that any of this information made it highly foreseeable that Alexis was or would be violent or intended to harm others. They certainly do not allege that TEI was aware at any time prior to September 2013 that

---

[24] In contrast, compare this Court's decision in <u>Phillips v. Federal Bureau of Prisons</u>, where negligence claims survived a motion to dismiss solely because plaintiff averred that her son (a resident at a halfway house) had warned the staff at the halfway house that he had received a threat on his life, that the staff ignored this warning, and that her son was shot that same day in front of the halfway house. 271 F. Supp. 2d 97, 99 (D.D.C. 2003). Thus, plaintiff alleged "that the attack could have been – and should have been – reasonably anticipated and her son protected." <u>Id.</u> at 103. This result is not unexpected. Plaintiff there plausibly averred that the known threat was specific both as to the harm (murder) and to the potential victim (plaintiff's son). <u>Id.</u> at 99. Plaintiffs here have not plead, and cannot plead, any such nexus. There are no facts in any of the complaints – or even in the Navy Report or the DoD Report – that suggest that Alexis at any point made violent threats against his co-workers at the Washington Navy Yard or any other location or suggested that he intended to commit murder. There similarly are no allegations that TEI knew of such threats (since they never were made).

Alexis was capable of committing, or would commit, the crime he ultimately perpetrated at the Navy Yard on September 16, 2013.[25]

Plaintiffs similarly allege that Alexis' behavior was so severe in early August 2013 that law enforcement and co-workers needed to be called to the scene. Plaintiffs, however, fail to acknowledge that those very individuals – who interacted with Alexis at the scene – did not feel unsafe, threatened, or afraid Alexis would cause any harm to anyone, let alone commit mass murder. In a post-9/11 environment, the security guards at the Norfolk Airport interacted with Alexis on August 4, 2013 and allowed him to board his plane without incident. Delorenzo Compl. Ex. 239, at 32; Ridgell Compl. at ¶¶ 32-34. In Newport, multiple officers from both the Newport Naval Station Police and the Newport Police Department observed firsthand the events alleged to have occurred in Newport and felt it unnecessary to detain Alexis "because they believed he was not a threat, nor in need of immediate care or treatment." Delorenzo Compl. Ex. 239, at 33, 36-37; Ridgell Compl. at ¶ 43. In other words, the individuals specifically charged by law to protect human life and prevent crimes of violence concluded that Alexis was *not* going to endanger human life or commit a crime. And Summer Cole, his HPES supervisor, observed

---

[25] To the extent that Plaintiffs attempt to meet the heightened foreseeability standard by citing to incidents of past crime at military installations, such an attempt must similarly fail. See Proctor Compl. at ¶¶ 79-81; Zagami Compl. at ¶¶ 9-10; Kohler Compl. at ¶¶ 9-10; Ridgell Compl. at ¶¶ 7-8; Delorenzo Compl. (various references throughout). Information about past crime in general in a particular area is insufficient to establish heightened foreseeability. See, e.g., Clement v. Peoples Drug Store, Inc., 634 A.2d 425, 429 (D.C. 1993) (affirming directed verdict for defendant drug store because evidence of a "criminally active environment" is insufficient to prove foreseeability of employee's murder in store parking lot); Bailey v. District of Columbia, 668 A.2d 817, 820 (D.C. 1995) (holding that "generic information" of shootings in the vicinity was insufficient to show heightened foreseeability of shooting at junior high school cheerleading competition). The information regarding past crimes at military bases on which Plaintiffs attempt to rely here cannot form the basis of heightened foreseeability required, as they are akin to alleging that the crime took place in a high crime area as in Clement and Bailey. Just because a crime takes place in a "high crime area" does not make that specific criminal act more foreseeable. Similarly, just because a military installation may be more susceptible to attack does not make particular crimes at such locations so foreseeable that a duty arises to protect against them.

Alexis' behavior firsthand and dismissed it out of hand.  Ridgell Compl. at ¶¶ 41-42; Delorenzo

Compl. Ex. 239, at 35-36.  In fact, she felt so safe with Alexis that she allowed him to sleep in

the same hotel room with her while the incident in Newport was unfolding and had lunch with

him later that day.  Id. at 35-38.

Workman makes plain that what TEI knew of Alexis' behavior in August 2013 did not

make his actions on September 16th highly foreseeable.  See 320 F.3d 259 (D.C. Cir. 2003).  In

Workman, the plaintiff, on behalf of her daughter's estate, sued for wrongful death and claimed

that her daughter's murder was particularly foreseeable to the relief agency employing her as an

aid worker in Somalia.  Specifically, plaintiff claimed that the murder was foreseeable because

her daughter had emailed the agency that the possibility of her being kidnapped in Somalia was

"not farfetched."  Id. at 264.  The Court noted that, at the very most, the email from the daughter

put the agency on notice that a kidnapping was foreseeable if the Somalians did not receive all of

the aid expected and grew angry.  Id.  Between sending that February, 1999 email and her

murder in late March, 1999, however, the reason why the kidnapping was possible never

materialized.  Id.  Furthermore, during this period, the daughter extended her contract with the

agency, took an additional trip to Somalia without incident, and communicated with the agency

without expressing fear of any kind.  Id.  In other words, during this period, the arguably

foreseeable danger abated.  Given that all of these facts were known to the agency, the Court

held that the daughter's email did not put the agency on notice of the specific danger that *did*

later materialize (her murder), and thus her death was not foreseeable to the agency as a matter of

law.  Id. at 264-65.

Much like Workman, while Alexis' conduct in Newport in early August 2013 may

potentially have gave given rise to some potential concern, any such concern, however, would be

limited in time and place to Newport in early August 2013.  The danger that ultimately

materialized five weeks later at the Navy Yard was wholly unrelated and not foreseeable.

Plaintiffs reiterate again and again in their complaints that a TEI employee, Brenda Haberman

allegedly stated on August 6, 2013 that she was afraid Alexis might "harm others."  See, e.g.,

Proctor Compl. at ¶ 39; Halmon-Daniels Compl. at ¶ 39(c).  But whatever Haberman may or

may not have said on the other end of the phone in Florida, 2,000 miles away from the events in

question, the people who actually witnessed Alexis' behavior came to no such conclusion.  Thus,

to the extent Haberman or TEI owed any duty to anyone at that time and at that place, Haberman

discharged that duty by voicing those concerns to the desk clerk in Newport.  The police were

summoned, observed Alexis' behavior and hotel room first-hand, and determined that Alexis was

not a threat to anyone.  That was the beginning and end of any duty anyone at TEI owed to

anyone in Newport in August 2013, and could not give rise to a duty to anyone at the

Washington Navy Yard more than a month later.

Indeed, and as Haberman and other TEI personnel learned in the hours following these

incidents, any such concern never materialized.  Instead, as Plaintiffs must concede, as far as TEI

knew, Alexis acted in a calm and rational manner between August 7, 2013 and September 16,

2013 and was neither threatening, violent, nor alarming in any manner.  Alexis never indicated to

any TEI representative during this period that he intended to engage in violence, thought he was

under "constant bombardment by some sort of ELF weapon," had been put on medication after

two visits to VA hospitals, had purchased a firearm, or intended to commit murder.  All TEI

knew, and had reason to know during this time period, was that Alexis worked at four other

Navy project sites over the next month without incident.  Proctor Compl. at ¶ 67.

To overcome their pleading burden, Plaintiffs must plausibly allege that it was highly

foreseeable to TEI in August 2013 that Alexis would harm his co-workers at the Washington

Navy Yard in the manner he did.  They have failed to do so.  Plaintiffs instead aver that because

Alexis engaged in arguably bizarre, yet non-violent, behavior in August 2013, TEI had a duty to protect an indefinite class of persons for an indefinite period of time.  Such non-specific averments are insufficient to overcome meet this Court's exacting heightened foreseeability standard.  See, e.g., D.C. v. Beretta, U.S.A., Corp., 872 A.2d 633, 642 (D.C. 2005) (noting that the D.C. Court of Appeals has repeatedly "rejected liability as a matter of law where foreseeability (hence duty) was not limited by any evidentiary reference *to a precise location or class of persons*.") (emphasis added); G'Sell v. Carven, 724 F. Supp. 2d at 108. n. 5 (holding sexual assault not foreseeable to building owner even though plaintiff alleged security guard saw or should have seen assailants engaging in lewd (and potentially criminal) behavior in building lobby, because "their non-violent behavior did not make it foreseeable that they would violently attack plaintiffs."); see also DiSalvo, 974 A.2d at 872-73 ("It is not sufficient to establish a general possibility that the crime would occur, because … the mere possibility of crime is easily envisioned and heightened foreseeability requires more precision.").

### C.    Plaintiffs Fails to State a Vicarious Liability Claim for Assault and Battery.

Plaintiffs McCullough and Proctor bring claims for Assault and Battery against TEI.  See McCullough Compl. at Count II; Proctor Compl. at Count VII and Count VIII.  These claims are grounded in a *respondeat superior* theory of liability, whereby Plaintiffs seeks to hold TEI vicariously liable for the alleged intentional torts committed by Alexis.[26]  These claim must be dismissed, however, because an employer (such as TEI) cannot, as a matter of law, be liable under a *respondeat superior* theory for the intentional torts of employees if the torts were not

---

[26]    Plaintiff McCullough also brings a separate claim for "Respondeat Superior Liability" at Count IV.  This claim, however, does not appear to be any different from the previously-asserted claim of negligence.  See McCullough Compl. at ¶ 94 ("Defendants are liable *respondeat superior* for negligence, gross negligence and deliberate indifference of its agents as alleged in Count I, supra.").   In any event, *respondeat superior* is a theory of derivative liability for some underlying tort, not a cause of action.

carried out in furtherance of the employment relationship.  See, e.g., Stevens v. Sodexo, Inc., 846

F. Supp. 2d 119, 129 (D.D.C. 2012).  To fall within the scope of employment, "the tortious

activity 'must be actuated, at least in part, by a purpose to further the master's business,' and this

'intent or purpose ... excludes from the scope of employment all actions committed solely for

[the servant's] own purposes.'" D.C. v. Bamidele, 103 A.3d 516, 525 (D.C. 2014) (internal

citations omitted).[27]  See also Boykin v. District of Columbia, 484 A.2d 560, 564 (D.C. 1984)

(holding sexual assault on student by employee of public school for deaf children fell outside

scope of assailant's employment, noting fact that job responsibilities "afforded [employee] the

opportunity" to commit the crime was insufficient to make the defendant vicariously liable for

his acts).

Alexis was clearly not acting within the scope of his employment when he committed

mass murder on September 16, 2013.  Instead of plausibly alleging that Alexis was acting within

the scope of his employment (which they cannot do), Plaintiffs instead pleaded legal conclusions

that need not be accepted by the Court.  See McCullough Compl. at ¶¶ 80, 82 ("Defendant's

employee, in furtherance of defendant's business and within the scope of employment, without

fault or provocation by Plaintiff, violently shot at and attempted to kill Plaintiff…"); Proctor

Compl. at ¶ 202 ("Alexis was acting within the apparent scope of his employment and/or

agency.").  These allegations in no way, however, establish that Alexis was acting within the

scope of his employment when he intentionally and violently murdered and assaulted several

individuals, and the counts seeking to hold TEI vicariously liable for such must be dismissed.

---

[27]  The D.C. courts follow the Restatement (Second) of Agency § 228 (1958) when determining
whether an action falls within the scope of the employment relationship.  The Third
Restatement of Agency articulates a similar test, but the District of Columbia Court of
Appeals has not adopted this test.  See Bamidele, 103 A.3d at 525.  In either case, however,
plaintiffs have failed to show that Alexis acted within the scope of his employment under
either test.

In addition, the applicable statute of limitations for assault and battery in the District of Columbia is one (1) year from the incident at issue.  <u>See</u> D.C. Code § 12-301(4).  McCullough filed her Complaint on September 15, 2015, nearly two years from the September 16, 2013 incident on which the assault and battery allegedly occurred.  Accordingly, McCullough's claim for assault and battery is time-barred.

**CONCLUSION**

For all of the reasons stated above, Defendant, The Experts, Inc., respectfully requests that this Court grant its motion and dismiss Plaintiffs' Complaints in full.

Respectfully submitted,

/s/ Jeffrey E. McFadden
Jeffrey E. McFadden (D.C. Bar No. 434234)
Mark E. Chopko (D.C. Bar No. 410353)
STRADLEY RONON STEVENS & YOUNG, LLP
1250 Connecticut Avenue, N.W., Suite 500
Washington, DC 20036
 (202) 507-5150

<u>Dated</u>: December 11, 2015

# 2683367  v. 4